# EXHIBIT B

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | | |
|---|---|---|
| **Bailey Ziencik,** an individual | ) | Case No._____ |
| And | ) | |
| **Kelly Ziencik**, an individual | ) | |
| And | ) | COMPLAINT |
| **Pascale Wasson,** an individual | ) | |
| **Plaintiffs,** | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| **Snap, Inc. d/b/a SnapChat** a Corporation; | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Bailey Ziencik, , individually, and Plaintiff Kelly Ziencik, individually,  and Plaintiff Pascale Wasson, individually, (collectively "Plaintiffs") by and through their attorney Lee W. Davis, Esquire and the Law Offices of Lee W. Davis, Esquire, L.L.C. allege against Defendant Snap,Inc., d/b/a SnapChat, a Corporation, the following:

### INTRODUCTION AND SUMMARY OF ACTION

This Products Liability Tort Action is brought on behalf of Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson for personal injuries factually and proximately caused, facilitated and exacerbated by Defendant Snap Inc., d/b/a SnapChat (hereinafter "the Defendant Product") by inactions and actions, failure to adhere to Defendant Product's own unconscionable Terms of Service and Law Enforcement Guide, and to reasonably

3

and foreseeably protect Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson from personal injury.

As alleged with greater particularity in the paragraphs below, central to the Defendant Product's design and operation, is anonymous text messaging which is alluring to predators. The Defendant Product advertises and promotes itself as a clandestine text message service, used on smartphones and computers, that deletes intimate, ephemeral messages.  The Defendant Product's servers are designed to automatically delete messages sent in one-on-one Chat after both users have opened and left the Chat.

The Defendant Product, by and through employees and/or agents, acted with impunity, after the Defendant Product was alerted on multiple occasions, through the Defendant Product's own internal messaging system, multiple law enforcement agencies and Search Warrant(s) to the threats of imminent death or serious bodily injury to Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

The Defendant Product is being held accountable in this Complaint for the Defendant Product's acts, systems, procedures and/or practices.

The Defendant Product is intentionally designed to alert a perpetrator, not protect the Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson, victims of substantiated, violent threats, nor protect a member of Plaintiff Bailey Ziencik's household, Plaintiff Kelly Ziencik. The Defendant Product hindered multiple law enforcement agencies which were seeking information about credible threats or harmful activity communicated while using the Defendant Product.  The Defendant Product's failure to take prompt and effective action to prevent continued threats and identify the perpetrator of the threats of bodily harm or imminent death caused and exacerbated the injuries of Plaintiffs.

The Defendant Product is intentionally and defectively designed to thwart law enforcement investigations which exacerbated harm and injuries to the Plaintiffs. The Defendant Product is intentionally and defectively designed to protect perpetrators of threats, not victims of known, credible threats. This Complaint outlines the abject failure of the Defendant Product to warn about known threats. The Defendant Product's user accounts are by default public, allowing any user to contact any other user, thus exposing users as young as 13 years to online threats. This Complaint outlines the contemptable failure of the Defendant Product to timely respond to Search Warrants of this Court or any court, law enforcement, or Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik or Plaintiff Pascale Wasson concerning substantiated, credible threats which caused and exacerbated severe harm and injury to the Plaintiffs. This Complaint outlines the Defendant Product's utter failure to operate as a normal consumer/user would expect.  Once threats were received by the Plaintiff Bailey Ziencik, the Defendant Product gave itself discretion to choose to ignore reports of credible, substantiated violent threats of imminent death or serious bodily injury or harm by Search Warrant reported to the Defendant Product.

The Defendant Product, as explained below, ignored repeated, reported, credible threats and exacerbated the harm and created harm to Plaintiffs by failing to respond to the reporting by Plaintiff Bailey Ziencik  and Plaintiff Pascale Wasson through the Defendant Product's internal messaging system, while protecting the perpetrators of threats. The Defendant Product is designed defectively to hinder law enforcement investigations of credible and substantiated threats.  While the Communications Decency Act (CDA) of 1996 47 U.S.C. § 230 grants broad immunity to websites for publishing information provided by third parties, it DOES NOT grant immunity for a website's own statements or conduct. This complaint outlines the Defendant Product's conduct and defectively designed policy, custom and practice.

**Parties**

1.      Plaintiff Bailey Ziencik is a resident of Westmoreland County, Pennsylvania, and at the time of incident at issue, above the age of 18, and a student, during the relevant time period, at The University of Pittsburgh in Pittsburgh, PA.

2.      Plaintiff Kelly Ziencik is a resident of Westmoreland County, Pennsylvania, above the age of 18 and member of the household of and mother of Plaintiff Bailey Ziencik.

3.      Plaintiff Pascale Wasson is a resident of Wellesley, Massachusetts and at the time of incident at issue, above the age of 18, and a student, during the relevant time period, at Amherst College in Amherst, Massachusetts.

4.      Defendant Snap, Inc., d/b/a SnapChat, is a Corporation with principal place of business in California, organized under the laws of the State of Delaware.

**Jurisdiction and Venue**

5.      This Products Liability Tort Action is brought under the laws of the Commonwealth of Pennsylvania and under the common law of the Commonwealth of Pennsylvania. The Plaintiffs herein bring this action based entirely upon the common and statutory laws of the Commonwealth of Pennsylvania, and the Plaintiffs do not rely upon any federal constitutional provision, federal statute, or federal law in bringing this action, and do not seek relief in this Complaint under any federal constitutional provision, statute or law.

6.      To the extent that the Defendant Product will contend that the Plaintiffs are seeking relief in this Complaint under a federal constitutional provision, statute or law, the Plaintiffs expressly deny said contentions.

7.      The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question, as the Defendant Product, specifically and purposely availed itself in this matter of the

rights and privileges of the Magisterial District Court and Court of Common Pleas of Allegheny County, Pennsylvania and laws and statutes of the Commonwealth of Pennsylvania.

8.      The Defendant Product affirmatively compelled legal process in the Magisterial District Court and Court of Common Pleas of Allegheny County, Pennsylvania and laws and statutes of the Commonwealth of Pennsylvania which demanded multiple Search Warrants (Exhibits 8 & 10) be issued under the laws of the Commonwealth of Pennsylvania in this matter.

9.      Thus, by the Defendant Product's own actions, compelling multiple Search Warrants in the Courts of Allegheny County, Pennsylvania, the Court of Common Pleas of Allegheny County, Pennsylvania has personal jurisdiction over the Defendant Product.

10.      Removal is improper. Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from any act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office). No claim of admiralty or maritime law is raised. Plaintiffs did not sue a foreign state or agency. Accordingly, since Plaintiffs have waived all potential federal causes of action, there is no federal question jurisdiction under 28 USC §1331.

11.      The tortious injuries to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson are the result of the Defendant Product, defectively designed, that failed to warn of its inherent dangers, facilitated threats, ignored credible, substantiated reports of threats directed to violently harm Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, delayed law enforcement investigations and attempted to protect and shield the perpetrator of threats from law enforcement investigations.

12.      Justice Holmes stated, "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he

had been present at the effect, if the state should succeed in getting him within its power."

*Christopher Strassheim* v. *Milton Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911).

13.     The Pennsylvania long arm statute conveys personal jurisdiction of this Court over the

Defendant Product:

> **§ 5322.  Bases of personal jurisdiction over persons outside this Commonwealth.**
>
>    **(a)  General rule.--**A tribunal of this Commonwealth may exercise personal jurisdiction over a person (or the personal representative of a deceased individual who would be subject to jurisdiction under this subsection if not deceased) who acts directly or by an agent, as to a cause of action or other matter arising from such person:
>    (1)  Transacting any business in this Commonwealth. Without excluding other acts which may constitute transacting business in this Commonwealth, any of the following shall constitute transacting business for the purpose of this paragraph:
>                 (i)  The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.
>                 (ii)  The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts
>    …
>    (4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.
>    …
>    (10) Committing any violation within the jurisdiction of this Commonwealth of any statute, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit.
>    *42 Pa.C.S.A. § 5322*

14.     The Defendant Product specifically compelled, delayed and responded to legal process

(the Original Search Warrant - Exhibit 6) by the District Justice Maureen McGuire-Desent,

District Court 05-0-04 of Allegheny County, Pennsylvania and therefore the "doing of [that]

single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or

otherwise accomplishing an object with the intention of initiating a series of such acts in the

Courts of Allegheny County, PA" to secure an unnecessary series of search warrants, delay

providing information to law enforcement, exacerbating harm, and causing tortious injury to

Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik in Pennsylvania and Plaintiff Pascale Wasson in Massachusetts.

15.     Venue is proper in Allegheny County, Pennsylvania because a substantial part of the events or omissions giving rise to the claim occurred in Allegheny County, Pennsylvania.

16.     A terroristic threat is committed, at least in part, in the state in which the victim receives it, are persuasive and are compatible with our conclusion that, in order for a communication to be conveyed in satisfaction of the terroristic threats statute, it must be received by another person. *Commonwealth* v. *Vergilio*, 2014 PA Super 254, 103 A.3d 831 (Pa. Super. Ct. 2014).

17.     The Communications Decency Act (CDA) of 1996 47 U.S.C. § 230 does not apply because this action arises from the Defendant Product's failure to follow their own internal procedures which failure directly caused and exacerbated Plaintiffs' damages and the Defendant Product did not follow applicable state law.

18.     The CDA does not apply to this action as this action does not necessarily arise from any "published content". The gravamen of this action is the Defendant Product's failure to follow their own internal procedures for reporting violent behavior and the subsequent injuries and damage caused directly by the Defendant Product's failure to follow those procedures. The Defendant Product's procedures for reporting were followed exactly as specified by Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson in futility and caused and exacerbated their damages while the Defendant Product continued to fail to act as the Plaintiffs' damages were compounded by the Defendant Product's inaction. In addition, the Defendant Product failed to follow state law as the Defendant Product failed to comply with a duly issued search warrant which was executed by District Justice Maureen McGuire-Desent, District Court 05-0-04 of Allegheny County, Pennsylvania on January 2, 2019. The Defendant Product's failure to

respond to the search warrant(s), as is required by law, is a direct cause of Plaintiffs' damages and the exacerbation of Plaintiffs' damages.

## FACTS

19.    Defendant Snap, Inc. d/b/a SnapChat (Defendant Product) is a camera, i.e. a product. (Exhibit 1)

20.    The Defendant Product allows intimate text messages between and among users.

21.    The Defendant Product is an Application or "App" available for download, intended for use on the Apple or Android operating system on smartphones, as well as a website accessible from any personal computer with internet access. (Exhibit 2, Page 4)

22.    Snap, Inc. is listed on the New York Stock Exchange. It is not a "startup" technology company lacking resources. Snap Inc. operates a camera company. The company offers Snapchat, a camera application that helps people to communicate through short videos and images called Snaps. It also provides Camera, a tool to personalize and add context to Snaps; Chat that allows creating and watching stories, chatting with groups, making voice and video calls, and communicating through a range of contextual stickers and Bitmojis; and Discover that helps surfacing the stories and shows from publishers, creators, and the community based on a user's subscriptions and interests. In addition, the company offers Snap Map, which brings to a live map of individual location, showing nearby friends, popular stories, and a heatmap of recent snaps posted; Memories that allows users to choose to save the Snaps they create in a searchable personal collection, and users to create Snaps and stories from their saved Snaps and camera roll; and Spectacles, a hardware product that connects with Snapchat and captures video from a human perspective. (Exhibit 3)

23.     By default, when a new user creates a new user account with the Defendant Product, that new user account is public, i.e., visible to all other users of the Defendant Product.

24.     On or about the late evening of December 18, 2018, near midnight, Plaintiff Bailey Ziencik, a consumer, was using the Defendant Product in a manner for which the Defendant Product was intended.

25.     Then, Plaintiff Bailey Ziencik received an attempt to communicate via the Defendant Product from the perpetrator of subsequent threats.  The perpetrator tried to induce Plaintiff Bailey Ziencik into communication by falsely claiming that they were prior acquaintances. Plaintiff Bailey Ziencik did not initiate communication with the perpetrator.

26.     On or about midnight on December 18, 2018, initially innocuous text messages from the perpetrator using the Defendant Product turned violent and threating to Plaintiff Bailey Ziencik's physical person.

27.     The text messages threatened violent, physical attack specifically stating the attack would happen to the Plaintiff Bailey Ziencik while she going about her normal daily activities as a student on The University of Pittsburgh Campus.

28.     The multiple messages included claims by the perpetrator to be a junior at the University of Pittsburgh and also threated that the perpetrator "knows where she lives", and "will slash her throat." (Exhibit 4, Page 1)

29.     The only tool available to Plaintiff Bailey Ziencik within the Defendant Product was the ability to block the initial Defendant Product perpetrator user account. After Plaintiff Bailey Ziencik blocked the initial account, the perpetrator utilized different Defendant Product user accounts to escalate the terror and the threats of bodily harm to the Plaintiff Bailey Ziencik.

30.     Once Plaintiff Bailey Ziencik blocked the username "rmoney8211," she immediately began receiving more messages from the usernames "wsullovan7" and "rmoneyl890. (Exhibit 4 at Page 1)

31.     "At this time, [Plaintiff Bailey] Ziencik also received a message stating 'You think you can block me? I have 15 fake usernames to get to you.'" (Exhibit 4 at Page 1)

32.     Plaintiff Kelly Ziencik, Plaintiff Bailey Ziencik's mother, and member of her household, was present, and eye witnessed the receipt of the threatening text messages.

33.     The anonymity of location of the source of the threat and identity of perpetrator of the threats is integral to the design of the Defendant Product.

34.     The Defendant Product, upon information and belief, is omniscient as to all user activity using the Defendant Product.

35.     Upon information and belief, the Defendant Product's employees/agents are constantly aware, contemporaneously, in real time, of certain relevant information, including the phone number linked to a user account; the user's location data, their message metadata, which may show who they spoke to and when, their Internet protocol or IP address, the network accessing the Defendant Product, device type, the duration of time the Defendant Product was accessed, and the internet service provider.

36.     The location and identity of the individual threating physical harm and violence was completely unknown to Plaintiff Bailey Ziencik or Plaintiff Kelly Ziencik in the late night of December 18, 2018.  The location and identity of the perpetrator was known to the employees/agents of the Defendant Product immediately upon the transmission of the threatening messages.

37.     On or about December 18, 2018, Plaintiff Bailey Ziencik utilized the Defendant Product's advertised, internal messaging system to alert the Defendant Product to the violent threats. (Exhibit 5)

38.     The Defendant Product's advertised, internal messaging system has never responded, nor has any representative of the Defendant Product responded, in any manner, to Plaintiff Bailey Ziencik or Plaintiff Kelly Ziencik.

39.     On or about December 19, 2018, Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik jointly contacted local police (Allegheny Township, Pennsylvania) and subsequently filed a report of the threats made to Plaintiff Bailey Ziencik.

40.     On or about December 19, 2018, Plaintiff Bailey Ziencik continued to receive additional threats via the Defendant Product from the same perpetrator.

41.     The threats of violence and harm were specifically directed at Plaintiff Bailey Ziencik's activities in, on and around The University of Pittsburgh Campus in Pittsburgh, PA.

42.     On or about December 19, 2018, Plaintiff Bailey Ziencik reported the incident to The University of Pittsburgh Police. (See Exhibit 4)

43.     On or about December 19, 2018, The University of Pittsburgh Police relied on the Defendant Product's Law Enforcement Guide Section IX Sample Language for Preservation Request and created a preservation request. (Exhibit 2, Page 13).

44.     On December 19, 2018 The University of Pittsburgh requested a preservation order be issued by the Defendant Product for usernames: "rmoney8211," "rmoneyl890" and "wsullovan7/" for all information including but not limited to associated email addresses, phone numbers, display names, Snapchat account creation dates and IP addresses, Timestamps and IP addresses of

account logins and logouts, logs of previous Snaps/Stories, and Chats, location data, and content. (Exhibit ).

45.     The University of Pittsburgh Police did not receive a response from the Defendant Product though relied on the Defendant Product's Sample Language for Preservation Request when creating the preservation request. (Exhibit 2)

46.     The Defendant Product notified at this point, in multiple ways, by Plaintiff Bailey Ziencik and The University of Pittsburgh Police of the substantiated threats of severe bodily injury or imminent death being made by the perpetrator, permitted the perpetrator to continue his unabated use of the Defendant Product as his platform to threaten victims. The perpetrator continued to use of the Defendant Product in contravention of the Defendant Product's Terms of Service.

47.     Then, on or about the evening of December 27, 2018, Plaintiff Pascale Wasson, a consumer, was using the Defendant Product in a manner for which the Defendant Product was intended.

48.     Then, Plaintiff Pascale Wasson received an attempt to communicate via the Defendant Product from the perpetrator of subsequent threats.

49.     Plaintiff Pascale Wasson's threats were sent by the same perpetrator using the same Defendant Product user accounts that threatened severe bodily injury or imminent death to Plaintiff Bailey Ziencik more than 10 days prior.

50.     The same perpetrator tried to induce Plaintiff Pascale Wasson into communication by falsely claiming that they were prior acquaintances. Plaintiff Pascale Wasson did not initiate communication with the perpetrator.

51.     On or about December 27, 2018, initially innocuous text messages from the perpetrator using the Defendant Product turned violent and threating to Plaintiff Pascale Wasson's  physical person. (Exhibit 7)

52.     The text messages threatened violent, physical attack specifically stating the attack would happen to the Plaintiff Pascale Wasson while she going about her normal daily activities as a student on the Amherst College Campus in Amherst, Massachusetts.

53.     On December 27, 2018, Plaintiff Pascale Wasson utilized the Defendant Product's advertised, internal messaging system to alert the Defendant Product to the violent threats.

54.     The Defendant Product's advertised, internal messaging system has never responded, nor has any representative of the Defendant Product responded, in any manner, to Plaintiff Pascale Wasson.

55.     On or about Saturday, December 29, 2018, the Defendant Product was contacted by a second law enforcement agency. The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police Department requested the same Defendant Product user account information by administrative subpoena because of the same or similar violent threats to harm yet another victim, Plaintiff Pascale Wasson. (Exhibit 7)

56.     On or about January 2, 2019, the Original Search Warrant was issued pursuant to PACC Title 18: 2709 (a)(4), PACC Title 18:2709(a)(5), PACC Title 18:2706(a)(1) by District Justice Maureen McGuire-Desent, District Court 05-0-04 of Allegheny County, Pennsylvania and transmitted to the Defendant Product at Snap Inc, 2772 Donald Douglas Loop North, Santa Monica, CA 90405, Attention: Custodian of Records (lawenforcement@snapchat.com). (Exhibit 8)

15

57.     The Original Search Warrant of January 2, 2019 identified credible threats via the Defendant Product and requested basic subscriber information for the Defendant Product user accounts associated with the usernames "rmoney8211," "rmoneyl890," and "wsullovan7" consisting of the email address, phone number, account creation date, and timestamps and IP address for the account logins/logouts. (Exhibit 8).

58.     Included within the Original Search Warrant issued by this Court to The University of Pittsburgh Police, and directed to the Defendant Product, the Defendant Product is notified of the specific violent threats to Plaintiff Bailey Ziencik including "Don't walk on campus alone" and "I'm going to slash your throat in when I see you on campus." (Exhibit 8, Page 3)

59.     Additionally, within the Original Search Warrant, The University of Pittsburgh Police "respectfully request an order prohibiting [the Defendant Product] from notifying the affected users in relation to the 'Snap User Notice Policy' due to the nature of the threats received and the subsequent possibility of retaliation which could result in serious bodily injury." (Exhibit 8, Page 3)  The University of Pittsburgh Police attempted to follow the Defendant Product's Law Enforcement Guide in order to ensure the safety of Plaintiff Bailey Ziencik.

60.     At this point, The Defendant Product did not respond to the Court's Original Search Warrant with responsive information nor a Motion in opposition to disclosure. (Exhibit 4)

61.     Without a response from the Defendant Product, and still unaware of the location of the perpetrator, The University of Pittsburgh Police, on behalf of the Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik, again attempted contact with the Defendant Product on January 10, 2019. (Exhibit 4)

62.     Initially, on January 10, 2019, The University of Pittsburgh Police telephoned "the Law Enforcement number, with negative results." (Exhibit  4)  Upon information and belief, the

Defendant Product's advertised, phone number found in the Defendant Product's Law Enforcement Guide, relied on by The University of Pittsburgh Police Department for the benefit of Plaintiffs, was inoperable, did not answer and/or was disconnected.

63.    Unable to speak with a live Defendant Product agent or employee via the advertised Law Enforcement phone number, The University of Pittsburgh Police, on behalf of Plaintiff Bailey Ziencik, then contacted the Defendant Product by email (Case #35378999) on January 10, 2019. (Exhibit  9, Page 4)

64.    Fourteen (14) days later, on January 24, 2019, the Defendant Product responded to the administrative subpoena from The Norfolk County, Massachusetts District Attorney's Office with the identity and location of the perpetrator of Plaintiff Pascale Wasson. (Exhibit 7) The same perpetrator of threats to Plaintiff Bailey Ziencik.

65.    Five (5) days later on January 29, 2019, after responding to the Wellesley Massachusetts Police, nineteen (19) days after The University of Pittsburgh Police attempted contact with the Law Enforcement Hotline and emailed the Defendant Product as advertised in the Defendant Product's Law Enforcement Guide, now more than a month after Plaintiff Bailey Ziencik's initial report of threat of bodily injury or imminent death, the Defendant Product responded to the Original Search Warrant. (Exhibit 4)

66.    0n January 29, 2019, the Defendant Product responded to the Original Search Warrant, advising that the "legal process" that was submitted would not prohibit them from notifying the owner (the perpetrator) of the aforementioned usernames. Furthermore, the Defendant Product advised that the information requested would be retained for 30 days, pending a response for further action or dismissal of the requested information. (Exhibit 4, Page 4)

67.     Thus, even after violent threats of bodily injury or imminent death to Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, and Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's messages through the Defendant Product's internal messaging system, along with inquiry of The University of Pittsburgh Police and the Original Search Warrant (Exhibit 8) issued according to Defendant Product's Law Enforcement Guide, the Defendant Product refused to respond. In addition, the Defendant Product had evidence that the same perpetrator threatened Plaintiff Pascale Wasson using the Defendant Product and inquiry by the Wellesley Massachusetts Police about the same perpetrator, yet the Defendant Product threatened The University of Pittsburgh Police that it would notify the perpetrator of the pending law enforcement investigations. The Defendant Product made its own discretionary decision to protect the perpetrator which continued to severely harm and jeopardize Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's safety.

68.     At this point in time, the Defendant Product did not provide the information demanded in the Original Search Warrant.

69.     According to the Defendant Product's normal operation and design, the Defendant Product continued protecting the perpetrator of a credible threat of violence and bodily injury or death, unreasonably and unconscionably, rather than aid and protect the victims.

70.     Even though the Defendant Product had been notified of credible threats by multiple law enforcement agencies, the Defendant Product is designed to inform the threat perpetrator. This further delayed law enforcement's investigation and continued to compromise Plaintiff Bailey Ziencik's personal safety, increasing harm, injury and damage to the Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik.

71.     The Defendant Product, at its sole discretion, determined that the Original Search Warrant, and contrary to the explicit language that comports with the Defendant Product's Law Enforcement Guide, would not protect the victim and a Second Search Warrant must be issued under Seal. Otherwise, the Defendant Product claimed it was either going to notify the perpetrator or ignore the Original Search Warrant by design.

72.     Thus, The University of Pittsburgh Police were compelled by the Defendant Product's unacceptable response to the Original Search Warrant to request a *Second* Search Warrant under Seal in the Court of Common Pleas of Allegheny County, Pennsylvania for the exact same information and materials as requested in the Original Search Warrant.

73.     On January 31, 2019, the Honorable Judge David Cashman of this Court, the Court of Common Pleas of Allegheny County, issued a Second Search Warrant under Seal directed to the Defendant Product pursuant to PACC Title 18: 2709 (a)(4), PACC Title 18:2709(a)(5), PACC Title 18:2706(a)(1) and "for good cause stated in the affidavits the Search Warrant Affidavits are sealed for 60 days by my certification and signature. (Pa.R.Crim.P. 211)" (Exhibit 10)

74.     The Second Search Warrant issued Under Seal was transmitted to the Defendant Product on January 31, 2019. (Exhibit 10)

75.     The Second Search Warrant was the fifth notice directed to the Defendant Product of credible threats sent from the same Defendant Product user accounts confirmed by The University of Pittsburgh Police and the Wellesley Massachusetts Police.

76.     On or about February 6, 2019, (Exhibit 9) the Defendant Product belatedly responded to the Original Search Warrant demands having initially refusing to follow the requirement.

77.     This response was more than 45 days after the Plaintiff's notice through the Defendant Product's internal messaging system and more than 30 days after the issuance of a valid Original

Search Warrant of District Court 05-0-04 of Allegheny County, Pennsylvania at the request of The University of Pittsburgh Police on Plaintiff Bailey Ziencik's behalf.

78.     The Defendant Product states in its response letter dated February 6, 2019, "Pursuant to your legal process dated *January 2, 2019*, attached is account information for the Snapchat user(s) rmoney8211 , wsullovan7, rmoneyl890, as well as a response letter and Certificate of Authenticity." *Emphasis added.* (Exhibit 9)

79.     The Defendant Product gave an untimely response (on February 6, 2019) to the initial January 2, 2019 Original Search Warrant that it had previously refused to answer. Upon information and belief, the Defendant Product has not answered the Second Search Warrant of January 31, 2019 that Defendant Product needlessly compelled.

80.     The Defendant Product has never responded to Plaintiff Bailey Ziencik, nor Plaintiff Pascale Wasson, through the Defendant Product's internal message system, nor, upon information and belief, the Second Search Warrant issued under Seal by Honorable Judge David Cashman of this Court, the Court of Common Pleas of Allegheny County issued on January 31, 2019.

81.     The Defendant Product intentionally refused to provide the information according to the Original Search Warrant issued by the District Court of Allegheny County, PA for nearly six weeks. Then, after the Defendant Product compelled the Second Search Warrant, inexplicably, the Defendant Product, at its own discretion determined that the Original Search Warrant was sufficient for the Defendant Product to release the information requested. This six-week delay of the response to the Original Search Warrant was an intentional, conscious act in wanton, reckless disregard of the legal duty the Defendant Product owed to the Court and Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

82.    This six-week delay exacerbated the harm and injury to Plaintiff Bailey Ziencik, Plaintiff

Kelly Ziencik and Plaintiff Pascale Wasson, whom were relying on the advertised and implied

Defendant Product Terms of Service (Exhibit 11) and Law Enforcement Guide. (Exhibit 2)

83.    As a result of the Defendant Product's six-week delay in responding to the Original

Search Warrant, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson,

The University of Pittsburgh Police, and the Wellesley Massachusetts Police remained unaware of

the source or location of the perpetrator of the threats.

84.    Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and The University of Pittsburgh Police

could only assume that the perpetrator of the credible threats of violence and threats to bodily

injury and harm of Plaintiff Bailey Ziencik stalked The University of Pittsburgh Campus in

Pittsburgh, Pennsylvania which caused continuous disruption to Plaintiff Bailey Ziencik's daily

activities and exacerbated harm and injuries.

85.    Plaintiff Pascale Wasson and the Wellesley Massachusetts Police could only assume that

the perpetrator of the credible threats of violence and threats to bodily injury and harm of Plaintiff

Pascale Wasson stalked Amherst College Campus in Amherst, Massachusetts which caused

continuous disruption to Plaintiff Pascale Wasson's daily activities and exacerbated harm and

injuries. The Wellesley Massachusetts Police notified the Amherst College Police of the threats to

harm Plaintiff Pascale Wasson on the Amherst College Campus. (Exhibit 7)

86.    Upon information and belief, according to the metadata belatedly provided by the

Defendant Product in response to the multiple Search Warrants, there are hundreds, if not

thousands, of victims of the same perpetrator, with known continued threats of violence against

the other users, unabated by the Defendant Product. As a result of the Defendant Product's

substantial and inexcusable delay in response, the information provided only pointed to a possible, not definitive, location of the perpetrator at a prior point in time.

87.     The Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik sought the assistance of the Westmoreland County, Pennsylvania District Attorney's Office, a *third* law enforcement agency, to try to establish, definitively, the present location of the perpetrator of the threats.

88.     Unable to definitively establish the present location of the perpetrator with the aid of a third law enforcement agency, the Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik sought the aid of the Federal Bureau of Investigation.

89.     Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson were only made conclusively aware of the identity and the whereabouts of the perpetrator of the threats on August 1, 2019 when the perpetrator was arrested by Federal Law Enforcement Agents in Texas, more than seven (7) months after initially reporting the threats to the Defendant Product and law enforcement.

90.      On March 3, 2020, the perpetrator of these violent threats using the Defendant Product pleaded Guilty to a Federal Felony and was sentenced to a total term of 4 years imprisonment in a Federal Penitentiary and 3 years supervised release.

91.     The Defendant Product failed to warn Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson of the inherent danger of the use of the Defendant Product in which user accounts are publicly available, by default, upon registration, thus, exposing Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson to predators by default.

92.     The Defendant Product's Law Enforcement Guide, relied on by The University of Pittsburgh Police, The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police, the District Court of Allegheny County, Pennsylvania and

the Court of Common Pleas of Allegheny County, Pennsylvania in this matter, for requesting information about the same Defendant Product user and user activity, states the Defendant Product will provide information to law enforcement, including the phone number linked to an account, the user's location data, and the message metadata, which may show who they spoke to and when. (Exhibit 2)

93.     The Defendant Product, upon information and belief, has the ability to immediately identify the perpetrator of the threats. The Defendant Product has sophisticated user identity tools, to track users' activity and contacts when utilizing the Defendant Product.

94.     The Defendant Product, upon information and belief, created a sophisticated "friend graph" to allow the Defendant Product to quickly identify contacts and message activity, in real time, between and among the Defendant Product users.

95.     The Defendant Product, upon information and belief, embedded within these tools for tracking the Defendant Product usage, has the ability to flag or make inoperable user accounts or block the communication between specified Defendant Product user accounts.

96.     As the direct and proximate result of the actions and inactions of the Defendant Product, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson suffered and continue to suffer from injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

97.     This Complaint against the Defendant Product is based on Strict Products Liability (Design Defect, Manufacturing Defect, Failure to Warn), Negligence, Negligence (Failure to Warn), Negligence Per Se, Gross Negligence, Intentional Infliction Of Emotional Distress, Negligent Infliction Of Emotional Distress, Pennsylvania's Unfair Trade Practices and Consumer

Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq., Intentional and Fraudulent

Misrepresentation, Negligent Misrepresentation, Assault and Unconscionability.

## STRICT PRODUCTS LIABILITY

98.     Strict liability allows a Plaintiff to recover where a product in "a defective condition,

unreasonably dangerous to the user or consumer" causes harm to the plaintiff. §402A,

Restatement (Second) of Torts. There are three different types of defective conditions that can

give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn

defect. *Walton* v. *Avco* Corp., 530 Pa. 568, 576, 610 A.2d 454, 458 (1992)

## COUNT I

### Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Strict Products Liability - Design Defect

99.     The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully

set forth herein.

100.    In *Webb* v. *Zern*, 422 Pa. 424, 220 A.2d 853 (1966), the Pennsylvania Supreme Court

formally adopted § 402A of the Restatement (Second) of Torts as the law governing strict

products liability actions. This section provides:

> i.      One who sells any product in a defective condition unreasonably dangerous to
> the user or consumer or to his property is subject to liability for physical harm thereby
> caused to the ultimate user or consumer, or to his property, if
> 1.      the seller is engaged in the business of selling such a product, and
> 2.      it is expected to and does reach the user or consumer without substantial change
> in the condition in which it is sold.
> ii.     The rule stated in Subsection (1) applies
> a.      although the seller has exercised all possible care in the preparation and
> b.      sale of his product, and the user or consumer has not bought the product from or
> entered into any contractual relation with the seller. Restatement (Second) of Torts, §
> 402A (1965).

101.    To prevail in an action under § 402A, the plaintiff must prove that the product was

defective, the defect existed when it left the defendant's hands, and the defect caused the harm.

*Riley* v. *Warren Manufacturing, Inc.,* 455 Pa.Super. 384, 688 A.2d 221, 224 (1997).

102.    The Defendant Product is engaged in the business of selling the Defendant Product.

103.     Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson used the Defendant Product

unaltered and defective from the Defendant Product's "Hands".

104.    The defect(s) are that the Defendant Product is designed to (1) thwart law enforcement

investigations by alerting perpetrators of violent threats of law enforcement investigations, (2)

have complete discretion to ignore valid law enforcement inquiries, (3) have complete discretion

to ignore valid Search Warrants of this or any Court, (4) delay timely response to valid law

enforcement investigatory inquiries and Search Warrants of this or any Court, (5) have

discretion not to respond to the Defendant Product's own internal messaging system that is

promoted as method to report abuse to the Defendant Product, and/or (6) not consistently

maintain the Defendant Product's Law Enforcement Hotline.

105.    The defect(s) render the Defendant Product an unreasonably dangerous product to the

consumers, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik, and Plaintiff Pascale Wasson.

106.    The defect(s), individually and separately, contributed to the harm and proximately

caused injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia to

the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

107.    The danger of using the Defendant Product is unknowable and unacceptable to the

average or ordinary consumer, including Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik, and

Plaintiff Pascale Wasson.

108.    A reasonable person would conclude that the probability and seriousness of harm caused by the Defendant Product would outweigh the burden or costs of taking precautions.

109.    The Defendant Product is specifically designed, contrary to public policy, to alert the threat perpetrator of any law enforcement investigation initiated, at the discretion of the Defendant Product, thus jeopardizing the safety of and causing harm to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

110.    Additionally, the Defendant Product failed to maintain the Law Enforcement Hotline jeopardizing the safety of and causing harm to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

111.    The danger that the perpetrator of threats is protected by the Defendant Product to the detriment, injury and harm of the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik or Plaintiff Pascale Wasson is unknowable and unacceptable to the average or ordinary consumer.

112.    A reasonable person would conclude that the probability and seriousness of harm caused by the Defendant Product's thwart of law enforcement investigation outweighs  the burden or costs to the Defendant Product to take precautions.

113.    Thwarting law enforcement investigations, delaying law enforcement investigations, and withholding critical user information causes more harm than the burden to the Defendant Product to maintain the Law Enforcement Hotline, respond to law enforcement, respond to Search Warrant(s) of this or any court and promptly identify the perpetrator of threats of bodily injury or imminent death.

114.    To alert perpetrators under investigation by law enforcement for known, credible, criminal threats is oxymoronic thus endangering average or ordinary consumers, such as

Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik, or Plaintiff Pascale Wasson, and potentially compromises any law enforcement investigations.

115.    Additionally, the Defendant Product is defective because it limits the ability of law enforcement to directly communicate with an agent or employee of the Defendant Product and erroneously assumes internet access for law enforcement at times of emergency.

116.    Presently, upon information and belief, there is no operable phone number for law enforcement or any Defendant Product user to contact the Defendant Product, jeopardizing the safety of Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson and contrary to public policy.

117.    The Defendant Product is defectively designed to entice those that seek an Internet based Texting/Messaging service in which the ephemeral messages purportedly disappear. This feature makes the Defendant Product especially attractive to threat perpetrators.

118.    As a direct and proximate cause of the defective design of the Defendant Product to protect the perpetrator of threats, threatening to commit bodily harm or imminent death, thwart valid law enforcement investigations and ignore Search Warrants of this or any Court of general jurisdiction, and have no reasonable means of contacting the Defendant Product, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson suffered and continue to suffer injuries including Acute Stress Disorder

119.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's, and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's defective design, that is unreasonably dangerous as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

      a.    Compensation for suffering and inconvenience;

b.    Compensation for Plaintiff Bailey Ziencik's and Plaintiff's Pascale Wasson's limitation and preclusion from performing Normal activities;

c.    Compensation for great emotional distress;

d.    Compensation for Plaintiffs' loss of their general health, strength and vitality;

e.    Punitive and exemplary damages;

f.    Any further relief found just and appropriate by the Court.

**Count II**

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Strict Products Liability - Manufacturing Defect**

120.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

121.    The Defendant Product did not operate as the consumer(s), Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik, and Plaintiff Pascale Wasson would expect.

122.    After attempting contact via the Defendant Product's advertised, internal messaging system, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson reasonably and foreseeably expected a response from the Defendant Product.

123.    Then, after the Defendant Product was contacted by law enforcement with notice of credible threats, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson reasonably and foreseeably expected a reply from the Defendant Product to The University of Pittsburgh Police inquiry on their behalf.

124.    More than a week after the Defendant Product was previously contacted by Plaintiff Bailey Ziencik and The University of Pittsburgh Police, with notice of credible threats by the same perpetrator, Plaintiff Pascale Wasson reasonably and foreseeably expected that the perpetrator should have been previously blocked or terminated from use of the Defendant Product before the perpetrator had the ability to terrorize her using the Defendant Product on December 27, 2018.

28

125.    Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson reasonably and foreseeably relied on the information available to the public from the Defendant Product that the Defendant Product would take threats of violence seriously and not allow the threating activity by users to proliferate through the Defendant Product.

126.    Then, on or about Saturday, December 29, 2018, the Defendant Product was contacted by a *second* law enforcement agency. The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police Department's administrative subpoena requested the same Defendant Product user account information because of the same or similar violent threats to harm yet another victim, Plaintiff Pascale Wasson. (Exhibit 7)

127.    Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson reasonably and foreseeably expected a timely reply from the Defendant Product to law enforcement inquiries on their behalf.

128.    Then, on Wednesday, January 2, 2019, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson relied on the Original Search Warrant issued by District Justice Maureen McGuire-Desent, District Court 05-0-04 of Allegheny County, Pennsylvania to elicit a response from the Defendant Product indicating the location and identity of the perpetrator of the violent threats. (Exhibit 8) Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson expected a response from the Defendant Product and return of the information sought in the Original Search Warrant. At this point, the Defendant Product did not respond.

129.    Then, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson reasonably and foreseeably relied on the Defendant Product's response to law enforcement and expected the Defendant Product's Law Enforcement Hotline to Answer. The Defendant Product Law Enforcement Hotline did not answer.

130.    On January 10, 2019 The University of Pittsburgh Police relied on the Defendant

Product's Law Enforcement Guide and emailed the Defendant Product's law enforcement

email address (lawenforcement@snapchat.com) (Exhibit 4) as another attempt to contact the

Defendant Product with the information sought in the Original Search Warrant and the Norfolk

County District Attorney's administrative subpoena. At this point, the Defendant Product did

not respond.

131.    On January 24, 2019 the Defendant Product responded to the administrative subpoena

from the Norfolk County, Massachusetts District Attorney's Office with the identity and

location of the perpetrator, but still did not respond to The University of Pittsburgh Police.

132.    The Defendant Product obstructed The University of Pittsburgh Police from obtaining

the same information about the same perpetrator.

133.    Five days later, on January 29, 2019, The University of Pittsburgh Police were informed

by the Defendant Product that the Original Search Warrant submitted by The University of

Pittsburgh Police, was determined insufficient at the Defendant Product's discretion. (exhibit

4)

134.    Since the Original Search Warrant was deemed insufficient by the Defendant Product's

discretion, on January 31, 2019, The University of Pittsburgh Police immediately sought a

Second Search Warrant under Seal from Judge David Cashman of this Court. (Exhibit 10)

135.    On February 6, 2019, the Defendant Product, after more than 1 month of needless

delay, while protecting the perpetrator, finally decided, under the Defendant Product's

discretion, to respond to the Original Search Warrant.  Upon information and belief, the

Defendant Product has not responded to the Second Warrant.

136.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's

injuries sustained as a direct and proximate result of Strict Products Liability - Manufacturing

Defect of the Defendant Product and the complete inaction of the Defendant Product, once

notice of substantiated threats were received by the Defendant Product and reported to the

Defendant Product by Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik, and Plaintiff Pascale

Wasson and law enforcement, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff

Pascale Wasson demand the following relief:

   a.   Compensation for great suffering and inconvenience;
   b.   Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's
        limitation and preclusion from performing Normal activities;
   c.   Compensation for great emotional distress;
   d.   Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e.   Punitive and exemplary damages;
   f.   Any further relief found just and appropriate by the Court.

### Count III

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against Defendant Product for Strict Products Liability - Failure to Warn**

137.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully

set forth herein.

138.    A third doctrine recognized under § 402A is the "failure-to-warn" theory, under which

the plaintiff may recover for the defendant's failure to provide adequate instructions to the user

on how to use the product as the product was designed. *Weiner* v. *American Honda Motor Co.,

Inc.*,718 A.2d 305, 309 (Pa.Super.1998). "To succeed on a claim of inadequate or lack of

warning, a plaintiff must prove that the lack of warning rendered the product unreasonably

dangerous and that it was the proximate cause of the injury." *Barton* v. *Lowe's Home Ctrs.,

Inc.*, 2015 PA Super 203, 124 A.3d 349, 354-355 (Pa. Super. Ct. 2015) quoting *Riley*, 224.

139.     A product is defective due to a failure-to-warn where the product was "distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Mackowick* v. *Westinghouse Electric*, 525 Pa. 52, 56, 575 A.2d 100, 102 (1990).

140.     As with the other two types of strict liability claims, a plaintiff raising a failure-to-warn claim must establish only two things: that the product was sold in a defective condition "unreasonably dangerous" to the user, and that the defect caused plaintiff's injury. To establish that the product was defective, the plaintiff must show that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product "unreasonably dangerous." *Walton* v. *Avco Corp.,* 530 Pa. 568, 610 A.2d 454, 458 (Pa. 1992).

141.     For the plaintiff in a failure-to-warn claim to establish the second element, causation, the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller. See *Sherk* v. *Daisy-Heddon*, 498 Pa. 594, 598 and 602, 450 A.2d 615, 617 and 619 (1982)  *Phillips* v. *A-Best Products Co.*, 542 Pa. 124, 132, 665 A.2d 1167 (Pa. 1995)

142.     Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson used the Defendant Product unaltered and defective from the Defendant Product's "Hands."

143.     Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson were the ultimate user(s) of the Defendant Product with unknown dangers inherent in the product.

144.     The Defendant Product does not warn any user that if the user is a recipient of a known credible threat that (1) the Defendant Product is specifically designed with user accounts accessible to any other user account by default, (2) the Defendant Product is specifically designed to alert the perpetrator of any potential law enforcement investigation, hence

threatening the safety of the victims, (3) the Defendant Product is specifically designed to

ignore, a valid Search Warrant, or comparable order, of this or any Court, solely at the

discretion of the Defendant Product (4) the Defendant Product has discretion to ignore or reply

to reports of threats by its users and (5) the Defendant Product's Law Enforcement Hotline may

be inoperable or does not answer.

145.    The Defendant Product does not warn the ultimate user(s), Plaintiff Bailey Ziencik or

Plaintiff Pascale Wasson, about the seriousness of any threat when utilizing the Defendant

Product. The Defendant Product, by design and intention, can make the determination about

choosing to answer or ignore law enforcement request for information, placing any potential

victim at a substantial risk of serious injury or harm.

146.    The Defendant Product does not warn that any new user account, is by default,

viewable by the public, i.e., any person using the Defendant Product, not solely user defined

contacts.

147.    The Defendant Product does not warn that a public user account exposes the user(s), as

young as 13, to potential harassment and stalking which is a significant, foreseeable,

unreasonable risk to users of the Defendant Product.

148.    Plaintiff Pascale Wasson was never warned of the prior threats made to Plaintiff Bailey

Ziencik from the same perpetrator even with the Defendant Product's actual notice of the

perpetrator's violent threats contrary to its own Terms of Service. The Defendant Product

knowingly allowed the perpetrator to continue his harm unfettered.

149.    The lack of warnings renders the Defendant Product to be in a defective condition,

unreasonably dangerous to the Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

150.    As a direct and proximate result of the failure of the Defendant Product to warn, the Plaintiff Bailey Ziencik , Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson suffered and continue to suffer injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

151.    The injuries to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson are the direct and proximate result of the Defendant Product's manufacture, and/or production, and/or intentional design and/or distribution, and/or use and/or specification and/or failure to maintain and/or monitor and or/use of the Defendant Product which was inherently, excessively, and ultra-hazardously dangerous to the Plaintiffs and/or lacked elements necessary to make the Defendant Product safe for its intended uses.

152.    Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia, as set forth herein with associated complications, were directly and proximately caused by the actions and inactions of the Defendant Product acting through their agents, servants and/or employees and the Defendant Product is in breach of duty imposed by § 402A of the Restatement (Second) of Torts to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

153.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's Strict Products Liability - Failure to Warn that user accounts are public and that the Defendant Product is designed to alert threat perpetrators of law enforcement investigation or at the Defendant Product's discretion to respond to law enforcement or orders of any Court and the Defendant Product's inactions and actions as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

a.  Compensation for suffering and inconvenience;
b.  Compensation for Plaintiff Bailey Ziencik's and Pascale Wasson's limitation and preclusion from performing Normal activities;
c.  Compensation for great emotional distress;
d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
e.  Punitive and exemplary damages;
f.  Any further relief found just and appropriate by the Court.

## Count IV

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Breach of Implied Warranty of Merchantability**

154.    The Uniform Commercial Code ("U.C.C.") defines the implied warranty of merchantability as a warranty that the goods will pass without objection in the trade and are fit for the ordinary purposes for which such goods are used. 13 Pa.C.S.A. § 2314.

155.    Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson used the Defendant Product in the ordinary purposes for which such goods are used, but discovered that the Defendant Product did not operate as expected.

156.    Confronted with threats of serious bodily injury and threats of imminent death, Plaintiff Bailey Ziencik attempted to block the offending accounts and attempted to utilize the reporting methods available to her through the Defendant Product's internal messaging system and promptly reported the threats to local law enforcement and The University of Pittsburgh Police. (Exhibit 4)

157.    Confronted with threats of serious bodily injury and threats of imminent death, Plaintiff Pascale Wasson attempted to block the offending accounts and utilize the reporting methods available to her through the Defendant Product's internal messaging system and promptly reported the threats to the Wellesley Massachusetts Police Department. (Exhibit 7)

158.    The Defendant Product failed to operate under the ordinary and expected purposes for which such goods are used by Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson. The Defendant Product belatedly responded to The University of Pittsburgh Police, Search Warrant(s) of the District Court and the Court of Common Pleas of Allegheny County, PA. (Exhibits 4, 6 and 8) as well as The Norfolk County, Massachusetts District Attorney's Office acting on behalf of the Wellesley, Massachusetts Police Department's administrative subpoena. (Exhibit 7)

159.    Comment 11 to this section of the U.C.C. states that this warranty is so commonly taken for granted that its exclusion from a contract is recognized as a matter threatening surprise and therefore requiring special precaution. Thus, to exclude the implied warranty of merchantability, the exclusionary language must mention the term "merchantability" and be conspicuous. 13 Pa.C.S.A. § 2316(b). As noted in Comment 1 to section 2316(b), this section of the U.C.C. is designed to protect a buyer from unexpected and unbargained for language of disclaimer.

160.    A term or clause is "conspicuous" when it is "so written that a reasonable person against whom it is to operate ought to have noticed it.... Language in the body of a form is conspicuous if it is in larger or other contrasting type or color...." 13 Pa.C.S.A. § 1201. Comment 10 to section 1201 states that the test for conspicuousness is whether attention can reasonably be expected to be called to the exclusions. The primary object of the conspicuousness requirement is to avoid fine print waiver of rights by the buyer. *Greenspun* v. *American Adhesives, Inc.*, 320 F.Supp. 442 (E.D.Pa.1970). *Moscatiello* v. *Pittsburgh Contractors Equipment Co.*, 595 A.2d 1190, 407 Pa.Super. 363 (Pa. Super. Ct. 1991)

161.    The Defendant Product Warranty Disclaimer, buried on Page 12 of 33 of the Defendant Product's Terms of Service, did not adequately put Plaintiff Bailey Ziencik or Plaintiff Pascale

Wasson on notice that substantial rights of her(s) were being relinquished and waived. (Exhibit 11)

162.    The disclaimer was set forth in some of the "finest" print accessible via a smartphone, as in the uses of Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson. The contract is inconspicuous as well as misleading.

163.    The letters "IMPLIED WARRANTY OF MERCHANTABILITY" are capitalized among other claims of absolution of liability but are buried deep in the middle of Page 12 of 33 of the Defendant Product's Terms of Service on a smartphone screen. (Exhibit 11)

164.    In addition, reference is made only to the "disclaimers" on page 12 of 33 rather than to the limitation on warranties and remedies available to the Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson. This language clearly does not meet the letter or the spirit of the U.C.C. requirements. The Limitation on Liability in the Terms of Service, which does not apply to the instant matter, and the Arbitration Clause, are similarly, buried deep within the document and the legal ramifications, buried so deep, are clearly not comprehensible by the average lay person, much less a young person, as young as 13, to whom the Defendant Product has intentionally directed its Terms of Service.

165.    As a result of the failure of the Defendant Product to operate as intended, and failure to be fit for the ordinary purpose designed, the Defendant Product Breached the Implied Warranty of Merchantability of that the Defendant Product made to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik, and Plaintiff Pascale Wasson and as a direct and proximate result of the actions and inactions of the Defendant Product, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson suffered and continue to suffer severe injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

166.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's

injuries sustained as a direct and proximate result of Defendant Product's Breach of the Implied

Warranty of Merchantability because the Defendant Product did not operate and was not fit for

its ordinary use by the consumers, Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson and the

Defendant Product's inaction and actions as aforesaid, Plaintiff Bailey Ziencik, Plaintiff Kelly

Ziencik and Plaintiff Pascale Wasson demand the following relief:

   a.  Compensation for suffering and inconvenience;
   b.  Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation
       and preclusion from performing Normal activities;
   c.  Compensation for great emotional distress;
   d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e.  Punitive and exemplary damages;
   f.  Any further relief found just and appropriate by the Court.

**Count V**

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim
against the Defendant Product for Breach of Express Warranty**

167.    "A written express warranty that is part of the sales contract is the seller's promise which

relates to goods, and it is part of the basis of the bargain. 13 Pa.C.S. § 2313(a)(1). This statement

of law is not qualified by whether the buyer has read the warranty clause and relied on it in

seeking its application." *Samuel-Bassett* v. *Kia Motors America, Inc.,* 34 A.3d 1, 76 UCC

Rep.Serv.2d 384 (Pa. 2011)

168.    The perpetrator of threats was enabled by the Defendant Product to use, and continue to

use, the Defendant Product in contravention of the Defendant Product's Terms of Service

(Exhibit 11) at Section 6, Page 6 of 33:

> 6. Respecting Other People's Rights
> Snap Inc. respects the rights of others. And so should you. You therefore may not
> use the Services, or enable anyone else to use the Services, in a manner that:
> …
> •   bullies, harasses, or intimidates.

38

…

169.    The perpetrator of threats was enabled by the Defendant Product to use, and continue to

use, the Defendant Product in contravention of the Defendant Product's Terms of Service

(Exhibit 11) at Section 8, Page 8 of 33:

> …
> 8. Safety
> We try hard to keep our Services a safe place for all users. But we can't guarantee
> it. That's where you come in. By using the Services, you agree that:
> - You will not use the Services for any purpose that is illegal or prohibited
>   in these Terms
> …
> - You will not use the Services in a way that could interfere with, disrupt,
>   negatively affect, or inhibit other users from fully enjoying the Services,
>   or that could damage, disable, overburden, or impair the functioning of the
>   Services.
> …
> - You will not post content that contains pornography, graphic violence,
>   threats, hate speech, or incitements to violence.

170.   In addition, the Defendant Product permitted the perpetrator to use and continue to use

multiple Defendant Product accounts to threaten Plaintiff Bailey Ziencik and Plaintiff Pascale

Wasson in contravention of the Defendant Product's Terms of Service (Exhibit 11)  at Section 9,

Page 9 of 33:

> 9. Your account
> You are responsible for any activity that occurs in your Snapchat account. So it's
> important that you keep your account secure. One way to do that is to select a
> strong password that you don't use for any other account.
> By using the Services, you agree that, in addition to exercising common sense:
> - You will not create more than 1 account for yourself.
>   …

171.   Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, each and separately, immediately

availed themselves of the method advertised by the Defendant Product to Report Abuse and

notified the Defendant Product through the Defendant Product's internal messaging system.

(Exhibit 5)

172.    Having no response from the Defendant Product, Plaintiff Kelly Ziencik and Plaintiff

Pascale Wasson timely reported the threats of imminent death or serious bodily injury to law

enforcement. The Defendant Product's Law Enforcement Guide (Exhibit  2) states at Page 2:

> Because Snap is committed to assisting law enforcement investigations as the law
> requires, we provide email support to law enforcement agencies for non-emergency
> matters, and 24-hour online service for emergency situations involving the threat of
> imminent death or bodily injury. Contact information for our Law Enforcement
> Operations team is provided on the cover of this guide.

173.    Initially, The University of Pittsburgh Police, on December 19, 2018, contacted the

Defendant Product with a preservation request, relying on the Defendant Product's Law

Enforcement Guide for the address of the Defendant Product, as well as the "Sample Language

of the Request Letter" for Law Enforcement provided in the Defendant Product's Law

Enforcement Guide. (Exhibits 6 and Exhibit 2, respectively)

174.    The University of Pittsburgh Police had no response to the preservation request from the

Defendant Product.

175.    On Saturday, December 29, 2018, the Norfolk County Massachusetts District Attorney's

Office acting on behalf of the Wellesley Massachusetts Police issued an administrative subpoena

to the Defendant Product for the same predator's information.

176.    Then, after no response from the Defendant Product, The University of Pittsburgh Police

obtained the Original Search Warrant on Wednesday, January 2, 2019 placing the Defendant

Product on notice of the threats of imminent death and serious bodily injury, where on page 3 of

the Original Search Warrant the threats are noted ""Don't walk on campus alone" and "I'm going

to slash your throat in when I see you on campus." (Exhibit 8 at page 3)

177.    In addition, the Defendant Product was made aware that "Once [Plaintiff Bailey] Ziencik

blocked the username "rmoney8211," she immediately began receiving more messages from the

usernames "wsullovan7" and "rmoneyl890." (Exhibit 8 at Page 3) The perpetrator was using

multiple Defendant Product user accounts.

178.    "At this time, [Plaintiff Bailey] Ziencik also received a message stating 'You think you

can block me? I have 15 fake usernames to get to you.'" (Exhibit 8 at Page 3)

179.    The Original Search Warrant requested by The University of Pittsburgh Police stated

ultimately at Page 3 "Additionally, I respectfully request an order prohibiting Snapchat from

notifying the affected users in relation to the "Snap User Notice Policy" due to the nature of the

threats received and the subsequent possibility of retaliation which could result in serious bodily

injury." Thus, the Defendant Product was given notice of the threats received and the subsequent

possibility of retaliation which could result in serious bodily injury or imminent death. (Exhibit

8)

180.    Snap User Notice Policy states:

Snap's policy is to notify our Snapchat users when we receive legal process seeking the
disclosure of their records. Before we respond to the legal process, we allow affected
users to challenge the legal process in court and to provide us a file-stamped copy of the
challenge.
We recognize two exceptions to this policy. First, we will not notify users of legal
process where providing notice is prohibited by a court order issued under 18 U.S.C. §
2705(b) or by other legal authority. Second, where we, in our sole discretion, believe an
exceptional circumstance exists — such as cases involving child exploitation or the threat
of imminent death or serious bodily injury — we reserve the right to forgo user notice.
To minimize delays related to our user notice policy, law enforcement can take one of
the following steps, if applicable:
    1. Inform us upfront that you have no objection to us notifying the affected user(s)
    of your legal process. This saves us the step of notifying you of Snap's user notice
    policy and awaiting your confirmation that you have no objection.
    2. Provide a court order issued in accordance with 18 U.S.C. § 2705(b) that
    prohibits Snap from providing notice to the affected user(s).
    3. Provide a valid legal basis that prohibits Snap from providing notice to the
    affected user(s).
    4. Inform us that your case involves child exploitation, or the threat of imminent
    death or serious bodily injury, and provide a sufficient factual basis for *Snap to
    independently make that determination*. Emphasis added (Exhibit 2, Page 5)

181.    The University of Pittsburgh Police, the Wellesley Massachusetts Police, and the District Court informed the Defendant Product in accordance with the Defendant Product's Law Enforcement Guide's  "Snap User Notice Policy," to prohibit the Defendant Product from notifying the perpetrator because the nature of the threats received by Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson and the subsequent possibility of retaliation which could result in serious bodily injury and the threat of imminent death to Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson. The Defendant Product failed to act according to the express terms of the Defendant Product's Law Enforcement Guide.

182.    Incredulously, the Defendant Product initially ignored, did not timely respond to, nor file a Motion to Quash or Motion for a Protective Order regarding the Original Search Warrant of the District Court of Allegheny County, PA. (Exhibit 8)

183.    The University of Pittsburgh Police, as well as Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson, relied on the Defendant Product's Law Enforcement Guide which states at Page 4, "Support for Law Enforcement - Because Snap is committed to assisting law enforcement investigations as the law requires, we provide email support to law enforcement agencies for non-emergency matters, and 24- hour online support for emergency situations involving the threat of imminent death or serious bodily injury. Contact information for our Law Enforcement Operations team is provided on the cover of this Guide."  (Exhibit 2)

184.    On January 10, 2019, The University of Pittsburgh Police attempted calling the Defendant Product's 24-hour Law Enforcement Hotline for emergency situations involving the threat of imminent death or serious bodily injury.

185.     The University of Pittsburgh Police's  attempt to call the Defendant Product was met with "Negative results," i.e., the Law Enforcement Hotline was no longer operable, did not answer and/or was disconnected. (Exhibit 4)

186.     The University of Pittsburgh Police were forced, on January 10, 2019, to resort to email in an attempt to contact the Defendant Product.  Even with notice of the threats of serious bodily injury and the threats of imminent death to Plaintiff Bailey Ziencik in the Original Search Warrant and Plaintiff Pascale Wasson in the administrative subpoena according to the Defendant Product's Law Enforcement Guideline, there was no response for nineteen days to The University of Pittsburgh Police after the email. (Exhibit 4)

187.     On January 24, 2019 the Defendant Product responded to The Norfolk County, Massachusetts District Attorney's Office acting on behalf of the Wellesley, Massachusetts Police Department requested by administrative subpoena sent on behalf of Plaintiff Pascale Wasson. The Defendant Product identified the potential perpetrator and his potential location, more than 1 month after Plaintiff Bailey Ziencik reported the same threatening Defendant Product user accounts. (Exhibit 7)

188.     Five days later, on January 29, 2019,  the Defendant Product incredulously responded to the Original Search Warrant, twenty-seven (27) days after service, advising that the "legal process" that was submitted would not prohibit them from notifying the owner of the aforementioned usernames. Furthermore, The University of Pittsburgh Police was advised by the Defendant Product that the information requested would be retained for 30 days, pending a response for further action or dismissal of the requested information. (Exhibit 9).

189.     At this point, the Defendant Product had previously disclosed the same information, about the same Defendant Product user accounts, to The Norfolk County Massachusetts District

Attorney's Office acting on behalf of the Wellesley Massachusetts Police Department by administrative subpoena for the benefit of Plaintiff Pascale Wasson.

190.    The Defendant Product, at this point, was *not* responding to the Original Warrant *and* was potentially going to inform the perpetrator of the pending University of Pittsburgh Police and/or Wellesley Massachusetts Police investigations, further jeopardizing the safety of Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

191.    On January 31, 2019, The University of Pittsburgh Police immediately sought, and Judge David Cashman of this Court signed, a Second Search Warrant Under Seal. (Exhibit  10)

192.    Although the Defendant Product initially decided, at its discretion, the Original Search Warrant was unfit, inexplicably the Defendant Product, at its sole discretion, chose to answer the Original Search Warrant.

193.    Finally, on February 6, 2019, the Defendant Product responded to the Original Search Warrant, waiting forty-nine (49) days from the initial notice to the Defendant Product, of the threats of serious bodily injury and the threats of imminent death to Plaintiff Bailey Ziencik.

194.    Upon information and belief, there is no record of any response from the Defendant Product to Judge Cashman's Second Search Warrant Under Seal.

195.    The threats "Don't walk on campus alone" and "I'm going to slash your throat in when I see you on campus." are categorized as threats of severe bodily injury or imminent death, and the lack of response from the Defendant Product, contrary to the Defendant Product's Law Enforcement Guide and Terms of Service, the Express Warranty at issue, proximately caused and exacerbated the injuries to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson as the Defendant Product recklessly, carelessly and deliberately allowed significant time, more than a month,  to pass before belatedly responding to The Norfolk County

44

Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police Department administrative subpoena.

196.    The Defendant Product did not respond to the Original Search Warrant of the District Court of Allegheny County, PA and The University of Pittsburgh Police until February 6, 2019.

197.     Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson sustained injuries as a direct and proximate result of the Defendant Product's Breach of Express Warranty by the Defendant Product's inactions and actions, contrary to the Defendant Product's Terms of Service and Law Enforcement Guide, when substantiated credible threats were received by the Defendant Product, reported by Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, The University of Pittsburgh Police and the Wellesley Massachusetts Police, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

   a.  Compensation for great suffering and inconvenience;
   b.  Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
   c.  Compensation for great emotional distress;
   d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e.  Punitive and exemplary damages;
   f.  Any further relief found just and appropriate by the Court.

**Count VI**
**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Negligence**

198.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

199.    The Defendant Product owed a duty of care to act with reasonable care to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson as this legal duty exists

independently from any contractual obligations between the parties. *Dittman* v. *UPMC*, 196 A.3d 1036, 1056 (Pa. 2018)

200.     The Defendant Product's affirmative conduct by issuance of the Defendant Product's Law Enforcement Guide and inclusion of a method to report abuse in the Defendant Product's Terms of Service, the Defendant Product knew the likelihood that such a situation might be created, i.e., threats transmitted by the Defendant Product, and that a perpetrator might avail himself of the Defendant Product and the opportunity the Defendant Product creates to commit such a tort or crime. *Ford* v. *Jeffries*, 379 A.2d 111, 474 Pa. 588, 597 (Pa. 1977).

201.     The Defendant Product's affirmative conduct is generally under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act in which a defendant's affirmative, risk-causing conduct is in issue. *Seebold* v. *Prison Health Servs., Inc.,* 57 A.3d 1232, 1246 (Pa. 2012)

202.     The Defendant Product created its internet-accessible "App" without adequate user safety measures to block threatening messages from other Defendant Product users. The Defendant product failed to respond to valid law enforcement requests, including Search Warrants, and the equivalent administrative subpoena, that utilize the Defendant Product's required language from the Defendant Product's Law Enforcement Guide, and a responsive Defendant Product Law Enforcement Hotline or email address. These factual assertions plainly constitute affirmative conduct on the part of the Defendant Product.

203.     The Defendant Product breached the duty of reasonable care owed to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson by allowing the perpetrator to

continue to utilize the Defendant Product to terrorize the Plaintiffs anonymously and unfettered.

204.    The Defendant Product breached the duty of reasonable care to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson by not allowing the Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson to block or stop the unwanted messages.

205.    The Defendant Product breached the duty of reasonable care to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson by not severing the contact between the Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson and the perpetrator once the Plaintiff Bailey Ziencik notified the Defendant Product of these specific threats of bodily harm and imminent death using the Defendant Product's internal messaging system purportedly designed for the purpose of reporting abuse to the Defendant Product.

206.    The Defendant Product breached the duty of reasonable care to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson by not responding to law enforcement, investigating the threats on their behalf, to ascertain the identity and location of the perpetrator.

207.    The Defendant Product breached the duty of reasonable care to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson by not responding for weeks to The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police Department administrative subpoena to ascertain the location and identity of the perpetrator.

208.    The Defendant Product breached the duty of reasonable care to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson by not responding for more

than 5 weeks to the Original Search Warrant to ascertain the identity and location of the perpetrator after issuance of the Original Search Warrant by the District Court.

209.     The Defendant Product breached the duty of reasonable care to Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik by not responding to the Second Search Warrant issued by Judge David Cashman to ascertain the identity and location of the perpetrator.

210.     The breach of that duty, to be reasonable, is the direct and proximate cause of the Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's damages.

211.     The Defendant Product knew or should have known that the Defendant Product, acting or failing to act, in the above-described manner, would cause any user of the product foreseeably to suffer from emotional distress.

212.     The current and continuing damages suffered by Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson are a direct and proximate result of the negligence of the Defendant Product, in that they produced, supplied, and/or sold, and/or used, and/or specified and/or knew, or in the exercise of reasonable care, should have known, was inherently, excessively, and ultra-hazardously dangerous to Plaintiffs.

213.     The Defendant Product manufactured and/or fabricated and/or supplied and/or sold and/or intentionally created product support for the Defendant Product users which the Defendant Product knew or should have known was defective and/or unreasonably dangerous to the users or consumers, such as Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, and acted in such a manner which was willful, wanton, gross and in total disregard for the health and safety of the user or consumer, i.e., Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

214.    The Defendant Product, prompted by pecuniary motives, willfully and wantonly ignored and/or failed to act upon data. Rather, the Defendant Product deceives the public in several aspects: by controlling industry-supported research in a manner inconsistent with the health and safety interest of users and consumers, by suppressing the dissemination of certain information relating to the harmful effects of the failure of the Defendant Product to act. Such activities deprived the users of the Defendant Product of the opportunity to determine whether or not they would expose themselves to the unreasonably dangerous Defendant Product.

215.    As a direct and proximate result of the Defendant Product's aforesaid actions and inactions, Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson were threatened as alleged and Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson suffered and continue to suffer personal injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

216.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's Negligence that the Defendant Product assumed the Duty to act with care, to respond once receipt of a known credible threat of bodily injury and/or imminent death to Plaintiff(s) and breached that duty recklessly, with needless delay in responding to Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's reports of threats of bodily injury or imminent death. Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

   a. Compensation for great suffering and inconvenience;
   b. Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
   c. Compensation for great emotional distress;

d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
e.  Punitive and exemplary damages;
f.  Any further relief found just and appropriate by the Court.

## Count VII

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Negligence - Failure to Warn**

217.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

218.    The Defendant Product has a duty to exercise reasonable care to operate in a reasonable manner.

219.    The Defendant Product knew the identity and location of the perpetrator of threats the instant the perpetrator hit "send" on the offending messages.

220.    The Defendant Product owed Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson a duty to exercise reasonable care to protect them against an unreasonable risk of harm arising out of the failure to warn the Defendant Product users that the Defendant Product would notify perpetrators of threats of law enforcement investigations which would create the risk of injury to users reporting threats of violence and bodily harm to the Defendant Product.

221.    The Defendant Product never warned Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson, when either Plaintiff registered for the Defendant Product user account, that the Defendant Product could be used to perpetrate threats of bodily injury or imminent death.

222.    Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson each used the Defendant Product at her own risk, but the Defendant Product failed to warn Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson, that even if the Defendant Product is notified of a credible threat of

bodily injury or imminent death, the Defendant Product would not intervene to sever the contact(s) between victims and perpetrators.

223.    Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson were not warned that the Defendant Product would fail to be reasonable and allow the threats to continue. Additionally, the Defendant Product did not warn that, even after notification, the Defendant Product would allow the offending activity to continue unfettered.

224.    The Defendant Product failed to warn that the Defendant Product may not cooperate with law enforcement, or if the Defendant Product chooses to cooperate with law enforcement, cooperation is at the Defendant Product's complete discretion to ignore valid directives of any Court of general jurisdiction.

225.    The Defendant Product failed to warn Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson that the Defendant Product would not identify the perpetrator or the perpetrator's location even though the Defendant Product has that information readily and easily accessible.

226.    The Defendant Product failed to warn that the Defendant Product has complete discretion to warn the perpetrator of a law enforcement investigations before the Defendant Product responds to any Search Warrant or subpoena of any Court or law enforcement, further endangering Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

227.    The Defendant Product breached that duty by allowing the perpetrator to continue to use the Defendant Product to terrorize Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson anonymously and unfettered.

228.    The Defendant Product breached that duty by not allowing Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson to block or stop the unwanted messages.

229.    The Defendant Product breached that duty by not severing the contact immediately between Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson with the perpetrator after Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson notified the Defendant Product of these specific threats using the Defendant Product's internal messaging system, defectively designed to notify the Defendant Product of reports of abuse (Exhibit 5)

230.    The Terms of Service failed to warn that the Defendant Product is designed to alert the perpetrator of threats of law enforcement investigations.

231.    The breach of that duty to warn by the Defendant Product, to be reasonable, is the direct and proximate cause of the Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's damages.

232.    The Defendant Product knew or should have known that acting in the above-described manner would cause any user of the product to suffer from emotional distress, injury, harm and disruption to the user's life.

233.    The injuries of Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson are the direct and proximate result of the Negligent failure to warn by the Defendant Product, which is designed and/or, produced and/or, supplied and/or, sold and/or,  used and/or specified and/or, monitored and/or provided as a public service, or in the exercise of reasonable care, should have known, was inherently, excessively, ultra-hazardous and dangerous to any Defendant Product user.

234.    The Defendant Product manufactured and/or designed and/or, produced, and/or, supplied, and/or sold, and/or used, and/or specified and/or monitored and/or provided as a public service the Defendant Product, which with the knowledge of the Defendant Product, was unreasonably dangerous to users or consumers, such as Plaintiff Bailey Ziencik, Plaintiff Kelly

Ziencik and Plaintiff Pascale Wasson, and acted in such a manner which was willful, wanton, and in total disregard for the health and safety of the user or consumer, i.e., Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik or Plaintiff Pascale Wasson.

235.    Prompted by pecuniary motives, the Defendant Product willfully and wantonly ignored and/or failed to act upon the reports of Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, and law enforcement. Rather, the Defendant Product deceived Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik,  and the Plaintiff Pascale Wasson, as well as the pubic, in several aspects: by controlling user information in a manner inconsistent with the health and safety interest of users and consumers, by suppressing the dissemination of information relating to the harmful threats, by not responding to valid threats and resultant requests of law enforcement and by the lack of an effective means for the user/consumer to contact the Defendant Product.

236.    Such actions and inactions deprived the users of the Defendant Product, Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, the opportunity to determine whether or not they would expose themselves to the unreasonably dangerous threats when using a Defendant Product public account. All Defendant Product user accounts are automatically visible to all other Defendant Product users by default.

237.    As a direct and proximate result of the aforesaid actions and inactions of the Defendant Product, Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson were threatened while using the Defendant Product and Plaintiff Kelly Ziencik eye witnessed the threats to her daughter. These actions and inactions of the Defendant Product caused and continued to caused Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson terror and injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

238.     As the result of the Defendant Product's Negligent Failure to warn users/consumers of reports of threats of bodily injury or imminent death by other Defendant Product users and the lack of warning that the Defendant Product can choose inaction, at the Defendant Product's complete discretion, after substantiated threats of bodily injury or imminent death are reported by a consumer/user, such as Plaintiff Bailey Ziencik and Pascale Wasson, and/or law enforcement, such as The University of Pittsburgh Police, the Wellesley Massachusetts Police, administrative subpoena, and Search Warrants of this Court, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

   a.   Compensation for great suffering and inconvenience;
   b.   Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
   c.   Compensation for great emotional distress;
   d.   Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e.   Punitive and exemplary damages;
   f.   Any further relief found just and appropriate by the Court.

**Count VIII**

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against Defendant Product for Negligence Per Se**

239.     The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

240.     In order to prove a claim based on negligence per se, the following four requirements must be met:

   (1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;

   (2) The statute or regulation must clearly apply to the conduct of the defendant;

   (3) The defendant must violate the statute or regulation;

(4) The violation of the statute or regulation must be the proximate cause of the

plaintiff's injuries.

*Schemberg* v. *Smicherko*, 2014 PA Super 23, 85 A.3d 1071 (Pa. Super. Ct. 2014)

241.   There was no response from the Defendant Product to The Norfolk County,

Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts

Police administrative subpoena of Saturday, December 29, 2019, for nearly a month, until

January 24, 2019.

242.   There was no response from the Defendant Product to the Original Search Warrant

issued by Magistrate District Justice Maureen McGuire-Desent, District Court 05-0-04 of

Allegheny County, Pennsylvania of Wednesday, January 2, 2019 (Exhibit 8)for nearly a

month until January 29, 2019. (Exhibit 4)

243.   On January 29, 2019, the Defendant Product, without either a Motion to Quash or

Motion for a Protective Order, simply refused, at the Defendant's own discretion, to respond

to the Original Search Warrant. (Exhibit 4)

244.   Title 42 JUDICIARY AND JUDICIAL PROCEDURE§ 4132 Attachment and

summary punishment for contempts states:

> The power of the several courts of this Commonwealth to issue attachments
> and to impose summary punishments for contempts of court shall be restricted
> to the following cases:
>> (1)  The official misconduct of the officers of such courts respectively.
>> (1.1)  The willful failure of the officers of such courts to disclose a
>> person's complete criminal history record information when requested.
>> (2)  Disobedience or neglect by officers, parties, jurors or witnesses of
>> or to the lawful process of the court.
>> (3)  The misbehavior of any person in the presence of the court,
>> thereby obstructing the administration of justice.

245.   Title 42 JUDICIARY AND JUDICIAL PROCEDURE § 4137 Contempt powers of

magisterial district judges states:

(a)  General rule.--A magisterial district judge shall have the power to issue attachments and impose summary punishments for criminal contempts of a magisterial district judge court in the following cases:

(1)  Misbehavior of any person in the presence of the court, thereby obstructing the administration of justice.
(2)  Failure of a person to obey lawful process in the nature of a subpoena issued by a magisterial district judge.

246.    Although the requested Original Search Warrant by The University of Pittsburgh Police adhered to the Defendant Product's Law Enforcement Guide and specified not to alert the perpetrator of threats, on January 29, 2019, the Defendant Product belatedly responded to The University of Pittsburgh Police advising that the "legal process" that was submitted was insufficient. (Exhibit 4)

247.    The Defendant Product unilaterally made the preposterous determination, at the Defendant Product's sole discretion, that the "legal process" was insufficient and would not prohibit the Defendant Product from notifying the perpetrator of threats.

248.    If the Defendant Product believed "legal process" was insufficient, the Defendant Product should have pursued available legal avenues, i.e., a Motion to Quash or a Motion for a Protective Order with the issuing Court. The Defendant Product simply cannot respond stating  the "legal process" is insufficient. Only the issuing Court can determine the sufficiency of "legal process," not the Defendant Product.

249.    Furthermore, the Defendant Product advised that the information requested would be retained for 30 days, pending a response for further action or dismissal of the requested information.

250.    First, The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police Department administrative subpoena of December 29, 2019 was ignored until the response of January 24, 2019. This administrative subpoena was

issued to protect the interests of Plaintiff Pascale Wasson, specifically, as opposed to the public generally.

251.    The Original Search Warrant of this Court issued to the Defendant Product was initially rebuffed on January 29, 2019, and ignored by the Defendant Product, until the response of February 6, 2019. The Original Search Warrant was issued to protect the interests of Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik, specifically, as opposed to the public generally.

252.    Additionally, the Defendant Product failed to obey the lawful process of this Court, the Second Search Warrant Under Seal of Judge David Cashman of January 31, 2019. Upon information and belief, there has been no response, whatsoever, to the Second Search Warrant to date.

253.    Second, the statute or regulation clearly applies to the conduct of the Defendant Product, requiring the Defendant Product to divulge the information as requested in the Search Warrant(s) and administrative subpoena.

254.    Third, the Defendant Product did not respond to Plaintiff Pascale Wasson or the Wellesley, Massachusetts Police until January 24, 2019 (Exhibit 7), nor respond to Plaintiff Bailey Ziencik or The University of Pittsburgh Police until January 29, 2019. (Exhibit 4)

255.    Then, when the Defendant Product did respond to the Original Warrant, the Defendant Product failed to obey the lawful process of Magistrate District Justice Maureen McGuire-Desent, District Court 05-0-04 of Allegheny County, Pennsylvania contrary to Title 42 JUDICIARY AND JUDICIAL PROCEDURE §§ 4135 and 4137.

256.    Only after multiple requests by The University of Pittsburgh Police, The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley

Massachusetts Police by administrative subpoena and Search Warrant(s) of this Court, in open disobedience of this Court, did the Defendant Product, on January 24, 2019 reply to Plaintiff Pascale Wasson, and ultimately on February 6, 2019 belatedly replied to the process of this Court, 49 days after the threats were received by Plaintiff Bailey Ziencik.

257.    Fourth, the failure of the Defendant Product to respond to the inquiries of law enforcement, and administrative subpoena of other Courts and Search Warrant(s) of this Court proximately caused and exacerbated injuries. Many weeks passed while the Defendant Product refused to comply with the administrative subpoena and Search Warrant(s), while Plaintiff Bailey Ziencik  and Plaintiff Pascale Wasson, each, reasonably thought the perpetrator lurked her respective campus, knew her location, movements and class schedule, causing and continuing to cause Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

258.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's Negligence Per Se and contemptable failure to respond to valid legal process of this or any Court by inaction and actions as aforesaid, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

   a. Compensation for suffering and inconvenience;
   b. Compensation for Plaintiff Bailey Ziencik's and Pascale Wasson's limitation and preclusion from performing Normal activities;
   c. Compensation for great emotional distress;
   d. Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e. Punitive and exemplary damages;
   f. Any further relief found just and appropriate by the Court.

### Count IX

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Gross Negligence**

259.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

260.    "[G]ross negligence has … been described as 'the want of even scant care' and 'the failure to exercise even that care which a careless person would use.' W. Keeton, D. Dobbs, R. Keeton & D. Owens, Prosser and Keeton on Torts, § 34 at 183 (5th ed.1984)." *Ratti* v. *Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 704, 2000 Pa. Super. 239 (Pa. Super. Ct. 2000) citing *Ambrose* v. *New Orleans Police Dept. Ambulance Serv.,* 639 So.2d 216, 219-20 (La. 1994) (internal quotations and citations omitted) (stating "Gross negligence has been defined as the want of that diligence which even careless men are accustomed to exercise. Gross negligence has also been termed the entire absence of care and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others. Additionally, gross negligence has been described as an extreme departure from ordinary care or the want of even scant care."); and BLACK'S LAW DICTIONARY, defining gross negligence as "[a] lack of slight diligence or care," and "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party...." BLACK'S, 1057 (7th Ed.1999). *Ratti* v. *Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 704-705, 2000 Pa. Super. 239 (Pa. Super. Ct. 2000).

261.    The Defendant Product has a duty to exercise reasonable care to the users Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson to operate in a reasonable manner.

262.    The Defendant Product knew the identity and location of the perpetrator of threats the instant the perpetrator "hit send" to deliver the offending messages to Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson.

263.    The Defendant Product was in the best position to protect against the risk of continued harm to the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

264.    The Defendant Product was put on notice of the assaults and threats.

265.    The Defendant Product displayed the complete absence of care and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson and others because the Defendant Product did not utilize the software and network dashboards under its control to prevent subsequent threats by the perpetrator or to respond to Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson, users of their product.

266.    The Defendant Product's conduct, from the moment Plaintiff Bailey Ziencik used the Defendant Product's internal messaging system on December 19, 2018 until the Defendant Product's reply of February 6, 2019, displays the complete absence of care and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others, such as Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

267.    Once Plaintiff Bailey Ziencik notified the Defendant Product, through the Defendant Product's own internal messaging system, that the Defendant Product was being utilized by the perpetrator in violation of the Defendant Product rules, the Defendant Product had a duty to intervene and sever further communications between the Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson and the perpetrator of the threats.

268.    Neither Plaintiff Bailey Ziencik, nor Plaintiff Pascale Wasson, initiated contact with the perpetrator.

269.     The Defendant Product's underlying algorithm gave the perpetrator access to Plaintiff

Bailey Ziencik's and Plaintiff Pascale Wasson's user accounts. The Defendant Product did

not stop the facilitation of the activity, with the means and knowledge to do so, with actual

notice of the threats. The Defendant Product should have acted to prevent further injury.

270.     The Defendant Product displayed an extreme departure from ordinary care or the

want of even scant care for Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff

Pascale Wasson as the Defendant Product sought to protect the perpetrator and not respond to

valid law enforcement investigations, administrative subpoena or valid Search Warrants of

this Court.

271.      For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale

Wasson's injuries sustained as a direct and proximate result of the Defendant Product's

Gross Negligence by willfully, wantonly and recklessly protecting threat perpetrators and

ignoring and delaying response to law enforcement and Court Orders and by the Defendant

Product's actions and inactions as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly

Ziencik and Plaintiff Pascale Wasson demand the following relief:

a. Compensation for great pain, suffering and inconvenience;
b. Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation
   and preclusion from performing Normal activities;
c. Compensation for great emotional distress;
d. Compensation for Plaintiffs' loss of their general health, strength and vitality;
e. Punitive and exemplary damages;
f. Any further relief found just and appropriate by the Court.

### COUNT X

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim
against the Defendant Product for Intentional Infliction of Emotional Distress**

272.     The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully

set forth herein.

273. Pennsylvania common law recognizes a cause of action for intentional infliction of emotional distress, which makes unlawful certain extreme and outrageous conduct that results in severe emotional distress and was intended or committed with a disregard for a substantial probability of causing such distress. *Motheral* v. *Burkhart*, 583 A.2d 1180 (Pa. Super. 1990); RESTATEMENT (Second) of Torts, § 46 (1965).

274. In the present case, the Defendant Product acted in an extreme and outrageous manner when the Defendant Product refused to take action after Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson specifically warned the Defendant Product about the perpetrator's threats, and the Defendant Product failed to answer the Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's initial reports through the Defendant Product 's internal messaging system.

275. Then, the Defendant Product refused to take action and respond after an initial inquiry by The University of Pittsburgh Police on December 19, 2018.

276. Then, the Defendant Product continued the outrageous refusal to take action and respond to Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, The University of Pittsburgh Police and the Wellesley Massachusetts Police concerning same or similar threats originating from the same perpetrator, using the same Defendant Product user accounts.

277. The Defendant Product continued the outrageous refusal to take action in a timely manner after issued the administrative subpoena of December 29, 2019 (Exhibit 7) and the Original Search Warrant of January 2, 2019. (Exhibit 8) The Defendant Product refused to respond to notice of threats and the requests of Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, The University of Pittsburgh Police, the Wellesley Massachusetts Police, The Norfolk County Massachusetts District Attorney's Office and District Justice Maureen

McGuire-Desent, District Court 05-0-04 of Allegheny County, Pennsylvania of the same or similar threats originating from the same perpetrator using the same Defendant Product user accounts.

278.    On January 24, 2019, the Defendant Product answered the Norfolk County Massachusetts District Attorney's Office's, acting on behalf of the Wellesley Massachusetts Police, administrative subpoena.

279.    However, five days later, on January 29, 2019, the Defendant Product continued the outrageous refusal to take action in a timely manner and respond to the Original Search Warrant issued on January 2, 2019 by District Justice Maureen McGuire-Desent, District Court 05-0-04 of Allegheny County, Pennsylvania, after notification by the Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, The University of Pittsburgh Police and Wellesley Massachusetts Police of the same or similar threats originating from the same perpetrator using the same Defendant Product user accounts.

280.    On January 29, 2019, the Defendant Product outrageously responded to The University of Pittsburgh Police and the Original Search Warrant, advising that the "legal process" that was submitted would not prohibit [the Defendant Product] from notifying the [perpetrator] of the aforementioned usernames. (Exhibit 4)

281.    Furthermore, the Defendant Product advised that the information requested would be retained for 30 days, pending a response for further action or dismissal of the requested information.

282.    The Defendant Product menaced that the Defendant Product could potentially notify the perpetrator of law enforcement investigations, further jeopardizing the safety of Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

283.    Then, the Defendant Product intimated that it would ignore a valid Search Warrant of this or any Court, even after notification of threats by the Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, multiple law enforcement agencies and other Courts.

284.    The Defendant Product demanded that The University of Pittsburgh Police submit a second search warrant under seal, thus further knowingly jeopardizing the safety of Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, proximately causing and exacerbating injuries and harm to Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.  The Defendant Product needlessly prolonged the investigation by The University of Pittsburgh Police.

285.    As the result of the inexcusable delay by the Defendant Product to respond to Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, The University of Pittsburgh Police, The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police by administrative subpoena and the Search Warrants of this Court in a timely manner, directly, foreseeably and proximately caused Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

286.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's Intentional Infliction of Emotional Distress by the intentional and outrageous delay to respond to law enforcement, this and other Courts and the Defendant Product's conduct as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and plaintiff Pascale Wasson demand the following relief:

    a.  Compensation for suffering and inconvenience;
    b.  Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
    c.  Compensation for great emotional distress;

d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;

e.  Punitive and exemplary damages;

f.  Any further relief found just and appropriate by the Court.

### COUNT XI

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Negligent Infliction of Emotional Distress**

287.   The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

288.   Pennsylvania common law recognizes a cause of action for negligent infliction of emotional distress, which makes unlawful the failure to exercise due care for the protection of others against unreasonable risk, or which constitutes an unintentional breach of a legal duty causing damage which is foreseeable and without which the damage would not have occurred. This includes the actions alleged herein, that result in severe emotional distress. *Smith* v. *School Dist. of Philadelphia*, 112 F. Supp. 2d 417, 428 (E.D. Pa. 2000).

289.   The Defendant Product, by its actions and inactions, owed a duty to exercise due care for the protection of Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

290.   The Defendant Product failed to exercise due care for the protection of Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson against unreasonable risk and/or an unintentional breach of the Defendant Product's legal duty causing damage which is foreseeable and without which, the damage would not have occurred.

291.   The Defendant Product's actions and inactions alleged herein resulted in severe emotional distress and injury including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson. The Defendant Product did not respond to the Plaintiff  Bailey Ziencik, The

65

University of Pittsburgh Police, Plaintiff Pascale Wasson, The Norfolk County

Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts

Police's administrative subpoena and the Search Warrants of this Court in timely manner.

292.     The Defendant Product's actions and inactions directly, foreseeably and proximately

caused injury to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale

Wasson including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

293.     For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale

Wasson's injuries sustained as a direct and proximate result of the Defendant Product's

Negligent Infliction of Emotional Distress by the Defendant Product's wanton, reckless and

outrageous delay to respond to law enforcement, this and other Courts by the Defendant

Product as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff

Pascale Wasson demand the following relief:

   a. Compensation for suffering and inconvenience;
   b. Compensation for Plaintiff Bailey Ziencik's  and Plaintiff Pascale Wasson's
      limitation and preclusion from performing Normal activities;
   c. Compensation for great emotional distress;
   d. Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e. Punitive and exemplary damages;
   f. Any further relief found just and appropriate by the Court.


## COUNT XII

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; 73 P.S. §§201-1 et seq.**

294.     The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully

set forth herein.

295.     The Defendant Product violated Pennsylvania's prohibition against unfair and

deceptive acts and practices under §201-3. Unlawful acts or practices.

296.    Unfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2

of the Pennsylvania Unfair Trade Practices and Consumer Protection Law:

> (i) Passing off goods or services as those of another;
> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
> (iv) Using deceptive representations or designations of geographic origin in connection with goods or services;
> (v)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;
> (vi)  Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;
> (vii)  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
> (viii)  Disparaging the goods, services or business of another by false or misleading representation of fact;
> (xiv)  Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;
> (xxi)Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

297.    The Defendant product violated the Pennsylvania Unfair Trade Practices and

Consumer Protection Law by misrepresenting and failing to disclose in the Defendant

Product's Terms of Service (Exhibit 11) its policies:

a. The Defendant Product fails to disclose that user accounts are deceptively, by default,

open to the public.

b. The Defendant Product fails to disclose the intentional design of the Defendant Product

to alert threat perpetrators of law enforcement investigations in the Terms of Service.

Even with known, substantiated threats reported by law enforcement, the Defendant

Product is intentionally designed to, at the Defendant Product's discretion, notify

perpetrators of known, substantiated threats of potential law enforcement investigations and/or ignore reports altogether further endangering any victim.

c. The Defendant Product fails to disclose that it is intentionally designed, at the Defendant Product's discretion, to notify perpetrators of known, substantiated threats of law enforcement investigations or simply ignore Search Warrants or Orders altogether, further endangering any victim.

d.  The Defendant Product fails to disclose that it is intentionally designed, at the Defendant Product's discretion, to choose to ignore and not respond to credible threat reports sent through the Defendant Product's internal messaging system.

e.  The Defendant Product fails to disclose that the Defendant Product's 24-Hour Law Enforcement Hotline  or any contact for law enforcement is inoperable or does not answer or is non-responsive.

f.  Furthermore, the Defendant Product's Law Enforcement Guide is not incorporated in the Terms of Service and is not easily accessible by the ordinary consumer.

298.    The Defendant Product has complete discretion under the Defendant Product's Law Enforcement Guide whether or not to respond to law enforcement investigations or valid Search Warrants. The discretion adversely impacts the Defendant Product's customers in favor of maximizing the Defendant Product's profits in violation of Pennsylvania's Unfair Trade Practices Act and Consumer Protection Laws, 73 P.S. §§201-1 *et seq.*

299.    According to the Defendant Product Law Enforcement Guide, the Defendant Product has complete discretion, whether or not, to answer legal process. This is only disclosed in the Law Enforcement Guide, not referenced in the Terms of Service, and this information is not readily available to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

300.    The Defendant Product deceived reasonable consumers, including Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson, that absent from the Defendant Product's Terms of Service, the Defendant Product is designed, at its sole discretion, to protect perpetrators of known, substantiated criminal threats of law enforcement investigations and would not protect victims.

301.    The Defendant Product was used by Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson primarily for personal, family or household purposes under §201-9.2. Private actions. The Defendant Product provided a service to Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.  The Defendant Product provides access to user account information, messages and transactions as a service.

302.    Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson, whose right to act arises under UTPCPL Section 9.2, must show that he or she was damaged as a result of a Defendant Product's unlawful act. *Weinberg* v. *Sun Co.,* 565 Pa. 612, 777 A.2d 442, 446 (2001) (Section 9.2 "clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action"); *DiLucido* v. *Terminix Int'l, Inc.*, 450 Pa. Super. 393, 401-02, 676 A.2d 1237, 1241 (1996) (Section 9.2's "use of the phrase 'as a result of' indicates the intent of the Legislature to require a causal connection between the unlawful practice and a plaintiff's loss").

303.    The Defendant Product's Terms of Service are deceptive because the Defendant Product does not inform the consumer of its intentional design to alert threat perpetrators of law enforcement investigations. The Defendant Product claims complete discretion to answer valid law enforcement inquiries or Search Warrants.

304.    As the direct and proximate cause of the Defendant Product's deceptive and unfair Terms of Service, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson were injured by the Defendant Product's intentional design, at the Defendant Product's discretion, to alert perpetrators of threats and not aid victims.

305.    The Defendant Product user accounts are designed to be public by default and failed to respond to Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, law enforcement, administrative subpoena, and Search Warrants. The Defendant Product's intentionally deceptive design caused Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

306.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's violation of the Unfair Trade Practices Act and Consumer Protection Laws, 73 P.S. §§201-1 *et seq.* concerning the Defendant Product's misleading and deceptive design, and the Defendant Product's conduct as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

a. Compensation for suffering and inconvenience;
b. Compensation for Plaintiff Bailey Ziencik's  and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
c. Compensation for great emotional distress;
d. Compensation for Plaintiffs' loss of their general health, strength and vitality;
e. Punitive and exemplary damages;
f. Any further relief found just and appropriate by the Court.

307.    In addition, under  the Unfair Trade Practices Act and Consumer Protection Laws, 73 P.S. §§201-1 *et seq,* the Defendant Product is liable to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson for the damages that they have suffered as a result of the Defendant Product's actions and inactions, the amount of such damages to be determined at trial,

plus an award of three times the actual damages sustained, but not less than one hundred dollars ($100), as well as such relief as this Court deems necessary or proper including attorneys' fees and costs.

## Count XIII

### Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Negligent Misrepresentation

308.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

309.    Pennsylvania common law recognizes a cause of action for negligent misrepresentation consisting of the making of a false material representation by one party, made under circumstances in which the misrepresenter ought to have known of its falsity; with the intent to induce the other party to act upon it, all of which results in injury to the other party.

310.    The Defendant Product induced Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson to use the Defendant Product through the advertised, yet inoperable, systems and procedures available to consumers to report threats. The inoperable systems and procedures created a false sense of security which caused harm and injury to the Plaintiffs.

311.    Plaintiff Bailey Ziencik and  Plaintiff Pascale Wasson used the Defendant Product's advertised, internal messaging system to report the threats of the same perpetrator. Neither Plaintiff has had any response from the Defendant Product.

312.    The Defendant Product made the false material representation that it supports law enforcement and is responsive to Search Warrants, or similar subpoenas, of this or any Court and then, at the Defendant Product's discretion, ignored the Search Warrants issued by this

and other Courts for nearly a month, never filing a Motion for a Protective Order or Motion to Quash.

313.     Thus, the Defendant Product, by not responding to Plaintiff Bailey Ziencik's or Plaintiff Pascale Wasson's reports of threats on the Defendant Product internal messaging service advertised to alert the Defendant Product to threats of bodily injury or imminent death, caused harm and injury to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

314.     Additionally, by not responding accordingly to the Search Warrant(s) or administrative subpoena, the Defendant Product, contrary to its representation in the Defendant Product's  Law Enforcement Guide (Exhibit 2), caused harm and injury to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

315.     The Defendant Product falsely represented itself and induced Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson to use the internal messaging service, as an effective alert tool to the Defendant Product of threats of bodily harm. The Defendant Product never responded, thus causing injuries to the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

316.     The Defendant Product falsely represented that Search Warrants and/or administrative subpoenas with the Defendant Product's requested language would be responded to by the Defendant Product. The Defendant Product induced law enforcement on behalf of the Plaintiffs to adhere to the Defendant Product's Law Enforcement Guide to create a valid request. (Exhibit 2)

317.    The Defendant Product did not respond according to the Defendant Product's Law Enforcement Guide, for nearly a month, either by administrative subpoena or Search Warrant, causing and exacerbating injuries by withholding the location and identity of the perpetrator from valid law enforcement investigations.

318.    The Defendant Product's advertised Law Enforcement Hotline did not work, was inoperable or  disconnected causing and exacerbating injuries by withholding the location and identity of the perpetrator from valid law enforcement investigations.

319.    The Defendant Product does not disclose to the average consumer, that it is designed to alert threat perpetrators of law enforcement investigations, further endangering Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

320.    The Defendant Product promoted methods to report abuse, however, the futility for action and intentionally delayed response to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson, The University of Pittsburgh Police, The Wellesley Massachusetts Police, Search Warrants or subpoenas of this Court or any Court, directly and proximately caused the personal injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson.

321.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product for negligently misrepresenting to anticipate any response from the Defendant Product as promoted in the Defendant Product's Terms of Service and Law Enforcement Guide and the Defendant Product's misrepresentation, as aforesaid, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

a.  Compensation for suffering and inconvenience;
b.  Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
c.  Compensation for great emotional distress;
d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
e.  Punitive and exemplary damages;
f.  Any further relief found just and appropriate by the Court.

## Count XIV

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Intentional and Fraudulent Misrepresentation**

322.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

323.    Pennsylvania common law recognizes a cause of action for intentional and fraudulent misrepresentation consisting of the making of a false material representation by one party, where that party knew of its falsity, with the intent to deceive and induce the other party to act upon it, all of which results in injury to the other party.

324.    The Defendant Product knew that publishing its "Report Abuse on Snapchat" (Exhibit 5) induced users, who may receive violent threats, such as Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson, that the Defendant Product would respond to the report of threats.

325.    Promoting the Defendant Product's internal messaging system and other legal avenues to uncover the source threats, the Defendant Product induced Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson to use systems and procedure available to consumers to report threats. The promoted, yet inoperable, systems and procedures created a false sense of security causing harm and injury to the Plaintiffs.

326.     Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson used the Defendant Product's promoted, internal messaging system to report the threats from the same perpetrator, neither Plaintiff received any response from the Defendant Product.

327.     The Defendant Product's Law Enforcement Hotline did not work, was inoperable or disconnected, causing and exacerbating injuries, by withholding the location and identity of the perpetrator from valid law enforcement investigations.

328.     The Defendant Product did not respond as promoted in the Defendant Product's Law Enforcement Guide, for nearly a month, to either administrative subpoena or Search Warrant, causing, and exacerbating injuries, by the Defendant Product's actions and inactions withholding the location and identity of the perpetrator of threats from valid law enforcement investigations.

329.     The Defendant Product does not disclose to the average consumer, that it is designed to alert the threat perpetrator of law enforcement investigations, further endangering the Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson.

330.     The Defendant Product's conduct to ignore, delay and not respond to the Defendant Product's internal messaging system, multiple law enforcement agencies, Court Ordered Search Warrant(s) and administrative subpoenas further exacerbated injuries to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson. The Defendant Product's conduct is indicative of the Defendant Product's intent to deceive and induce the Plaintiffs to report, in futility, threats of bodily injury, all of which directly and proximately caused Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

331.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's Intentional and Fraudulent Misrepresentation that the Defendant Product would be responsive to its promoted methods of reporting threats and orders of Court and the Defendant Product's misrepresentation as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

    a.  Compensation for suffering and inconvenience;
    b.  Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
    c.  Compensation for great emotional distress;
    d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
    e.  Punitive and exemplary damages;
    f.  Any further relief found just and appropriate by the Court.

**Count XV**

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Assault**

332.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

333.    Pennsylvania common law recognizes a cause of action for assault which consists of the intentional placing of another party in fear of imminent harmful or offensive conduct.

334.    The Defendant Product intentionally, recklessly, willfully, and wantonly placed the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson in fear of the imminent harmful or offensive conduct.

335.    The Defendant Product placed the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson in fear of imminent harm or offensive conduct when the Defendant Product intentionally, recklessly withheld, and delayed releasing, for more than a month, the information concerning the identity and whereabouts of the perpetrator of the

violent threats, lawfully demanded by Search Warrant(s) of this Court and law enforcement as well as notification through the Defendant Product's own internal messaging system.

336.    Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik were intentionally placed in fear and terror by the Defendant Product. By withholding the identity and whereabouts of the perpetrator, Plaintiff Bailey Ziencik and Plaintiff Kelly Ziencik could only assume that the perpetrator of violent threats lurked The University of Pittsburgh Campus, stalking Plaintiff Bailey Ziencik, to harm her at any moment.

337.    Plaintiff Pascale Wasson was intentionally placed in fear and terror by the Defendant Product. By withholding the identity and whereabouts of the perpetrator, Plaintiff Pascale Wasson could only assume that the perpetrator of violent threats lurked the Amherst College Campus, stalking Plaintiff Pascale Wasson, to harm her at any moment.

338.    The Defendant Product, by its conduct, in delaying response for more than 45 days without excuse, to Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, The University of Pittsburgh Police and Search Warrants issued by the District Court and the Court of Common Pleas of Allegheny County, Pennsylvania, intentionally placed Plaintiff Bailey Ziencik in fear of imminent, harmful or offensive conduct by an unknown perpetrator who threatened "I'm going to slash your throat in when I see you on campus". (Exhibit 8, Page 3, and Exhibit 7, Page 2)

339.    The Defendant Product, by its conduct, in delaying response for more than 23 days without excuse, to Plaintiff Pascale Wasson, Plaintiff Bailey Ziencik, The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police's administrative subpoena, intentionally placed Plaintiff Pascale Wasson in fear of

imminent, harmful or offensive conduct by an unknown perpetrator who threated "I'm going to slash your throat in when I see you on campus". (Exhibit 7)

340.    Under Pennsylvania common law, as a direct and proximate result of the Assault by the Defendant Product on Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson suffered, and continue to suffer, injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia.

341.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Defendant Product's Assault on Plaintiff Bailey Ziencik and Plaintiff Pascale Wasson by intentionally keeping the Plaintiffs in fear of serious bodily harm and imminent death by not responding to the multiple requests for the threat perpetrator's identity and location and the Defendant Product's conduct as aforesaid, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

   a.  Compensation for suffering and inconvenience;
   b.  Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;
   c.  Compensation for great emotional distress;
   d.  Compensation for Plaintiffs' loss of their general health, strength and vitality;
   e.  Punitive and exemplary damages;
   f.  Any further relief found just and appropriate by the Court.

### Count XVI

**Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's Claim against the Defendant Product for Unconscionability**

342.    The Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

343.    The doctrine of unconscionability "has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Cardinal* v. *Kindred Healthcare, Inc*., 155 A.3d 46, 53 (Pa. Super. 2017) (quoting *MacPherson* v. *Magee Mem. Hosp. for Convalescence*, 128 A.3d 1209, 1221 (Pa.Super. 2015) (en banc). The first element - lack of meaningful choice - has become known as procedural unconscionability, while the unreasonableness prong is called substantive unconscionability. *Salley* v. *Option One Mortg. Corp*., 925 A.2d 115, 119 (Pa. 2007).*Chillas* v. *Reedy*, Pages 7-8 (Pa. Super. Ct. 2020)

344.    The Defendant Product's Terms of Service and Law Enforcement Guide are procedurally and substantively unconscionable in the following respects, among others:

345.    The Defendant Product's Terms of Service (Exhibit 11) are procedurally unconscionable because the Defendant Product does not disclose, or reasonably disclose that the Defendant Product has a setting that consumers can use to "opt out" of default public user account.

346.    The Defendant Product's Terms of Service are procedurally unconscionable because the Defendant Product does not provide the customer the opportunity to reasonably and effectively block and report threatening messages and/or user accounts.

347.    The Defendant Product's Terms of Service are procedurally unconscionable because the Defendant Product's Terms of Service are contracts of adhesion in that they are standardized online forms on smartphones, imposed and drafted by the Defendant Product, which is a party of vastly superior bargaining strength, and only relegates to Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson the opportunity to adhere to them or reject the agreement in its entirety.

348.   The Defendant Product's Terms of Service are substantively unconscionable because the Defendant Product does not disclose that, solely at the Defendant Product's discretion, the Defendant Product can ignore known, substantiated threats of bodily injury and/or imminent death.

349.   The Defendant Product's Terms of Service are substantively unconscionable because the Defendant Product does not disclose to the consumer, that the Defendant Product is designed to alert the perpetrator of known, substantiated threats of bodily injury and/or imminent death made to law enforcement, protecting the perpetrator of the threats.

350.   The Defendant Product's Terms of Service are substantively unconscionable because the Defendant Product does not affirmatively block accounts when known, substantiated threats of bodily injury and/or imminent death are made known to law enforcement.  Rather, blocking accounts is at the complete discretion of the Defendant Product.

351.   The protection of perpetrators of threats by the Defendant Product and other "terms" are buried deep within the Terms of Service and are disclosed in an ineffective, ambiguous, misleading, and an unfair manner to the consumer. All "terms" are not wholly contained in the Terms of Service, but rather in a different and distinct document, the Law Enforcement Guide (Exhibit 2), which is not commonly seen or easily accessible by the consumers, including Plaintiff Bailey Ziencik or Plaintiff Pascale Wasson. The Law Enforcement Guide is not mentioned in the Defendant Product's Terms of Service. (Exhibit 11) Notification to the perpetrators of threats of law enforcement investigations as a designed response of the Defendant Product, is only disclosed in the Law Enforcement Guide. (Exhibit 2)

352.   The Defendant Product's Terms of Service provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading because the Defendant Product does not

unambiguously state that the Defendant Product is designed, at the Defendant Product's sole discretion, to alert threat perpetrator(s) of law enforcement investigations, further endangering victims.

353.    Law enforcement must, beyond convincing a Court of the probable cause that the Defendant Product possesses evidence of the commission of a crime, also convince the Defendant Product to release the information.  The Defendant Product acts as if it is "above the law," without legal basis, and gives itself the discretion to act with impunity, and simply ignore Search Warrants of the District Court and the Court of Common Pleas of Allegheny County, PA or similar orders of any Court.

354.    The Defendant Product's Terms of Service favor the Defendant Product because the Defendant Product does not disclose that it does not have to respond to the reports of threats by Plaintiff Bailey Ziencik, Plaintiff Pascale Wasson, The University of Pittsburgh Police, The Norfolk County Massachusetts District Attorney's Office acting on behalf of the Wellesley Massachusetts Police, and the Original Search Warrant of District Justice Maureen McGuire-Desent, and the Second Search Warrant Judge David Cashman of this Court.

355.    For Plaintiff Bailey Ziencik's, Plaintiff Kelly Ziencik's and Plaintiff Pascale Wasson's injuries sustained as a direct and proximate result of the Unconscionable Terms of Service of the Defendant Product because the Terms of Service do not disclose the Defendant Product's design to ignore law enforcement at the Defendant Product's discretion or warn threat perpetrators of law enforcement investigations and the Defendant Product's conduct as aforesaid, the Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson demand the following relief:

a.   Compensation for great suffering and inconvenience;

b. Compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing Normal activities;

c. Compensation for great emotional distress;

d. Compensation for Plaintiffs' loss of their general health, strength and vitality;

e. Punitive and exemplary damages;

f. Any further relief found just and appropriate by the Court.

WHEREFORE, Plaintiff Bailey Ziencik, Plaintiff Kelly Ziencik and Plaintiff Pascale Wasson, each, individually, for all reasons stated above in Counts I through XVI, inclusive, have been damaged and claim damages of the Defendant Snap, inc. d/b/a Snapchat in an amount in excess of Thirty Five Thousand ($35,000.00) Dollars, which is in excess of the arbitration jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania, compensation for great suffering and inconvenience, compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing normal activities, compensation for great emotional distress, compensation for Plaintiffs' loss of their general health, strength and vitality, punitive and exemplary damages, attorneys fees, costs of the litigation and any further relief found just and appropriate by the Court in each and every Count herein.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY RAISED HEREIN.

Dated: December 3, 2020                Law Offices of Lee W Davis, Esquire, L.L.C.

BY: _____

Lee W. Davis, Esquire (PA I.D. 77420)
5239 Butler Street, STE 201
Pittsburgh, PA  15201
(412) 781-0525
(412) 781-0527 (fax)
lee@leewdavis.com
ATTORNEY FOR PLAINTIFFS

## VERIFICATION

I, Bailey Ziencik, hereby certify that the statements set forth in the foregoing Plaintiff's

Complaint are true and correct to the best of our knowledge, information and belief. The

factual matters set forth therein are based upon information which has been furnished to

counsel or which has been gathered by counsel as it pertains to this lawsuit; that the

language contained in the foregoing is that of counsel and not the undersigned; and,

that to the extent that the contents of same is that of counsel the undersigned has relied

upon counsel in making this affidavit.

I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A.

§4904 relating to unsworn fabrication to authorities, which provides that if I knowingly

make false averments, I may be subject to criminal penalties.


Bailey Ziencik

Date: 12.2.2020

**VERIFICATION**

I, Kelly Ziencik, hereby certify that the statements set forth in the foregoing Plaintiff's

Complaint are true and correct to the best of my knowledge, information and belief. The

factual matters set forth therein are based upon information which has been furnished to

counsel or which has been gathered by counsel as it pertains to this lawsuit; that the

language contained in the foregoing is that of counsel and not the undersigned; and,

that to the extent that the contents of same is that of counsel the undersigned has relied

upon counsel in making this affidavit.

I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A.

§4904 relating to unsworn fabrication to authorities, which provides that if I knowingly

make false averments, I may be subject to criminal penalties.


Kelly Ziencik

Date: 12/2/2020

## VERIFICATION

I, Pascale Wasson, hereby certify that the statements set forth in the foregoing Plaintiff's

Complaint are true and correct to the best of my knowledge, information and belief. The

factual matters set forth therein are based upon information which has been furnished to

counsel or which has been gathered by counsel as it pertains to this lawsuit; that the

language contained in the foregoing is that of counsel and not the undersigned; and,

that to the extent that the contents of same is that of counsel the undersigned has relied

upon counsel in making this affidavit.

I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A.

§4904 relating to unsworn fabrication to authorities, which provides that if I knowingly

make false averments, I may be subject to criminal penalties.


Pascale Wasson

Date: 12/02/20

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | | |
|---|---|---|
| **Bailey Ziencik,** an individual | ) | Case No._____ |
| | ) | |
| And | ) | |
| | ) | COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) | NUMBER 1 |
| | ) | |
| And | ) | |
| | ) | |
| **Pascale Wasson,** an individual | ) | |
| | **)** | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **Snap, Inc. d/b/a SnapChat** | ) | |
| a Corporation; | ) | |
| | ) | |
| **Defendant.** | ) | **Filed on Behalf of the Plaintiffs,** |
| | ) | **Bailey Ziencik and Kelly Ziencik** |
| | ) | |
| | ) | Counsel of Record for Plaintiffs: |
| | | Lee W. Davis, Esquire |
| | | Pa. I.D. No. 77420 |
| | | Law Offices of |
| | | Lee W. Davis, Esquire, L.L.C. |
| | | 5239 Butler St., STE 201 |
| | | Pittsburgh, PA 15201 |
| | | Telephone:    (412) 781-0525 |
| | | Fax No.:    (412) 781-0527 |
| | | E-mail:    lee@leewdavis.com |



## Company Profile

Snap Inc. is a camera company.

We believe that reinventing the camera represents our greatest opportunity to improve the way people live and communicate.

We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

## Contact

Investor Relations

 Email

Media

 Email    **Exhibit 1**

Snap Inc. Headquarters

   

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | |
|---|---|
| **Bailey Ziencik,** an individual | )    Case No._____ |
| | ) |
| And | ) |
| | )    COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | )    NUMBER 2 |
| | ) |
| And | ) |
| | ) |
| **Pascale Wasson,** an individual | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **Snap, Inc. d/b/a SnapChat** | ) |
| a Corporation; | ) |
| | ) |
| **Defendant.** | )    **Filed on Behalf of the Plaintiffs,** |
| | )    **Bailey Ziencik and Kelly Ziencik** |
| | ) |
| | )    Counsel of Record for Plaintiffs: |
| | Lee W. Davis, Esquire |
| | Pa. I.D. No. 77420 |
| | Law Offices of |
| | Lee W. Davis, Esquire, L.L.C. |
| | 5239 Butler St., STE 201 |
| | Pittsburgh, PA 15201 |
| | Telephone:    (412) 781-0525 |
| | Fax No.:      (412) 781-0527 |
| | E-mail:       lee@leewdavis.com |

Exhibit 2



# Snap Inc.
# Law Enforcement Guide

*Last Updated: September 21, 2018*

---

**Download the most recent version at** https://www.snapchat.com/lawenforcement

## Contact Information for Law Enforcement

### Sending Legal Process and Related Inquiries

We accept service of legal process and general questions from law enforcement via email or mail. ***Note:*** *Receipt of law enforcement requests by these means is for convenience only and does not waive any objections or legal rights of Snap Inc. or its users.*

Email:      lawenforcement@snapchat.com

Mail:       Custodian of Records
Snap Inc.
2772 Donald Douglas Loop North
Santa Monica, CA 90405

### Requesting Emergency Law Enforcement Assistance

For emergency law enforcement assistance, complete and submit the Law Enforcement Emergency Response Form:

https://lawenforcement.snapchat.com/emergency

*Note: This form is for use only by sworn law enforcement officials requiring emergency assistance regarding a threat of imminent death or bodily injury. All other inquiries from law enforcement must be directed to the email address above.*

# Table of Contents

| | | |
|---|---|---|
| I. | Snap and Law Enforcement Overview | 2 |
| II. | Snap User Notice Policy | 3 |
| III. | How Snapchat Works | 4 |
| IV. | Identifying a Snapchat Account | 6 |
| V. | Required Legal Process | 8 |
| VI. | Preservation Requests | 11 |
| VII. | Emergency Requests | 12 |
| VIII. | Testimony | 12 |
| IX. | Sample Language and Forms for Legal Process Requests | 13 |

# I.   Snap and Law Enforcement Overview

Snapchat is a mobile application made by Snap Inc. ("Snap") and available through the iPhone App Store and Google Play Store. The Snapchat app provides users a way to share moments with photos, videos, and chats.

This guide provides information for law enforcement officials seeking records from Snap.

**U.S. Legal Process Requirements**

Snap discloses account records solely in accordance with our Terms of Service, the Stored Communications Act, 18 U.S.C. §2701, et seq. ("SCA"), and other applicable laws. The SCA mandates that we disclose certain user data to law enforcement only in response to specific types of legal process, including subpoenas, court orders, and search warrants. Generally, the SCA authorizes law enforcement to compel us to disclose basic subscriber information, non-content account information, and account content (as described in Section V "Required Legal Process" below) in response to appropriate legal process.

**International Legal Process Requirements**

Non-U.S. governmental and law enforcement agencies must rely on the mechanics of the Mutual Legal Assistance Treaty ("MLAT") or letters rogatory processes to seek user information from Snap. As a courtesy to international law enforcement, we will review and respond to properly submitted preservation requests (see Section VI "Preservation Requests" below) while the MLAT or letters rogatory process is undertaken.

Snap may, at its discretion, provide limited user account information to government agencies outside of the U.S. on an emergency basis when we believe that doing so is necessary to prevent death or serious physical harm to someone.

**Support for Law Enforcement**

Because Snap is committed to assisting law enforcement investigations as the law requires, we provide email support to law enforcement agencies for non-emergency matters, and 24-hour online service for emergency situations involving the threat of imminent death or bodily injury. Contact information for our Law Enforcement Operations team is provided on the cover of this guide.

Please note that Snap cannot provide legal advice to law enforcement officials. If you need clarification about SCA's restrictions on providers like Snap, please contact the Department of Justice's Computer Crime and Intellectual Property Section (CCIPS) at 202-514-1026 and ask to speak to the Duty Attorney.

## II.   Snap User Notice Policy

Our policy is to notify affected Snapchat users when we receive legal process seeking their records, information, and content. Before we respond to the legal process, we allow affected users seven days to challenge the legal process in court and to provide us a file-stamped copy of the challenge.

However, we do not provide such user notice when: (1) providing notice is prohibited by a court order issued under 18 U.S.C. § 2705(b) or by other legal authority; or (2) we believe an exceptional circumstance exists, such as cases involving child exploitation or the threat of imminent death or bodily injury.

To minimize delays related to user notice, you can take one of the following steps, if applicable:

1. Inform us upfront that you have no objection to us notifying affected users of your legal process. This saves us the step of notifying you of Snap's user notice policy and awaiting your confirmation that you have no objection.

2. Provide a court order consistent with 18 U.S.C. § 2705(b) that prohibits us from providing notice to affected users.

3. Provide an appropriate legal basis for prohibiting us from providing notice to affected users.

4. Inform us that your case involves child exploitation, or the threat of imminent death or bodily injury, and provide an appropriate legal and factual basis for us to independently make that determination.

# III.   How Snapchat Works

The following is an overview of how the Snapchat app works. Additional information is available on the Snapchat Support Site at https://support.snapchat.com.

## Snaps

Snaps are photos or videos taken using the Snapchat app's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story (explained below) or Chat.

Snap's servers are designed to automatically delete a Snap after it has been viewed by all intended recipients. Snap's servers are designed to automatically delete an unopened Snap sent directly to a recipient after 30 days and an unopened Snap in Group Chat after 24 hours.

## Stories

A user can add Snaps to their "Story". A Story is a collection of Snaps displayed in chronological order. Users can manage their privacy settings so that their Story can be viewed by all Snapchatters, their friends, or a custom audience. A user can also submit their Snaps to our crowd-sourced service "Our Story", which enables their Snaps to be viewed by all Snapchatters in Search and Snap Map.

Snap's servers are designed to automatically delete a Snap in a user's Story 24 hours after the user posts the Snap, but the user may delete part or all of the Story earlier. Submissions to Our Story may be saved for longer periods of time.

## Memories

Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user. Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

4

**Chat**

A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature. Our servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.

Snap's servers are designed to automatically delete unopened one-to-one chats in 30 days. Users can also chat in groups. Chats sent in groups are deleted after 24 hours whether they are opened or not. A user can save a message in Chat by pressing and holding the message. The user can unsave the message by pressing and holding it again. This will delete it from our servers. Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

**Location Data**

If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the app settings.

# IV.    Identifying a Snapchat Account

Before sending us a legal request, law enforcement must first identify the **<u>username</u>** of the account. ***Note***: *Users and law enforcement often confuse an account's username with an account's display name (also referred to as a vanity name). <u>We cannot locate an account by a display name.</u>*

**Snapchat Username**

A Snapchat username is a unique identifier associated with a specific Snapchat account, and it cannot be changed by the user. A display name, on the other hand, is not a unique identifier and can be created and changed by a user to indicate how the user will appear within the app. A user can also change a friend's display name to determine how that friend will appear to that particular user on the app, similar to how one can customize contact names on a smartphone.

Snapchat username attributes:

- Must be 3-15 characters long
- Must begin with a letter
- Can only contain letters, numbers, and the special characters hyphen ( - ), underscore ( _ ), and period ( . )
- Cannot end with a hyphen, underscore, or period
- Cannot contain spaces
- Cannot contain emojis or other symbols such as @, $, #, etc.
- Will appear only in lower-case letters within the app

Unlike a username, a display name can contain special characters and symbols beyond hyphen, underscore, or period, as well as spaces, emojis, and capital letters.

*Example of Snapchat username and display name:*



(The image above is a popup in Snapchat that can be accessed by pressing and holding on a user found within Search or a Chat screen.)

In the example above, the username is "niknak_111" and the display name has been set to "Niki", which appears above the username. Note that there can be only one Snapchat user with the username "niknak_111", but any number of users with the display name "Niki".

If a display name has not been created, the username will appear instead.

**TIP**: If you are unsure if you have the correct username, type it into the Snapchat Search screen to see if it appears. If it does not appear, then it does not exist or may have been deleted. ***Note***: *Some deleted accounts may still have some limited information stored depending on various factors*.

If you are unable to identify a username, we can try – with varying degrees of success – to locate the account with a phone number or email address. For context, Snap does not require users to submit a phone number or email address to create a Snapchat account. Because phone numbers and email addresses can easily be changed by users, this information has historically not been reliable in identifying users.

***Note***: *We are unable to locate Snapchat accounts based on any of the following data: display name, real name, date of birth, street address, social security number, and photos*.

7

# V.    Required Legal Process

**Sending Legal Process to Snap**

Please send all law enforcement criminal legal process and preservation requests (see Section VI "Preservation Requests" below) by email to lawenforcement@snapchat.com. Although we accept service of law enforcement criminal legal process by U.S. mail and overnight courier services delivered to the address provided on the cover of this guide, our response time will be significantly slower. **Note**: *We do <u>not</u> utilize fax service and are unable to accept service of criminal legal process by fax.*

**Legal Process Requirements Overview**

We can release user data on a non-emergency basis only if we receive law enforcement criminal legal process that fully complies with the law. The legal process should be submitted on a non-editable static file (such as PDF), name "Snap Inc." as the Custodian of Record, and should be dated and signed. To facilitate a prompt response when requesting data for more than one user (i.e., multiple usernames), those requests should be included in one legal process document.

When providing legal process requesting production of user data, please include the following details:

- Snapchat username (see Section IV "Identifying a Snapchat Account" above)
- The specific type of data you are seeking (see below)
- Any applicable due date
- Response contact information (preferably an email address, or if not, then a non-P.O. box physical address)
- If you object to us notifying affected users and why (see Section II "Snap User Notice Policy" above)

The required legal process varies depending on the type of user data you seek, as described below. Please also see Section VI below regarding preservation requests.

**Basic Subscriber Information**

Basic subscriber information is collected when a user creates a new Snapchat account, alters information at a later date, or otherwise interacts with the Snapchat app. Basic subscriber information may include:

- Snapchat username
- Email address
- Phone number
- Display name
- Snapchat account creation date and IP address
- Timestamp and IP address of account logins and logouts

***Note:*** *Not all information listed above is required for a user to use the app, and Snap does not independently verify user-provided subscriber information.*

The basic subscriber information entered by a user in creating an account is maintained as long as the user has not edited the information or removed the information from the account. Once the user makes a change, the previously existing information is overwritten. Upon receipt of a preservation request (see Section VI below), however, we can attempt to capture the user data available at that time; and future actions by the user will not affect the preserved user data. We also retain logs containing IP addresses associated with account login and logout for a limited period of time after the user has deleted their Snapchat account.

**Legal process required for basic subscriber information**: Basic subscriber information can be obtained through a subpoena (including one issued by a grand jury), administrative subpoena, or civil investigative demand pursuant to 18 U.S.C. § 2703(c)(2); a court order issued in accordance with 18 U.S.C. § 2703(d); or a federal or state search warrant.

**Logs of Previous Snaps, Stories, and Chats**

Logs contain metadata about a user's Snaps, Stories, and Chats, but not the user's content.

**Legal process required for logs**: Logs of previous Snaps, Stories, and Chats can be obtained pursuant to a court order under 18 U.S.C. § 2703(d) or a federal or state search warrant.

## Location Data

Location data may be available for a Snapchat user who has turned on location services on their device and opted into location services in the app settings.

**Legal process required for location data**: Location data, to the extent available, can be obtained pursuant to a federal or state search warrant.

## Content

Because Snap's servers are designed to automatically delete most user content as described in Section III "How Snapchat Works" above, and because much of a user's content is encrypted, we often cannot retrieve user content except in very limited circumstances. Memories content may be available until deleted by a user. My Eyes Only content is encrypted, and although we can provide the data file, we have no way to decrypt the data.

**Legal process required for message content or media content**: Content, to the extent available, can be obtained pursuant to a federal or state search warrant.

# VI.    Preservation Requests

Because Snapchat user data is not retained for a long period of time, it is important that law enforcement understands the concept of preservations and why it is important to request them.

A preservation is a snapshot in time of a user's data, including basic subscriber information, metadata (usage logs) and content (Chats, Snaps, Stories, and Memories). As referenced earlier, Snap retains different types of user data for different periods of time. It is likely that law enforcement would want Snap to make a preservation as soon as possible after an alleged incident for which it seeks evidence.

We honor formal requests from law enforcement to preserve user data in accordance with 18 U.S.C. § 2703(f). Upon receiving a signed and dated preservation request on law enforcement department letterhead, we will attempt to preserve available account information associated with any properly identified Snapchat users (see Section IV "Identifying a Snapchat Account" above) in an offline file for up to 90 days and will extend the preservation for one additional 90-day period with a formal extension request.

If you require an extension, submit a formal signed and dated preservation **extension** request on law enforcement department letterhead. The request needs to stipulate that it is an extension request and <u>not</u> an original preservation request.

***Note****: 18 U.S.C. § 2703(f) does not contemplate "serial" preservation requests or multiple extension requests beyond one additional 90-day period. Accordingly, we do not comply with such requests.*

# VII.    Emergency Requests

Sworn law enforcement officials may request user data on an emergency basis 24 hours a day by completing and submitting the Law Enforcement Emergency Response Form: https://lawenforcement.snapchat.com/emergency

Emergency requests must be submitted by a sworn law enforcement official and must come from an official law enforcement email domain. When filling out the emergency form, please provide the Snapchat username (see Section IV "Identifying a Snapchat Account" above) or associated phone number or email address, describe the nature of the emergency as specifically as possible, and specify the information that you are seeking to resolve the emergency situation.

Under 18 U.S.C. §§ 2702(b)(8) and 2702(c)(4), we are able to voluntarily disclose information when we believe in good faith that an <u>emergency posing a threat of imminent death or serious bodily injury requires immediate disclosure.</u>

# VIII.    Testimony

Snap does not provide expert witness testimony. However, data productions made to law enforcement will be accompanied by a signed Certificate of Authenticity, which should eliminate the need for the testimony of a Custodian of Records.

# IX.    Sample Language and Forms for Legal Process Requests

This section provides sample language that law enforcement may use to complete their request for basic subscriber information, logs of previous Snaps, or preservation of a Snapchat account. As a reminder, please send legal process requests to lawenforcement@snapchat.com.

### Sample Language to Request Basic Subscriber Information
"Basic subscriber information for the Snapchat account(s) associated with the username(s) _____ consisting of the email address, phone number, account creation date, and timestamps and IP address for account logins/logouts."

### Sample Language to Request Logs of Previous Snaps
"Logs, including sender, recipient, date, and time, concerning the previous Snaps sent to or from the Snapchat account(s) with the username(s) _____. "

### Sample Preservation Request Letter
*(Must be on law enforcement department letterhead, dated, signed, and sent from an official governmental email address.)*

Dear Custodian of Records:

The below listed account(s) is(are) the subject of an ongoing criminal investigation at this agency, and it is requested pursuant to 18 U.S.C. § 2703(f) that records associated with said account(s) be preserved pending the issuance of a search warrant or other legal process seeking disclosure of such information:

*[Specify Snapchat account username(s) or associated email address(es) or phone number(s) to be preserved (See Section IV, above).]*

I understand that Snap Inc. reserves the right to delete any account that violates its Terms of Service.

If you have any questions concerning this request please contact me at [*insert email address and phone contact*].

Sincerely,


(Your Signature)
(Your Name and Title Typed)

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | |
|---|---|
| **Bailey Ziencik,** an individual | ) Case No._____ |
| And | ) |
| | ) |
| **Kelly Ziencik**, an individual | ) COMPLAINT EXHIBIT |
| | ) NUMBER 3 |
| And | ) |
| | ) |
| **Pascale Wasson,** an individual | ) |
| | **)** |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **Snap, Inc. d/b/a SnapChat** | ) |
| a Corporation; | ) |
| | ) |
| **Defendant.** | ) **Filed on Behalf of the Plaintiffs,** |
| | ) **Bailey Ziencik and Kelly Ziencik** |
| | ) |
| | ) Counsel of Record for Plaintiffs: |

Lee W. Davis, Esquire
Pa. I.D. No. 77420
Law Offices of
Lee W. Davis, Esquire, L.L.C.
5239 Butler St., STE 201
Pittsburgh, PA 15201
Telephone:    (412) 781-0525
Fax No.:    (412) 781-0527
E-mail:    lee@leewdavis.com

Exhibit 3

## Company Profile

Snap Inc. operates as a camera company in the United States and internationally. The company offers Snapchat, a camera application that helps people to communicate through short videos and images called Snaps. It also provides Camera, a tool to personalize and add context to Snaps; Chat that allows creating and watching stories, chatting with groups, making voice and video calls, and communicating through a range of contextual stickers and Bitmojis; and Discover that helps surfacing the stories and shows from publishers, creators, and the community based on a user's subscriptions and interests. In addition, the company offers Snap Map, which brings to a live map of individual location, showing nearby friends, popular stories, and a heatmap of recent snaps posted; Memories that allows users to choose to save the Snaps they create in a searchable personal collection, and users to create Snaps and stories from their saved Snaps and camera roll; and Spectacles, a hardware product that connects with Snapchat and captures video from a human perspective. The company was formerly known as Snapchat, Inc. and changed its name to Snap Inc. in September 2016. Snap Inc. was founded in 2010 and is headquartered in Santa Monica, California.

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | |
|---|---|
| **Bailey Ziencik,** an individual | ) Case No._____ |
| | ) |
| And | ) |
| | ) COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) NUMBER 4 |
| | ) |
| And | ) |
| | ) |
| **Pascale Wasson,** an individual | ) |
| | **)** |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **Snap, Inc. d/b/a SnapChat** | ) |
| a Corporation; | ) |
| | ) |
| **Defendant.** | ) **Filed on Behalf of the Plaintiffs,** |
| | ) **Bailey Ziencik and Kelly Ziencik** |
| | ) |
| | ) Counsel of Record for Plaintiffs: |
| | Lee W. Davis, Esquire |
| | Pa. I.D. No. 77420 |
| | Law Offices of |
| | Lee W. Davis, Esquire, L.L.C. |
| | 5239 Butler St., STE 201 |
| | Pittsburgh, PA 15201 |
| | Telephone:    (412) 781-0525 |
| | Fax No.:       (412) 781-0527 |
| | E-mail:        lee@leewdavis.com |



**University of Pittsburgh**
**POLICE DEPARTMENT**
**INCIDENT REPORT**
3412 Forbes Avenue, Pittsburgh, PA, 15260
PHONE: 412-624-4040  FAX: 412-624-5671  police@pitt.edu

**Exhibit 4**

| LOCATION OF OCCURRENCE / ADDRESS | | | DATE / TIME REPORTED | CASE NO. |
|---|---|---|---|---|
| PSB / PUBLIC SAFETY BLDG, 3412 FORBES AVE PITTSBURGH, PA 15213 | | | 12/19/2018 11:37 | 18-04578 |

| CODE SECTION | CRIME | | CLASSIFICATION | LOSS | RECOVERY |
|---|---|---|---|---|---|
| | Assist Other Police Agency-general | | SERVICE | 0 | 0 |

| FROM: DATE/TIME | TO: DATE/TIME | APPROVED | CASE STATUS | RELATED AGENCY | RELATED AGENCY NUMBER |
|---|---|---|---|---|---|
| 12/19/2018 11:37 | 12/19/2018 12:38 | YES | | | |

**ITEMS IN REPORT**
[x] SUPPLEMENT   [x] PICTURE/IMAGES
[ ] FOLLOW UP   [ ] PROPERTY/EVIDENCE

**CATEGORIES**
[ ] ALCOHOL RELATED  [ ] DOMESTIC VIOLENCE  [ ] DIST. ATTY.  [ ] PATROL  [ ] PROBATION
[ ] TRAFFIC RELATED  [ ] WEAPON INVOLVED  [ ] SENIOR CITIZEN  [ ] INVESTIGATIONS  [ ] PHYSICAL PLANT
[ ] DRUGS INVOLVED  [ ] ARREST OCCURED  [ ] CHIEF  [ ] OTHER  [ ] PRESIDENT
[ ] GROUP INVOLVED

| INV | NAME: | SUFFIX | RACE | ETHNICITY | SEX | AGE | DOB | HT | WT | HAIR | EYE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| V | ZIENCIK, BAILEY | | U | U | F | 19 | | | | | |

| SSN | DRIVER'S LIC. NO. | STUDENT ID | | TYPE |
|---|---|---|---|---|
| | | | | Student |

| ADDRESS TYPE | STREET NUMBER | STREET NAME | SUITE NUMBER | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| | | | | | | |

**SYNOPSIS**
Assist the Allegehny Township Police.
Incident cleared (report time and time of occurrence are the same).

**NARRATIVE**

On December 19, 2018, at approximately 1210 hours, I, Officer Del Re, was dispatched to the Public Safety Building for assist other agency report.

I was advised that Judith Gerger received a phone call from a parent, Kelly Ziencik, regarding her daughter, Bailey Ziencik.  Bailey Ziencik has been receiving several disturbing messages via snapchat from an unknown person from approximately 0024 hours on December 19 to 0045 hours. I was able to speak with Bailey Ziencik via phone and she provided me with further information regarding this incident.

Ziencik stated that at approximately 0024 hours today, she received a snapchat message from an unknown person with the username RMONEY8211.  Ziencik said the conversation started as normal and then the unknown individual, who claims to be a junior at the University of Pittsburgh, began threatening her, stating that he "knows where she lives", and "will slash her throat."  After receiving these messages, Ziencik blocked the user from snapchat.  She then immediately began receiving more messages from the usernames WSULLOVAN7 and RMONEY1890.  The unknown individual who Ziencik believes is the same male, stated, "You think you can block me? I have 15 fake usernames to get to you."  Ziencik also blocked these usernames but before doing so, found that the names associated with these accounts were listed as Will Sullovan and Donald Hones. Ziencik was able to screenshot some of the messages, which are attached to the report.

After speaking further with Ziencik, she stated that she believes the male obtained her information through Facebook or Instagram because she has several pictures of her from Kiski

| REPORTING OFFICER | REVIEWED BY | APPROVAL DATE |
|---|---|---|
| DEL RE, MICHAEL | REDMAN, ANDREW | 12/19/2018 |

| SIGNATURES | PRINT DATE AND TIME | PRINTED BY | PAGE NO. |
|---|---|---|---|
| | 02/09/2019 11:22 | BRAUN, MEGAN | 1 of 2 |



**University of Pittsburgh**
**POLICE DEPARTMENT**
**INCIDENT REPORT**
3412 Forbes Avenue, Pittsburgh, PA, 15260
PHONE: 412-624-4040   FAX: 412-624-5671   police@pitt.edu

| LOCATION OF OCCURRENCE / ADDRESS<br>PSB / PUBLIC SAFETY BLDG, 3412 FORBES AVE<br>PITTSBURGH, PA 15213 | DATE / TIME REPORTED<br>12/19/2018 11:37 | CASE NO.<br>18-04578 |
| --- | --- | --- |

area High school and the University of Pittsburgh.  The male did not refer to her actual on campus address.

Ziencik also spoke with Allegheny Township Police, Officer Mark Janod, regarding this incident and the incident number is 20181219M9649.

I also attempted to contact Ziencik's mother via phone since she was the initial complainant, but have not received a call back after leaving a voicemail.

Investigation pending.

| REPORTING OFFICER<br>DEL RE, MICHAEL | REVIEWED BY<br>REDMAN, ANDREW | APPROVAL DATE<br>12/19/2018 | |
| --- | --- | --- | --- |
| SIGNATURES | | PRINT DATE AND TIME<br>02/09/2019 11:22 | PRINTED BY<br>BRAUN, MEGAN | PAGE NO.<br>2 of 2 |



**University of Pittsburgh**
**POLICE DEPARTMENT**

**Supplement Case Report**

**3412 Forbes Avenue, Pittsburgh, PA, 15260**

**PHONE: 412-624-4040   FAX: 412-624-5671   police@pitt.edu**

| | |
|---|---|
| | Case No. **18-04578** |

| Location of Occurrence / Address | Cad No. | Date and Time Reported |
|---|---|---|
| PSB / PUBLIC SAFETY BLDG/3412 FORBES AVE, PITTSBURGH, PA 15213 | 18-12-19-060289 | 12/19/2018 11:37 |

| CODE SECTION | CRIME DESCRIPTION | CLASSIFICATION |
|---|---|---|
| | Assist Other Police Agency-general | SERVICE |

Supplement Narrative

On January 2, 2019, at approximately 1245 hours, I, Detective Braun spoke with Bailey Ziencik in regards to this incident.

Ziencik was advised that due to jurisdictional issues, she needed to contact Allegheny Township Police Department since they are the lead investigators due to the harassment by communications occurring while she was at home on Christmas break. Ziencik was also provided with Rob Abrosene's (FBI) contact information due to a report that had been made by Kelly Ziencik.

At approximately 1400 hours, Ziencik called back to advise that upon speaking to Allegheny Township Police Department, she was informed that they are not going to proceed with an investigation for this incident.

Due to Allegheny Township's decision, a search warrant was filed, granted, and served on Snap Inc. (Snapchat) at approximately 1800 hours for any and all basic subscriber information for the Snapchat accounts associated with the usernames "rmoney8211," "rmoney1890," and "wsullovan7" in addition to any and all logs (including sender, recipient, date, and time) concerning the previous Snaps sent to or from the above mentioned usernames. It was also requested within the search warrant that an order be granted, prohibiting Snapchat from notifying the affected users in relation to the "Snap User Notice Policy" due to the nature of the threats received and the subsequent possibility of retaliation which could result in serious bodily injury.

Upon completion, Ziencik was advised that I will be taking over this investigation and a search warrant was ultimately served on Snapchat to gather identifying information on the individual contacting her. At this time, Ziencik stated that she would like to move forward with charges if the identity of the individual is able to be revealed.

Title IX was contacted and advised of this incident.

| Reporting Officer BRAUN, MEGAN | Supplement Date and Time Reported 01/02/2019 12:56 | Reviewed By | | Approval Date and Time |
|---|---|---|---|---|
| Signatures | | | | |
| | Print Date and Time 02/09/2019 11:22 | Printed By BRAUN, MEGAN | | Page No. 2 of 3 |



**University of Pittsburgh**
**POLICE DEPARTMENT**
**Supplement Case Report**
3412 Forbes Avenue, Pittsburgh, PA, 15260
PHONE: 412-624-4040   FAX: 412-624-5671   police@pitt.edu

| | | Case No. |
|---|---|---|
| | | **18-04578** |

| Location of Occurrence / Address | Cad No. | Date and Time Reported |
|---|---|---|
| PSB / PUBLIC SAFETY BLDG/3412 FORBES AVE, PITTSBURGH, PA 15213 | 18-12-19-060289 | 12/19/2018 11:37 |

| CODE SECTION | CRIME DESCRIPTION | CLASSIFICATION |
|---|---|---|
| | Assist Other Police Agency-general | SERVICE |

Supplement Narrative

On January 10, 2019, I, Detective Braun attempted to make contact with Snapchat via their Law Enforcement landline, with negative results.

At this time, an email was sent to lawenforcement@snapchat.com, requesting a time frame for a response to the search warrant due to Ziencik's request for further information.

On January 29, 2019, Snapchat responded to the original search warrant, advising that the "legal process" that was submitted would not prohibit them from notifying the owner of the aforementioned usernames. Furthermore, it was advised that the information requested would be retained for 30 days, pending a response for further action or dismissal of the requested information.

In response, Detective Laughlin filed a sealed search warrant with Common Pleas Judge David Cashman on January 31, 2019. Subsequently, this warrant was sent to Snapchat via email in response to their last message, which prohibits any information being relayed to the "affected users" for 60 days. A copy of this warrant has been added to the case file

| Reporting Officer | Supplement Date and Time Reported | Reviewed By | | Approval Date and Time |
|---|---|---|---|---|
| BRAUN, MEGAN | 02/05/2019 16:14 | | | |
| Signatures | | Print Date and Time | Printed By | Page No. |
| | | 02/09/2019 11:22 | BRAUN, MEGAN | 3 of 3 |

**University of Pittsburgh**

**POLICE DEPARTMENT**

**Photos**

Case Number: 18-04578

Description: Ziencik Screenshot 1.png



    

**University of Pittsburgh**

**POLICE DEPARTMENT**

**Photos**

Case Number: 18-04578

Description: Ziencik Screenshot 2.png



**University of Pittsburgh**

**POLICE DEPARTMENT**

**Photos**

Case Number: 18-04578

Description: Ziencik Screenshot 3.png











**University of Pittsburgh**
**POLICE DEPARTMENT**
**Photos**

Case Number: 18-04578
Description: Ziencik Screenshot 4.png



**University of Pittsburgh**
**POLICE DEPARTMENT**
**Photos**

Case Number: 18-04578
Description: Ziencik Screenshot 5.png







B744-ED979F6F79F8







In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | | |
|---|---|---|
| **Bailey Ziencik,** an individual | ) | Case No._____ |
| | ) | |
| And | ) | |
| | ) | COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) | NUMBER 5 |
| | ) | |
| And | ) | |
| | ) | |
| **Pascale Wasson,** an individual | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **Snap, Inc. d/b/a SnapChat** | ) | |
| a Corporation; | ) | |
| | ) | |
| **Defendant.** | ) | **Filed on Behalf of the Plaintiffs,** |
| | ) | **Bailey Ziencik and Kelly Ziencik** |
| | ) | |
| | | Counsel of Record for Plaintiffs: |
| | | Lee W. Davis, Esquire |
| | | Pa. I.D. No. 77420 |
| | | Law Offices of |
| | | Lee W. Davis, Esquire, L.L.C. |
| | | 5239 Butler St., STE 201 |
| | | Pittsburgh, PA 15201 |
| | | Telephone:     (412) 781-0525 |
| | | Fax No.:          (412) 781-0527 |
| | | E-mail:           lee@leewdavis.com |



# Snapchat Support

Discover tips and tricks, find answers to common questions, and get help!

What can we help you with?

**Exhibit 5**

< Safety

**Report Abuse on Snapchat**

Report a Safety Concern

Report Lenses

Report Infringement                  >

Report a Story on the Web

Snapchat Safety Center

Wellbeing                            >

Community Guidelines

Additional Resources                 >

## Report Abuse on Snapchat

You can always report abuse on Snapchat, including harassment, bullying, or any other safety concern. Every report is reviewed by someone at Snapchat, usually within 24 hours.

Learn how to report content you see on Snapchat, or report a Snapchat account. Together we can keep Snapchat a safe place and a strong community.

**Please Note**: if you can't report something using the Snapchat app, you can report things to us on the web, instead.

## Report a Snapchat Account

📢  What's New

https://support.snapchat.com/en-US/a/report-abuse-in-app

Report Abuse on Snapchat

To report someone's Snapchat account, **press and hold** on the Snapchatter's name, tap '**More**,' and tap '**Report**.'




11/2/2020

https://support.snapchat.com/en-US/a/report-abuse-in-app

Report Abuse on Snapchat

To report a Snap or Story you see on Snapchat, **press and hold** on it until appears at the bottom of the screen. Then tap to let us know what's going on.



https://support.snapchat.com/en-US/a/report-abuse-in-app

- Direct Snaps
- My Stories
- Custom Stories
- Public User Stories
- Snaps on the Snap Map

## Report a Story on the Web



To report a Story from the web (not the Snapchat app), click ↱ at the bottom of the video and click '⬜ **Report Snap**.'

If a place on the Snap Map isn't right, learn how to report it.

## Report or Hide Content in Stories

To report content in Stories, press and hold on the tile and tap '**Report Tile**.'

If you just don't like that kind of content, you can instead tap '**Hide**' to see fewer Stories like that in Stories.



Report Abuse on Snapchat

You can report Lenses that were created by Snapchatters. Tap up the Lens in the Lens carousel, tap ⓘ above the Lens, and tap 🏳 to report it.

**Need help with something else?**          YES          NO

**RELATED LINKS**

How do I use Group Chat?

How do I remove or block a Friend?

How do I change my privacy settings?

When Does Snapchat Delete Snaps and Chats?

Where can I find the Snapchat law enforcement guide?

How Snap Inc. Works with Law Enforcement

Safe Browsing

How do I request a copy of a Snap?

⌄ Company

⌄ Community

⌄ Advertising

⌄ Legal

Language

English (US)

◄►

11/2/2020

Terms of Service

Report Abuse on Snapchat

Ⅲ

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | |
|---|---|
| **Bailey Ziencik,** an individual | ) Case No._____ |
| | ) |
| And | ) |
| | ) COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) NUMBER 6 |
| | ) |
| And | ) |
| | ) |
| **Pascale Wasson,** an individual | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **Snap, Inc. d/b/a SnapChat** | ) |
| a Corporation; | ) |
| | ) |
| **Defendant.** | ) **Filed on Behalf of the Plaintiffs,** |
| | ) **Bailey Ziencik and Kelly Ziencik** |
| | ) |
| | ) Counsel of Record for Plaintiffs: |
| | Lee W. Davis, Esquire |
| | Pa. I.D. No. 77420 |
| | Law Offices of |
| | Lee W. Davis, Esquire, L.L.C. |
| | 5239 Butler St., STE 201 |
| | Pittsburgh, PA 15201 |
| | Telephone:    (412) 781-0525 |
| | Fax No.:    (412) 781-0527 |
| | E-mail:    lee@leewdavis.com |

Reply all |        Delete    Junk |

# Preservation Request

BE    **Braun, Megan E**                                        ⬜¡        Reply all  |
      Wed 12/19/2018, 4:39 PM
      lawenforcement@snapchat.com

Sent Items

        Preservation Letter.pdf
        36 KB

Download    Save to OneDrive - University of Pittsburgh

Please see the attached Preservation Letter.

If you have any questions, please feel free to contact me via email or the office number listed below.


Thanks,


Detective Megan Braun #1057
University of Pittsburgh Police Department
3412 Forbes Avenue
Pittsburgh, PA 15213

412-624-2121 (emergency)
412-624-5596 (office)
412-624-0612 (fax)



# University of Pittsburgh
*Police Department*

Public Safety Building
3412 Forbes Avenue
Pittsburgh, PA 15260
(412) 624-4040
Fax: (412) 624-0612
http://police.pitt.edu

December 19, 2018

ATTN: Custodian of Records

The University of Pittsburgh Police Department is investigating a report of harassment via SnapChat, outlined in UPPD report #18-04578.

Pursuant to this investigation, I'm requesting a preservation order be issued for usernames "rmoney8211," "rmoney1890," and "wsullovan7" for all information including but not limited to associated email addresses, phone numbers, display names, Snapchat account creation dates and IP addresses, Timestamps and IP addresses of account logins and logouts, logs of previous Snaps, Stories, and Chats, location data, and content.

If you have any questions, feel free to reach out via email or the office number listed below.

Thank you

det. Megn Bvn #1057

Detective Megan Braun
University of Pittsburgh PD
3412 Forbes Avenue
Pittsburgh, PA 15260

412-624-5596 (Office)
412-624-2121 (Emergency)
412-624-0160 (Fax)

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | | |
|---|---|---|
| **Bailey Ziencik,** an individual | ) | Case No._____ |
| And | ) | |
| | ) | COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) | NUMBER 7 |
| And | ) | |
| | ) | |
| **Pascale Wasson,** an individual | ) | |
| **Plaintiffs,** | ) | |
| vs. | ) | |
| **Snap, Inc. d/b/a SnapChat** | ) | |
| a Corporation; | ) | |
| **Defendant.** | ) | **Filed on Behalf of the Plaintiffs,** |
| | ) | **Bailey Ziencik and Kelly Ziencik** |
| | ) | Counsel of Record for Plaintiffs: |
| | ) | Lee W. Davis, Esquire |

Pa. I.D. No. 77420
Law Offices of
Lee W. Davis, Esquire, L.L.C.
5239 Butler St., STE 201
Pittsburgh, PA 15201
Telephone:      (412) 781-0525
Fax No.:      (412) 781-0527
E-mail:      lee@leewdavis.com

**Wellesley Police Department**

PERSONNEL NARRATIVE FOR PATROLMAN GAETANA A DICENSO

Ref: 18-1088-OF

**Exhibit 7**

Entered: 12/28/2018 @ 1830     Entry ID: 2886
Modified: 03/06/2019 @ 1333    Modified ID: 2886
Approved: 03/06/2019 @ 1342    Approval ID: 4484

REDACTED COPY

---

Summary report by: Patrolman GAETANA A DICENSO:

On Thursday December 27th, 2018, I was assigned to patrol sector 33 in marked Wellesley Police cruiser #1407. At approximately 6:51pm, I was dispatched to                          The reporting party stated his 19 year old daughter was being harassed on "Snapchat."

On my arrival, I was met by the reporting party,                                        invited me into his residence, where I was introduced to his daughter,
explained she had received unsettling messages on Snapchat earlier this evening from an account she was unfamiliar with. Snapchat is a popular application utilized on mobile devices, tablets, etc. that enables users to send photos, videos, and messages to other users. Snapchat messages, videos, and correspondence disappear once they are viewed. However, the recipient can always "screen shot" material, which allows it to save to the device as a photo.

stated this evening, she had received a message from Snapchat account "**rmoney8211**." explained this user had added her by searching her Snapchat name. The message alluded to inviting her to attend a formal with the sender.          explained she began interacting with "**rmoney8211**" who identified himself as "Neil."          stated she was trying to piece together whether she knew who "Neil" was. "Neil" claimed he had met          at a party and provided him with her Snapchat account name. "Neil" was unable to recall the location or date of the party where they allegedly met, according to          .          also stated she had no recollection of the occurrence.

In an effort to prove his identity, "Neil" stated his Snapchat account and Twitter account were linked, and provided her with his Twitter account name (**@thenewneil1**).          recalled having seen this Twitter account previously.          stated in August of 2017 she had received a message on Twitter, another social networking application, from an unknown male party. The message was from the Twitter handle (account) "**@thenewneil1**" and it read, "kind of scared to ask but would you want to go to summer formal with me?"          ignored the message, being that she did not know this party.

reviewed the Twitter account, and found indicators that "Neil" may be, or may have been a student at the University of Texas. "Neil's" Twitter bio listed him as a member of the "Alpha Tau Omega" fraternity, as well as having several "re-tweets" from the University of Texas football team.          questioned "Neil" about the University of Texas references, to which he stated he was a former student but had transferred to Amherst College.          currently attends Amherst College. She stated Amherst College has an online student database in which all current students information is accessible to other students, staff, etc.          stated she was unable to locate anyone named "Neil" at Amherst College.

When she stated this information to "Neil", he stated he had just transferred and it was possible his information was not accessible yet.          explained that "Neil" may have known she attended Amherst College because it is listed/displayed on her Twitter account.          said she also viewed "Neil's" followers on Twitter and did not find anyone she knew.          was friendly with a recent transfer at her school, and found his information was accessible on the database, despite recently transferring.

**Exhibit 7**

Wellesley Police Department

PERSONNEL NARRATIVE FOR PATROLMAN GAETANA A DICENSO

Ref: 18-1088-OF

| | |
|---|---|
| Entered: 12/28/2018 @ 1830 | Entry ID: 2886 |
| Modified: 03/06/2019 @ 1333 | Modified ID: 2886 |
| Approved: 03/06/2019 @ 1342 | Approval ID: 4484 |

then told "Neil" she did not believe he was authentic, and she believed the interaction/his identity to be fake. "Neil" became argumentative and stated he had a "snap story" up and he could not possibly be fake. Snapchat users are able to upload photos or videos to their profiles, called "stories." These "stories" can be seen by other users and disappear 24 hours after being posted. "Neil" took  screenshot of his "story" and sent it to         to prove his identity.

At this time, "Neil" grew agitated, demanding         apologize for calling him fake.         stated she would not apologize, to which "Neil" responded, "I'm not a fucking fake         ." "Neil" then stated, "do you think you can treat me like shit because I'm shorter than you?"         then blocked "Neil's" account.         stated she only began taking screen shots of the conversation when she believed it got "weird."

Shortly after,         received messages from two other Snapchat users, "**rmoney1890**" and "**wsullovan2**." This user wrote, "You treated my friend like shit."         responded by asking who the user was, to which "**wsullovan2**" wrote "We have all your info anyways you left your location on. I know you're in         ...Ugly cunt...We'll find you tonight." This user also sent messages reading, "Take as many screenshots as you need ugly cunt...We gave you a fake twitter anyway...Enjoy your screenshots...We will find you tonight."         also stated this user sent a message stating he was, "going to find her and slit her throat."         stated she did not screen shot the last message, before blocking this user.         forwarded all of the screenshots of the conversation she had retained.

After blocking both accounts, she continued to receive messages from other Snapchat accounts, similar to "rmoney." She did not accept/open those messages and then informed her parents of the disturbing messages she had received, prompting         call to Wellesley Police. I collected all of the information         had provided. I instructed         to refrain from interacting with parties unknown to her on social media, as well as making her current social media accounts private if possible. I also suggested she block any additional users on Snapchat who may be "Neil" or "Neil's friend." I provided         and         with my contact information and advised them to contact Wellesley Police if anything further should arise.

On Friday December 28th, 2018, I reached out to the Amherst College Police Department and spoke with Sergeant Lenart regarding the matter. Sgt. Lenart stated he queried the name "Neil" and found there to be only one Neil on campus, who was an assistant professor. I provided Sgt. Lenart with all of the information I had collected so the college is aware of the situation when         returns to campus. Sgt. Lenart stated he would be in touch should any other information come to light.

I also made contact with Sergeant Layne Smith of the University of Texas Police Department (UTPD) in Austin, Texas. I briefed Sgt. Smith of my findings thus far and she stated she would relay the information to detectives for further review. I e-mailed her the screenshots, account names, and the photo of "Neil." Sgt. Smith had found one of the Snapchat users, "**rmoney1890**" allegedly belonged to a "Donald Hones." Sgt. Smith confirmed neither Donald Hones or Will Sullovan were current/previous students of the college. She stated she, or UTPD detectives would reach out with any findings/progress.

I conducted a Google image search of both the photo provided by         and the profile picture

Wellesley Police Department                                           Page: 3

PERSONNEL NARRATIVE FOR PATROLMAN GAETANA A DICENSO          11/19/2020
                    Ref: 18-1088-OF

  Entered:  12/28/2018 @ 1830        Entry ID: 2886
  Modified: 03/06/2019 @ 1333        Modified ID: 2886
  Approved: 03/06/2019 @ 1342        Approval ID: 4484

from the Twitter account (**@thenewneil1**). The search yielded no results, as they could not be located.

On Saturday December 29th, 2018, I received e-mail correspondence from Sgt. Smith of UTPD, stating she had relayed the information to a detective within their department. I also completed, and submitted an administrative subpoena to "Snapchat, Inc." through the Norfolk County District Attorney's Office (NCDAO).

On January 24th, 2019, I received the results of the administrative subpoena I had submitted to "Snapchat, Inc." via an e-mail from Ms. Caroline McBirney (Administrative Subpoena Unit NCDAO). I reviewed the results and was provided with the e-mail addresses with which the Snapchat accounts "**rmoney8211**" and "**rmoney1890**" were created, the dates on which those accounts were created, and the IP addresses associated with the account's "creation." The e-mail listed in association with the "**rmoney8211**" account was **basestealer821@yahoo.com** and the e-mail associated with the "**rmoney1890**" account was **rjoshi@utexas.edu**. I was also provided with the dates, times, and IP addresses associated with those accounts each time they were "logged into" as well as "logged out" of during the period of time specified on the subpoena. The phone number 1 (248) 672-7067 was also provided. For the results of the administrative subpoena in their entirety, see attached.

After reviewing the results, I sent a subsequent e-mail to Sergeant Smith at UTPD, inquiring about the University of Texas e-mail account. In response, I received an e-mail from Sergeant Samantha Stanford of UTPD, informing me she had in fact located information regarding the e-mail address. Additionally, she stated she had also been contacted by a Detective Braun of the University of Pittsburgh Police Department (UTPD), who was investigating an identical case involving the same party. Sergeant Stanford stated she had provided Detective Braun with my contact information. Detective Braun and I made several attempts to make contact with each other, but have been unsuccessful.

On Monday February 11th, 2019, I was able to speak with Sergeant Stanford on the phone. She informed me that the student associated with the **rjoshi@utexas@edu** e-mail address was a Mr. Rahul Ramesh Joshi. Sergeant Stanford explained he had graduated UT in the spring of 2018, but would still be able to utilize the e-mail address, as it had not been deleted or had access repossessed.

Sergeant Stanford explained that, according to the information she had access to, Mr. Joshi did not appear to have any disciplinary issues while attending the University. She also provided me with the most up-to-date contact information Mr. Joshi had listed prior to graduating. She stated he provided a primary phone number of 1 (248) 672-7067, which she added was a cell phone number. Sergeant Stanford also provided me with Mr. Joshi's secondary e-mail address, which was **basestealer821@yahoo.com**.

The cell phone number, as well as the e-mail addresses, provided to me by Sergeant Stanford were consistent with the information provided to me by Snapchat. I was also able to conduct a query and locate a Texas driver's license for Mr. Joshi, complete with a color photo. The photos sent to via the Snapchat accounts, as well as the license photo for Mr. Joshi, appear to depict the

Wellesley Police Department
Page: 4
PERSONNEL NARRATIVE FOR PATROLMAN GAETANA A DICENSO
11/19/2020
Ref: 18-1088-OF

Entered: 12/28/2018 @ 1830    Entry ID: 2886
Modified: 03/06/2019 @ 1333   Modified ID: 2886
Approved: 03/06/2019 @ 1342   Approval ID: 4484

same individual.

On Tuesday February 12th, 2019, I was contacted by Detective Braun of the University of Pittsburgh Police Department (UPPD). She apprised me of the details of a case she had been actively investigating. She stated a female University of Pittsburgh student had reported an unsettling interaction with a male party on "Snapchat" that occurred on December 19th, 2018. Originally, the female stated the interaction occurred while she was home in Allegheny Township, PA on Christmas break. The female reported the incident while at home, and reported it once more to the University of Pittsburgh Police Department (UPPD) after returning from break.

Detective Braun explained the female student received messages on Snapchat from "**rmoney8211**." Detective Braun explained the messages began "normally" with the male party inviting the student to a dance. The female explained she was unfamiliar with the male party, and began asking questions about the male's identity. He claimed to be a junior at the University of Pittsburgh. The male party stated he had met the female once before, but could not provide details on how or when they had met. Once the student began questioning the legitimacy of the identity he provided, and subsequently rejecting his invitation, the nature of the messages shifted from normal to hostile.

The male party began making statements that he knew where she lived, told her not to walk alone on campus, and that he would slit her throat. After receiving these volatile messages, the student blocked the "**rmoney8211**" account. Shortly there after, she began receiving messages from two other Snapchat accounts, "**rmoney1890**" and "**wsullovan2**." Messages from these accounts made statements to the effect of having multiple fake accounts of which he could access the student, as well implying the accounts were fake and not legitimate. According to Detective Braun's conversation with the female, she also stated the male party was encouraging the student to "screenshot" the conversation as much as she wanted because he was not concerned about being identified.

Detective Braun had also submitted legal process to Snapchat and recovered the same information I received regarding the Snapchat accounts previously mentioned. She informed me the female's family had retained legal representation (Mr. Lee Davis). Detective Braun and I discussed several options regarding collaboratively pursuing charges.

On Tuesday February 19th, 2019, I was contacted via phone by Federal Bureau of Investigation (FBI) Agent Rob Ambrosini who works within the Pittsburgh division. He stated he was originally contacted by a parent of the University of Pittsburgh student, and later informed of my investigation. We spoke regarding the similarities between the incidents in both Pennsylvania and Wellesley, MA. He stated he would contact peers within his division, as well as within the Texas division to see what resources could potentially aid the investigation and ultimate prosecution of the charges.

On Wednesday March 6th, 2019, I was contacted by Detective James Williams of Westmoreland County District Attorney's Office. He explained he was working to combine my case with Detective Braun's. I informed him I would provide him with any/all material collected during the investigation. I provided Detective Williams with copies of the report for prosecution purposed. Any criminal charges are projected to be handled by the FBI. The case has been transferred, and the

**Wellesley Police Department**

PERSONNEL NARRATIVE FOR PATROLMAN GAETANA A DICENSO

Ref: 18-1088-OF

```
Entered:  12/28/2018 @ 1830      Entry ID: 2886
Modified: 03/06/2019 @ 1333   Modified ID: 2886
Approved: 03/06/2019 @ 1342   Approval ID: 4484
```

victim has been notified of that status of the case.

**CASE STATUS:** TRANSFERRED TO OTHER AGENCY

Patrolman GAETANA A DICENSO _____ 12/28/2018

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | |
|---|---|
| **Bailey Ziencik,** an individual | ) Case No._____ |
| And | ) |
| | ) |
| **Kelly Ziencik**, an individual | ) COMPLAINT EXHIBIT |
| | ) NUMBER 8 |
| And | ) |
| | ) |
| **Pascale Wasson,** an individual | ) |
| | **)** |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **Snap, Inc. d/b/a SnapChat** | ) |
| a Corporation; | ) |
| | ) |
| **Defendant.** | ) **Filed on Behalf of the Plaintiffs,** |
| | ) **Bailey Ziencik and Kelly Ziencik** |
| | ) |
| | ) Counsel of Record for Plaintiffs: |
| | Lee W. Davis, Esquire |
| | Pa. I.D. No. 77420 |
| | Law Offices of |
| | Lee W. Davis, Esquire, L.L.C. |
| | 5239 Butler St., STE 201 |
| | Pittsburgh, PA 15201 |
| | Telephone:     (412) 781-0525 |
| | Fax No.:     (412) 781-0527 |
| | E-mail:     lee@leewdavis.com |



Exhibit 8

# Commonwealth of Pennsylvania

# COUNTY OF ALLEGHENY

# APPLICATION FOR SEARCH WARRANT AND AUTHORIZATION

| Docket Number: (Issuing Authority): | Police Incident Number: 18-04578 | Warrant Control Number: |
|---|---|---|

| Detective Megan Braun #1057 | University of Pittsburgh Police | 412-624-5596 | 01/02/2019 |
|---|---|---|---|
| AFFIANT NAME | AGENCY | PHONE NUMBER | DATE OF APPLICATION |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):

Basic subscriber information for the Snapchat accounts associated with the usernames "rmoney8211," "rmoney1890," and "wsullovan7" consisting of the email address, phone number, account creation date, and timestamps and IP address for the account logins/logouts.　　　　(See Continuation Page for additional information)

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Safe Deposit Box, etc.):
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number  must be established, list only the last four digits. 204 Pa .Code §§ 213.1 - 213.7. *Snap Inc, 2772 Donald Douglas Loop North, Santa Monica, CA 90405, Attention: Custodian of Records (lawenforcement@snapchat.com)*

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):
*Snap Inc : 2772 Donald Douglas Loop North ; Santa Monica, CA 90405*

| VIOLATION OF (Describe conduct or specify statute): *PACC Title 18: 2709 (a)(4), PACC Title 18:2709(a)(5), PACC Title 18:2706(a)(1)* | DATE(S) OF VIOLATION: 12/19/2018 |
|---|---|

☐ **Warrant Application Approved by District Attorney - DA File No.** _ _ _ _ _ _
(If DA approval required per Pa.R.Crim.P.202(A) with assigned File No. per Pa.R.Crim.P.507)

☐ **Additional Pages Attached (Other than Affidavit of Probable Cause)**

☒ **Probable Cause Affidavit(s) MUST be attached (unless sealed below)   Total number of pages:** 3

TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE, AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband, or are or are expected to be otherwise unlawfully possessed or subject to seizure, and that these items or property are or are expected to be located on the particular person or at the particular place described above.

| Megan Braun | University of Pittsburgh PD | 1057 |
|---|---|---|
| Signature of Affiant | Agency or Address if private affiant | Badge Number |

Sworn to and subscribed before me this **2nd** day of **January**, **2019**.　Mag. Dist. No. **05-0-04**

Maureen McGraw-Desmet 660 First Ave. Pittsburgh PA 15219　(SEAL)
Signature of Issuing Authority　　　　Office Address

## SEARCH WARRANT
TO LAW ENFORCEMENT OFFICER:

WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described, and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☒ This Warrant shall be served as soon as practicable but between the hours of 6AM and 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the night or day but in no event later than:**
**6:16** M, o'clock **January 4, 2019**

☒ This Warrant shall be returned to judicial officer **PMC**
　* The issuing authority should specify a date not later than two (2) days after issuance.  Pa.R.Crim. 205(4)
　** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked.  Pa.R.Crim.P. 206(7)

Issued under my hand this **2nd** day of **January  2019** at **6:16 P** M, o'clock.　(SEAL)

Maureen McGraw Desmet　05-0-04　1/2022
Signature of Issuing Authority　Mag. Dist. or Judicial Dist. No.　Date Commission Expires:

Title of Issuing Authority: ☒ Magisterial District Judge   ☐ Common Pleas Judge   ☐ _____

☐ **For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for** _____ **days by my certification and signature. (Pa.R.Crim.P. 211)**

_____　_____ (Date)　_____ (SEAL)
Signature of Issuing Authority (Judge of the Court of Common Pleas or Appellate Court Justice or Judge).

*Right margin vertical text:* TO BE COMPLETED BY ISSUING AUTHORITY

MDJS 410A　　　　　Page 1 of 3

Case 2:21-cv-00049-AJS   Document 1-3   Filed 01/11/21   Page 138 of 184

**Commonwealth of Pennsylvania**

**COUNTY OF ALLEGHENY**

**APPLICATION FOR
SEARCH WARRANT
CONTINUATION PAGES**

| Docket Number:<br>(Issuing Authority): | Police Incident<br>Number: 18-04578 | Warrant Control<br>Number: |
|---|---|---|

**Continuation of :**

| X | Items to be search for<br>and seized | _____ | *Description of premises/person(s)*<br>*to be searched* | _____ | *Owner/Occupant* | _____ | *Violations* |
|---|---|---|---|---|---|---|---|

Logs, including sender, recipient, date, and time, concerning the previous Snaps sent to or from the Snapchat accounts with the usernames "rmoney8211," "rmoney1890," and "wsullovan7."

12/2019

Megn Brn

MDJS 410A

Page ___2___ of ___3___

**Commonwealth of Penn____vania**

**COUNTY OF ALLEGHENY**

**AFFIDAVIT OF
PROBABLE CAUSE**

| Docket Number: (Issuing Authority): | Police Incident Number:18-04578 | Warrant Control Number: |
|---|---|---|

**PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:**

*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa .Code §§ 213.1 - 213.7.*

On December 19, 2018, Officer Del Re responded to the "Public Safety Building," located at 3412 Forbes Avenue; Pittsburgh, PA 15260, for a harassment report.

Upon his arrival, he spoke with the victim, Bailey Ziencik via landline at which time she stated that on December 19, 2018 between 0024 and 0045 hours, she had received several disturbing messages via Snapchat from an unknown person using the username "rmoney8211." Ziencik advised that the conversation began with this individual telling her that they wanted her to accompany them to their "formal," claiming to be a junior at the University of Pittsburgh. When Ziencik no longer wished to converse with this individual, she received two (2) messages stating "Don't walk on campus alone" and "I'm going to slash your throat in when I see you on campus."

Once Ziencik blocked the username "rmoney8211," she immediately began receiving more messages from the usernames "wsullovan7" and "rmoney1890." At this time, Ziencik also received a message stating "You think you can block me? I have 15 fake usernames to get to you."

On December 24, 2018, I, Detective Braun was assigned this investigation, at which time a preservation letter requesting a preservation order for usernames "rmoney8211," "wsullovan7," and "rmoney1890" to include all information associated with the email addresses, phone numbers, display names, Snapchat account creation dates and IP addresses, timestamps and IP addresses of account logins and logouts, logs of previous Snaps, Stories, and Chats, location data, and content, was sent to Snap Inc. - Custodian of Records.

Based on this investigation and the information received, I, Detective Braun request a search warrant be issued for any and all basic subscriber information for the Snapchat accounts associated with the usernames "rmoney8211," "rmoney1890," and "wsullovan7" (consisting of the email address, phone number, account creation date, and timestamps and IP address for the account logins/logouts), in addition to any and all logs (including sender, recipient, date, and time) concerning the previous Snaps sent to or from the Snapchat accounts with the usernames "rmoney8211," "rmoney1890," and "wsullovan7." Additionally, I respectfully request an order prohibiting Snapchat from notifying the affected users in relation to the "Snap User Notice Policy" due to the nature of the threats received and the subsequent possibility of retaliation which could result in serious bodily injury.

*I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.*

| Affiant Signature | Date 01/02/2019 | Issuing Authority Signature | Date 1-2-19 | (SEAL) |
|---|---|---|---|---|

MDJS 410A

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | |
|---|---|
| **Bailey Ziencik,** an individual | )    Case No._____ |
| | ) |
| And | ) |
| | )    COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | )    NUMBER 9 |
| | ) |
| And | ) |
| | ) |
| **Pascale Wasson,** an individual | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **Snap, Inc. d/b/a SnapChat** | ) |
| a Corporation; | ) |
| | ) |
| **Defendant.** | )    **Filed on Behalf of the Plaintiffs,** |
| | )    **Bailey Ziencik and Kelly Ziencik** |
| | ) |
| | )    Counsel of Record for Plaintiffs: |

Counsel of Record for Plaintiffs:
Lee W. Davis, Esquire
Pa. I.D. No. 77420
Law Offices of
Lee W. Davis, Esquire, L.L.C.
5239 Butler St., STE 201
Pittsburgh, PA 15201
Telephone:    (412) 781-0525
Fax No.:    (412) 781-0527
E-mail:    lee@leewdavis.com

**Exhibit 9**

# Re: Snap Inc. Support (Case #35378999)

TS    Team Snapchat (LEO) <lawenforcement@snapchat.com>

                                                                    Reply all  |

Wed 2/6, 8:43 AM
Braun, Megan E

Inbox

##- Please type your reply above this line -##

Your request (35378999) has been updated. To add additional comments, reply to this email.

**Team Snapchat (LEO) (Snapchat)**
Feb 6, 5:43 AM PST

Pursuant to your legal process dated January 2, 2019, attached is account information for the Snapchat user(s) rmoney8211, wsullovan7, rmoney1890, as well as a response letter and Certificate of Authenticity.

Note that it is Snap Inc.'s policy to notify users when we receive legal process seeking their records, information, or content, except in two circumstances: when notifying users is prohibited by a court order issued under 18 U.S.C. § 2705(b) or other legal authority, or where Snap Inc., in its sole discretion, believes an exceptional circumstance exists, such as cases involving child exploitation or the threat of imminent death or bodily injury.

The legal process submitted in this matter appears to indicate that an exceptional circumstance exists. Therefore, Snap Inc. has not notified the user(s) in this matter and has produced information responsive to your request.

Regards,
Snap Inc. Law Enforcement Operations

Attachment(s)
Letter and Cert 35378999.pdf
Production_ 35378999.zip

# Snap Inc.

February 6, 2019

***Via Electronic Delivery***
*meb185@pitt.edu*

Detective Megan Braun
University of Pittsburgh PD
3412 Forbes Avenue
Pittsburgh, PA 15213

**Re: Search Warrant dated January 2, 2019 (Internal Ref. No. 35378999)**

Dear Detective Braun:

Pursuant to the Search Warrant issued in the above referenced matter, Snap Inc., the maker of the Snapchat App, has conducted a diligent search for documents and information available on Snap Inc.'s systems that are responsive to your request. Our response is made in accordance with state and federal law, including the Stored Communications Act, 18 U.S.C. §§ 2701, et seq.

We understand you have requested information regarding the Snapchat account(s) rmoney8211, wsullovan7, rmoney1890, as specified in the Search Warrant. Accompanying this letter is responsive information to the extent reasonably accessible from our systems, and a signed Certificate of Authenticity.

Regards,

Emrah Cetin
Snap Inc. Law Enforcement Operations

**Snap Inc.**

## Certificate of Authenticity

I hereby certify:

1.        I am employed by Snap Inc., located in Santa Monica, California. I have authority to submit this affidavit on behalf of Snap Inc. I have personal knowledge of the following facts and could testify competently thereto if called as a witness.

2.        Snap Inc. provides Internet-based services to its subscribers, including the Snapchat App, its free photo, video, and message sharing service.

3.        Attached is a true and correct copy of 11 .zip file(s) of data associated with the Snapchat account(s) rmoney8211, wsullovan7, rmoney1890, with Internal Reference No. 35378999 ("Document") produced in response to a Pennsylvania Search Warrant dated January 2, 2019.

4.        The attached Document is a record made and maintained by Snap Inc. The servers Snap Inc. uses record this data automatically at or near the time it is entered or transmitted by the user; this data is kept in the ordinary course of business activity; and it is the regular practice and custom of Snap Inc. to make such a record.

5.        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Date: February 6, 2019

_____
(Signature of Custodian of Records)

Emrah Cetin
(Name of Custodian of Records)

**Braun, Megan E**
Jan 10, 2:30 PM PST

Snap Inc. Law Enforcement Operations,

Good Evening. I recently sent a search warrant for the usernames "rmoney8211," "rmoney1890," and "wsullovan7" on Thursday January 3, 2019 for University of Pittsburgh Police incident number 18–04578. I have not received a response, aside from the automated message and have been contacted by the victim for an update on the identity of the individual. I attempted to make contact via the law enforcement number, with negative results.

At this time I was just wondering if there was any sort of time frame in regards to a response time that I can advise the victim of.

Thank you,

Detective Megan Braun #1057
University of Pittsburgh Police
3412 Forbes Avenue
Pittsburgh, PA 15260

412–624–5596 (office)
412–624–2121 (emergency)

**Braun, Megan E**
Jan 2, 3:48 PM PST

## To Whom it may Concern,

Attached is a search warrant in relation to a Preservation Letter that was sent on December 19, 2018.

Within the Affidavit of Probable Cause (page 3), it is requested that the affected users not be notified in relation to the "Snap User Notice Policy" due to the nature of the threats received (slicing the victims throat) and the subsequent possibility of retaliation which could result in serious bodily injury

If you have any questions, feel free to reach out to me at this email or the office number listed below.

**Thanks,**

**Detective Megan Braun** #1057
**University of Pittsburgh Police Department**
**3412 Forbes Avenue**
**Pittsburgh, PA 15213**

**412-624-2121 (emergency)**
**412-624-5596 (office)**
**412-624-0612 (fax)**

**Attachment(s)**
Search Warrant 1.pdf

[V0VMM5-EV4Z]

Getting too much email from Team Snapchat (LEO) <lawenforcement@snapchat.com>? You can unsubscribe

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | | |
|---|---|---|
| **Bailey Ziencik,** an individual | ) | Case No._____ |
| | ) | |
| And | ) | |
| | ) | COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) | NUMBER 10 |
| | ) | |
| And | ) | |
| | ) | |
| **Pascale Wasson,** an individual | ) | |
| | **)** | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **Snap, Inc. d/b/a SnapChat** | ) | |
| a Corporation; | ) | |
| | ) | |
| **Defendant.** | ) | **Filed on Behalf of the Plaintiffs,** |
| | ) | **Bailey Ziencik and Kelly Ziencik** |
| | ) | |
| | ) | Counsel of Record for Plaintiffs: |
| | | Lee W. Davis, Esquire |
| | | Pa. I.D. No. 77420 |
| | | Law Offices of |
| | | Lee W. Davis, Esquire, L.L.C. |
| | | 5239 Butler St., STE 201 |
| | | Pittsburgh, PA 15201 |
| | | Telephone:     (412) 781-0525 |
| | | Fax No.:         (412) 781-0527 |
| | | E-mail:         lee@leewdavis.com |

Exhibit 10


# University of Pittsburgh
*Police Department*

Jerome Cochran Public Safety Building
3412 Forbes Avenue
Pittsburgh, PA 15260
(412) 624-4040
Fax: (412) 624-0612
http://police.pitt.edu



01/31/2019

Custodian of Records:

Please refer to the attached search warrant issued regarding University of Pittsburgh Police report 18-04578. Please note that the warrant is **Signed and Sealed** by the Judge.

Abide by the Judges sealing of the warrant and **DO NOT PROVIDE USER NOTICE**.

This incident is where the user made statements threatening the life of the victim.

Any questions please contact me at 724-388-3125 or email of PJL23@PITT.edu.

Thank you,

Det. Patrick Laughlin

Case 2:21-pc-00049-MJH Document 1-3 Filed 01/11/21 Page 148 of 184

# Commonwealth of Pennsylvania

## APPLICATION FOR SEARCH WARRANT AND AUTHORIZATION

**COUNTY OF ALLEGHENY**



| Docket Number:<br>(Issuing Authority): | Police Incident<br>Number: 18-04578 | Warrant Control<br>Number: |
|---|---|---|

| Detective Patrick Laughlin #1027 | University of Pittsburgh Police | 412-624-5666 | 01/31/2019 |
|---|---|---|---|
| AFFIANT NAME | AGENCY | PHONE NUMBER | DATE OF APPLICATION |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):
Basic Subscriber information for the Snapchat accounts associated with the usernames "rmoney8211," "rmoney1890," and "wsullovan7" consisting of the email address, phone number, account creation date, and timestamps and IP address for the account logins/logouts.         (See Continuation Page for additional information)

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Safe Deposit Box, etc.):
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa .Code §§ 213.1 – 213.7. Snap Inc, 2772 Donald Douglas Loop North, Santa Monica, CA 90405, Attention: Custodian of Records (lawenforcement@snapchat.com)

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):
Snap Inc : 2772 Donald Douglas Loop North ; Santa Monica, CA 90405

| VIOLATION OF (Describe conduct or specify statute):<br>PACC Title 18: 2709(a)(4), PACC Title 18:2709(a)(5), PACC Title 18:2706(a)(1) | DATE(S) OF VIOLATION:<br>12/19/2018 |
|---|---|

☐ **Warrant Application Approved by District Attorney - DA File No.** _ _ _ _ _ _ _
(If DA approval required per Pa.R.Crim.P.202(A) with assigned File No. per Pa.R.Crim.P.507)

☐ **Additional Pages Attached (Other than Affidavit of Probable Cause)**

☐ **Probable Cause Affidavit(s) MUST be attached (unless sealed below)  Total number of pages:** _____

TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE, AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that the items or property identified as evidence or the fruit of a crime, or are contraband, or are or are expected to be otherwise unlawfully possessed or subject to seizure, and that these items or property are or are expected to be located on the particular person or at the particular place described above.

| _Signature of Affiant_ | _Agency or Address if private affiant_ | _Badge Number_ |
|---|---|---|
| | Univ of Pitt Pd | 1027 |

Sworn to and subscribed before me this 31st day of January 2019. Mag. Dist. No. 5th Judicial

_Signature of Issuing Authority_     308 Dani House     (SEAL)
_Office Address_

## SEARCH WARRANT
**TO LAW ENFORCEMENT OFFICER:**

WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described, and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☒ This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM and 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the night or day but in no event later than:**
2:20 A.M, o'clock   February 2, 2019

☐ This Warrant shall be returned to judicial officer _____

\*   The issuing authority should specify a date not later than two (2) days after issuance. Pa.R.Crim. 205(4)
\*\*  If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked . Pa.R.Crim.P. 206(7).

Issued under my hand this 31 day of January 2019 at 2:20 A.M, o'clock.   (SEAL)

| _Signature of Issuing Authority_ | _Mag. Dist. or Judicial Dist. No._ | 5th Judicial | Date Commission Expires: |
|---|---|---|---|
| Title of Issuing Authority: ☐ Magisterial District Judge  ☒ Common Pleas Judge | | | 1-1-22 |

☒ **For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for** 60 **days by my certification and signature.** (Pa.R.Crim.P. 211)

_Signature of Issuing Authority (Judge of the Court of Common Pleas or Appellate Court Justice or Judge)_     1-31-19 (Date)     (SEAL)

TO BE COMPLETED BY ISSUING AUTHORITY

MDJS 410A                                Page 1 of _

**Commonwealth of Pennsylvania**

**COUNTY OF ALLEGHENY**

| | | |
|---|---|---|
| Docket Number:<br>(Issuing Authority): | Police Incident<br>Number:18-04578 | Warrant Control<br>Number: |

**Continuation of :**

__X__ Items to be search for and seized    _____ *Description of premises/person(s) to be searched*    _____ *Owner/Occupant*    _____ *Violations*

Logs, inlucing but not limited to meta data about users Snaps, Stories, and Chats including sender, receipient, date, and time. Location Data as well as any Content concerning the previous Snaps sent to or from the Snapchat accounts with the usernames "rmoney8211," "rmoney1890," and "wsullovan7."

*Sealed warrant*

*Do not Make notification to user*

**Commonwealth of Pennsylvania**

**COUNTY OF ALLEGHENY**



**AFFIDAVIT OF PROBABLE CAUSE**

| Docket Number: (Issuing Authority): | Police Incident Number:18-04578 | Warrant Control Number: |
|---|---|---|

**PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:**

*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa .Code §§ 213.1 - 213.7.*

On December 19, 2018, Officer Del Re responded to the "Public Safety Building," located at 3412 Forbes Avenue: Pittsburgh, PA 15260, for a harassment report.

Upon his arrival, he spoke with the victim, Bailey Ziencik via landline, at which time she stated that on December 19, 2018 between 0024 and 0045 hours, she had received several disturbing messages via Snapchat from an unknown person using the username "rmoney8211." Ziencik advised that the conversation began with this individual telling her that they wanted her to accompany them to their "formal," claiming to be a Junior at the University of Pittsburgh. When Ziencik no longer wanted to converse with this individual, she received two (2) messages stating "Don't walk on campus alone," and "I'm going to slash your throat in when I see you on campus."

Once Ziencik blocked the username "rmoney8211," she immediately began receiving more messages from the usernames "wsullovan7" and "rmoney1890." At this time, Ziencik also received a message stating "You think you can block me? I have 15 fake usernames to get to you."

On December 24, 2018, Detective Braun and I, Detective Laughlin was assigned this investigation, at which time a preservation letter requesting a preservation order for usernames "rmoney8211," "wsullovan7," and "rmoney1890" to include all information associated with the email addresses, phone numbers, display names, Snapchat account creation dates and IP addresses, timestamps and IP addresses of account logins and logouts, logs of previous Snaps, Stories, and Chats, location data, and content, was sent to Snap Inc. - Custodian of Records.

Based on this investigation and the information received, I, Detective Laughlin request a search warrant be issued for any and all basic subscriber information for the Snapchat accounts associated with the usernames "rmoney8211," "rmoney1890," and "wsullovan7" (consisting of the email address, phone number, account creation date, and timestamps and IP address for the account logins/logouts), in addition to any and all logs (including sender, recipient, date, and time) concerning the previous Snaps sent to or from the Snapchat accounts with the usernames "rmoney8211," "rmoney1890," and "wsullovan7." Additionally, I respectfully request an order prohibiting Snapchat from notifying the affected users in relation to the "Snap User Notice Policy" due to the nature of the threats received and the subsequent possibility of retaliation which could result in serious bodily injury.

*I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.*

| Affiant Signature | Date 1/31/19 | Issuing Authority Signature | Date 1-31-19 (SEAL) |
|---|---|---|---|

MDJS 410A                                        Page ____ of ____

In the Court of Common Pleas of Allegheny County, Pennsylvania

Civil Division

| | | |
|---|---|---|
| **Bailey Ziencik,** an individual | ) | Case No._____ |
| | ) | |
| And | ) | |
| | ) | COMPLAINT EXHIBIT |
| **Kelly Ziencik**, an individual | ) | NUMBER 11 |
| | ) | |
| And | ) | |
| | ) | |
| **Pascale Wasson,** an individual | ) | |
| | **)** | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **Snap, Inc. d/b/a SnapChat** | ) | |
| a Corporation; | ) | |
| | ) | |
| **Defendant.** | ) | **Filed on Behalf of the Plaintiffs,** |
| | ) | **Bailey Ziencik and Kelly Ziencik** |
| | ) | |
| | ) | Counsel of Record for Plaintiffs: |
| | | Lee W. Davis, Esquire |

Pa. I.D. No. 77420
Law Offices of
Lee W. Davis, Esquire, L.L.C.
5239 Butler St., STE 201
Pittsburgh, PA 15201
Telephone:      (412) 781-0525
Fax No.:         (412) 781-0527
E-mail:          lee@leewdavis.com

**Snap Inc.**    Careers    News    Investors

English (US) ▾

If you live in the United States, you are agreeing to the Snap Inc. Terms of Service.

If you live outside the United States, you are agreeing to the Snap Group Limited Terms of Service.

## Snap Inc. Terms of Service

(If you live in the United States)
Effective: September 26, 2017

## Welcome!

We've drafted these Terms of Service (which we call the "Terms") so you'll know the rules that govern our relationship with you. Although we have tried our best to strip the legalese from the Terms, there are places where these Terms may still read like a traditional contract. There's a good reason for that: These Terms do indeed form a legally binding contract between you and Snap Inc. So please read them carefully.

By using Snapchat or any of our other products or services that link to these Terms (we refer to these simply as the "Services"), you agree to the Terms. Of course, if you don't agree with them, then don't use the Services.

ARBITRATION NOTICE: THESE TERMS CONTAIN AN ARBITRATION CLAUSE A LITTLE LATER ON. EXCEPT FOR CERTAIN TYPES OF DISPUTES MENTIONED IN THAT ARBITRATION CLAUSE, YOU AND SNAP INC. AGREE THAT DISPUTES BETWEEN US WILL BE RESOLVED

BY MANDATORY BINDING ARBITRATION, AND YOU AND SNAP INC.
WAIVE ANY RIGHT TO PARTICIPATE IN A CLASS-ACTION LAWSUIT OR
CLASS-WIDE ARBITRATION.

## 1. Who Can Use the Services

No one under 13 is allowed to create an account or use the Services.
We may offer additional Services with additional terms that may require
you to be even older to use them. So please read all terms carefully.

By using the Services, you state that:

- You can form a binding contract with Snap Inc.

- You are not a person who is barred from receiving the Services
  under the laws of the United States or any other applicable
  jurisdiction—meaning that you do not appear on the U.S. Treasury
  Department's list of Specially Designated Nationals or face any
  other similar prohibition.

- You will comply with these Terms and all applicable local, state,
  national, and international laws, rules, and regulations.

If you are using the Services on behalf of a business or some other
entity, you state that you are authorized to grant all licenses set forth in
these Terms and to agree to these Terms on behalf of the business or
entity. If you are using the Services on behalf of an entity of the U.S.
Government, you agree to the Amendment to Snap Inc. Terms of
Service for U.S. Government Users.

## 2. Rights We Grant You

Snap Inc. grants you a personal, worldwide, royalty-free, non-
assignable, nonexclusive, revocable, and non-sublicensable license to
access and use the Services. This license is for the sole purpose of
letting you use and enjoy the Services' benefits in a way that these

Terms and our usage policies, such as our Community Guidelines, allow.

Any software that we provide you may automatically download and install upgrades, updates, or other new features. You may be able to adjust these automatic downloads through your device's settings.

You may not copy, modify, distribute, sell, or lease any part of our Services, nor may you reverse engineer or attempt to extract the source code of that software, unless laws prohibit these restrictions or you have our written permission to do so.

## 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

We call Story submissions that are set to be viewable by Everyone as well as content you submit to crowd-sourced Services, including Our Story, "Public Content." For all content you submit to the Services other than Public Content, you grant Snap Inc. and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, use, display, reproduce, modify, adapt, edit, publish, and distribute that content. This license is for the limited purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones.

Because Public Content is inherently public and chronicles matters of public interest, the license you grant us for this content is broader. In addition to granting us the rights mentioned in the previous paragraph, you also grant us a perpetual license to create derivative works from,

promote, exhibit, broadcast, syndicate, sublicense, publicly perform, and publicly display Public Content in any form and in any and all media or distribution methods (now known or later developed). To the extent it's necessary, when you appear in, create, upload, post, or send Public Content, you also grant Snap Inc., our affiliates, and our business partners the unrestricted, worldwide, perpetual right and license to use your name, likeness, and voice, including in connection with commercial or sponsored content. This means, among other things, that you will not be entitled to any compensation from Snap Inc., our affiliates, or our business partners if your name, likeness, or voice is conveyed through the Services, either on the Snapchat application or on one of our business partner's platforms.

For information about how to tailor who can watch your content, please take a look at our Privacy Policy and Support Site.

While we're not required to do so, we may access, review, screen, and delete your content at any time and for any reason, including to provide and develop the Services or if we think your content violates these Terms. You alone, though, remain responsible for the content you create, upload, post, send, or store through the Service.

The Services may contain advertisements. In consideration for Snap Inc. letting you access and use the Services, you agree that we, our affiliates, and our third-party partners may place advertising on the Services. Because the Services contain content that you and other users provide us, advertising may sometimes appear near your content.

We always love to hear from our users. But if you volunteer feedback or suggestions, just know that we can use your ideas without compensating you.

## 4. The Content of Others

Much of the content on our Services is produced by users, publishers, and other third parties. Whether that content is posted publicly or sent privately, the content is the sole responsibility of the person or organization that submitted it. Although Snap Inc. reserves the right to review or remove all content that appears on the Services, we do not necessarily review all of it. So we cannot—and do not—take responsibility for any content that others provide through the Services.

Through these Terms and our Community Guidelines, we make clear that we do not want the Services put to bad uses. But because we do not review all content, we cannot guarantee that content on the Services will always conform to our Terms or Guidelines.

## 5. Privacy

Your privacy matters to us. You can learn how we handle your information when you use our Services by reading our Privacy Policy. We encourage you to give the Privacy Policy a careful look because, by using our Services, you agree that Snap Inc. can collect, use, and share your information consistent with that policy.

## 6. Respecting Other People's Rights

Snap Inc. respects the rights of others. And so should you. You therefore may not use the Services, or enable anyone else to use the Services, in a manner that:

- violates or infringes someone else's rights of publicity, privacy, copyright, trademark, or other intellectual-property right.

- bullies, harasses, or intimidates.

- defames.

- spams or solicits our users.

You must also respect Snap Inc.'s rights. These Terms do not grant you any right to do any of the following (or enable anyone else to do so):

- use branding, logos, designs, photographs, videos, or any other materials used in our Services.

- copy, archive, download, upload, distribute, syndicate, broadcast, perform, display, make available, or otherwise use any portion of the Services or the content on the Services except as set forth in these Terms.

- use the Services, any tools provided by the Services, or any content on the Services for any commercial purposes without our consent.

In short: You may not use the Services or the content on the Services in ways that are not authorized by these Terms. Nor may you help anyone else in doing so.

# 7. Respecting Copyright

Snap Inc. honors the requirements set forth in the Digital Millennium Copyright Act. We therefore take reasonable steps to expeditiously remove from our Services any infringing material that we become aware of. And if Snap Inc. becomes aware that one of its users has repeatedly infringed copyrights, we will take reasonable steps within our power to terminate the user's account.

We make it easy for you to report suspected copyright infringement. If you believe that anything on the Services infringes a copyright that you own or control, please fill out this form. Or you may file a notice with our designated agent:

Snap Inc.
Attn: Copyright Agent
63 Market Street

Venice, CA 90291
email: copyright@snap.com

If you file a notice with our Copyright Agent, it must comply with the requirements set forth at 17 U.S.C. § 512(c)(3). That means the notice must:

- contain the physical or electronic signature of a person authorized to act on behalf of the copyright owner.

- identify the copyrighted work claimed to have been infringed.

- identify the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed, or access to which is to be disabled, and information reasonably sufficient to let us locate the material.

- provide your contact information, including your address, telephone number, and an email address.

- provide a personal statement that you have a good-faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

- provide a statement that the information in the notification is accurate and, under penalty of perjury, that you are authorized to act on behalf of the copyright owner.

## 8. Safety

We try hard to keep our Services a safe place for all users. But we can't guarantee it. That's where you come in. By using the Services, you agree that:

- You will not use the Services for any purpose that is illegal or prohibited in these Terms.

- You will not use any robot, spider, crawler, scraper, or other automated means or interface to access the Services or extract other user's information.

- You will not use or develop any third-party applications that interact with the Services or other users' content or information without our written consent.

- You will not use the Services in a way that could interfere with, disrupt, negatively affect, or inhibit other users from fully enjoying the Services, or that could damage, disable, overburden, or impair the functioning of the Services.

- You will not use or attempt to use another user's account, username, or password without their permission.

- You will not solicit login credentials from another user.

- You will not post content that contains or links to pornography, graphic violence, threats, hate speech, or incitements to violence.

- You will not upload viruses or other malicious code or otherwise compromise the security of the Services.

- You will not attempt to circumvent any content-filtering techniques we employ, or attempt to access areas or features of the Services that you are not authorized to access.

- You will not probe, scan, or test the vulnerability of our Services or any system or network.

- You will not encourage or promote any activity that violates these Terms.

We also care about your safety while using our Services. So do not use our Services in a way that would distract you from obeying traffic or safety laws. For example, never Snap and drive. And never put yourself or others in harm's way just to capture a Snap.

# 9. Your Account

You are responsible for any activity that occurs in your Snapchat account. So it's important that you keep your account secure. One way to do that is to select a strong password that you don't use for any other account.

By using the Services, you agree that, in addition to exercising common sense:

- You will not create more than one account for yourself.

- You will not create another account if we have already disabled your account, unless you have our written permission to do so.

- You will not buy, sell, rent, or lease access to your Snapchat account, Snaps, a Snapchat username, or a friend link without our written permission.

- You will not share your password.

- You will not log in or attempt to access the Services through unauthorized third-party applications or clients.

If you think that someone has gained access to your account, please immediately reach out to Snapchat Support.

# 10. Memories

Memories is our data-storage service that makes it easier for you to reminisce anytime, anywhere. By agreeing to these Terms, you automatically enable Memories. Once Memories is enabled, it will remain enabled for as long as you maintain your Snapchat account. But you can always turn off certain Memories features through Settings.

One of the options we provide with Memories is the ability to create a restricted area by setting a passcode, which might be a PIN or a

passphrase or some other mechanism. This is similar to the device-lock option you may be using on your mobile device; by setting a passcode, you make it less likely that another person who gets ahold of your device will be able to see what you saved to the restricted area of Memories. But here's a big warning: IF YOU LOSE OR FORGET YOUR MEMORIES PASSCODE, OR IF YOU ENTER THE WRONG ONE TOO MANY TIMES, YOU WILL LOSE ACCESS TO ANY CONTENT YOU SAVED IN THE RESTRICTED AREA OF MEMORIES. We don't offer any passcode recovery features for this restricted area. You are solely responsible for remembering your passcode. Please go to our Support Site for more details on passcodes.

Your content in Memories might become unavailable for any number of reasons, including things like an operational glitch or a decision on our end to terminate your account. Since we can't promise that your content will always be available, we recommend keeping a separate copy of content you save to Memories.

We make no promise that Memories will be able to accommodate your precise storage needs. We reserve the right to set storage limits for Memories, and we may change these limits from time to time in our sole discretion. And just as with our other Services, your use of Memories may take up space on your device and may incur mobile data charges.

You may not resell any Memories features. This means you can't do something like use Memories to operate your own file-storage or distribution service for other people.

## 11. Data Charges and Mobile Phones

You are responsible for any mobile charges that you may incur for using our Services, including text-messaging and data charges. If

you're unsure what those charges may be, you should ask your service provider before using the Services.

If you change or deactivate the mobile phone number that you used to create a Snapchat account, you must update your account information through Settings within 72 hours to prevent us from sending to someone else messages intended for you.

## 12. Third-Party Services

If you use a service, feature, or functionality that is operated by a third party and made available through our Services (including Services we jointly offer with the third party), each party's terms will govern the respective party's relationship with you. Snap Inc. is not responsible or liable for a third party's terms or actions taken under the third party's terms.

## 13. Modifying the Services and Termination

We're relentlessly improving our Services and creating new ones all the time. That means we may add or remove features, products, or functionalities, and we may also suspend or stop the Services altogether. We may take any of these actions at any time, and when we do, we may not provide you with any notice beforehand.

While we hope you remain a lifelong Snapchatter, you can terminate these Terms at any time and for any reason by deleting your account.

Snap Inc. may also terminate these Terms with you at any time, for any reason, and without advanced notice. That means that we may stop providing you with any Services, or impose new or additional limits on your ability to use our Services. For example, we may deactivate your account due to prolonged inactivity, and we may reclaim your username at any time for any reason.

Regardless of who terminates these Terms, both you and Snap Inc. continue to be bound by Sections 3, 6, 9, 10, and 13-22 of the Terms.

## 14. Indemnity

You agree, to the extent permitted by law, to indemnify, defend, and hold harmless Snap Inc., our affiliates, directors, officers, stockholders, employees, licensors, and agents from and against any and all complaints, charges, claims, damages, losses, costs, liabilities, and expenses (including attorneys' fees) due to, arising out of, or relating in any way to: (a) your access to or use of the Services; (b) your content; and (c) your breach of these Terms.

## 15. Disclaimers

We try to keep the Services up and running and free of annoyances. But we make no promises that we will succeed.

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE" AND TO THE EXTENT PERMITTED BY LAW WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. IN ADDITION, WHILE SNAP INC. ATTEMPTS TO PROVIDE A GOOD USER EXPERIENCE, WE DO NOT REPRESENT OR WARRANT THAT: (A) THE SERVICES WILL ALWAYS BE SECURE, ERROR-FREE, OR TIMELY; (B) THE SERVICES WILL ALWAYS FUNCTION WITHOUT DELAYS, DISRUPTIONS, OR IMPERFECTIONS; OR (C) THAT ANY CONTENT, USER CONTENT, OR INFORMATION YOU OBTAIN ON OR THROUGH THE SERVICES WILL BE TIMELY OR ACCURATE.

SNAP INC. TAKES NO RESPONSIBILITY AND ASSUMES NO LIABILITY FOR ANY CONTENT THAT YOU, ANOTHER USER, OR A THIRD PARTY CREATES, UPLOADS, POSTS, SENDS, RECEIVES, OR STORES ON OR

THROUGH OUR SERVICES. YOU UNDERSTAND AND AGREE THAT YOU MAY BE EXPOSED TO CONTENT THAT MIGHT BE OFFENSIVE, ILLEGAL, MISLEADING, OR OTHERWISE INAPPROPRIATE, NONE OF WHICH SNAP INC. WILL BE RESPONSIBLE FOR.

## 16. Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY LAW, SNAP INC. AND OUR MANAGING MEMBERS, SHAREHOLDERS, EMPLOYEES, AFFILIATES, LICENSORS, AGENTS, AND SUPPLIERS WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR MULTIPLE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM: (A) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (B) THE CONDUCT OR CONTENT OF OTHER USERS OR THIRD PARTIES ON OR THROUGH THE SERVICES; OR (C) UNAUTHORIZED ACCESS, USE, OR ALTERATION OF YOUR CONTENT, EVEN IF SNAP INC. HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SNAP INC.'S AGGREGATE LIABILITY FOR ALL CLAIMS RELATING TO THE SERVICES EXCEED THE GREATER OF $100 USD OR THE AMOUNT YOU PAID SNAP INC., IF ANY, IN THE LAST 12 MONTHS.

## 17. Arbitration, Class-Action Waiver, and Jury Waiver

PLEASE READ THE FOLLOWING PARAGRAPHS CAREFULLY BECAUSE THEY REQUIRE YOU AND SNAP INC. TO AGREE TO RESOLVE ALL DISPUTES BETWEEN US THROUGH BINDING INDIVIDUAL ARBITRATION.

a. Applicability of Arbitration Agreement. You and Snap Inc. agree that all claims and disputes (whether contract, tort, or otherwise), including all statutory claims and disputes, arising out of or relating

to these Terms or the use of the Services that cannot be resolved in small claims court will be resolved by binding arbitration on an individual basis, except that you and Snap Inc. are not required to arbitrate any dispute in which either party seeks equitable relief for the alleged unlawful use of copyrights, trademarks, trade names, logos, trade secrets, or patents. To be clear: The phrase "all claims and disputes" also includes claims and disputes that arose between us before the effective date of these Terms.

b. Arbitration Rules. The Federal Arbitration Act governs the interpretation and enforcement of this dispute-resolution provision. Arbitration will be initiated through the American Arbitration Association ("AAA") and will be governed by the AAA Consumer Arbitration Rules, available here as of the date of these Terms, or by calling the AAA at 1-800-778-7879. If the AAA is not available to arbitrate, the parties will select an alternative arbitral forum. The rules of the arbitral forum will govern all aspects of this arbitration, except to the extent those rules conflict with these Terms. The arbitration will be conducted by a single neutral arbitrator. Any claims or disputes where the total amount sought is less than $10,000 USD may be resolved through binding non-appearance-based arbitration, at the option of the party seeking relief. For claims or disputes where the total amount sought is $10,000 USD or more, the right to a hearing will be determined by the arbitral forum's rules. Any judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction.

c. Additional Rules for Non-appearance Arbitration. If non-appearance arbitration is elected, the arbitration will be conducted by telephone, online, written submissions, or any combination of the three; the specific manner will be chosen by the party initiating the arbitration. The arbitration will not involve any personal appearance by the parties or witnesses unless the parties mutually agree otherwise.

d. Fees. If you choose to arbitrate with Snap Inc., you will not have to pay any fees to do so. That is because Snap Inc. will reimburse you for your filing fee and the AAA's Consumer Arbitration Rules provide that any hearing fees and arbitrator compensation are our responsibility. To the extent another arbitral forum is selected, Snap Inc. will pay that forum's fees as well.

e. Authority of the Arbitrator. The arbitrator will decide the jurisdiction of the arbitrator and the rights and liabilities, if any, of you and Snap Inc. The dispute will not be consolidated with any other matters or joined with any other cases or parties. The arbitrator will have the authority to grant motions dispositive of all or part of any claim or dispute. The arbitrator will have the authority to award monetary damages and to grant any non-monetary remedy or relief available to an individual under law, the arbitral forum's rules, and the Terms. The arbitrator will issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The arbitrator has the same authority to award relief on an individual basis that a judge in a court of law would have. The award of the arbitrator is final and binding upon you and Snap Inc.

f. Waiver of Jury Trial. YOU AND SNAP INC. WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY. You and Snap Inc. are instead electing to have claims and disputes resolved by arbitration. Arbitration procedures are typically more limited, more efficient, and less costly than rules applicable in court and are subject to very limited review by a court. In any litigation between you and Snap Inc. over whether to vacate or enforce an arbitration award, YOU AND SNAP INC. WAIVE ALL RIGHTS TO A JURY TRIAL, and elect instead to have the dispute be resolved by a judge.

g. Waiver of Class or Consolidated Actions. ALL CLAIMS AND DISPUTES WITHIN THE SCOPE OF THIS ARBITRATION AGREEMENT MUST BE ARBITRATED OR LITIGATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS. CLAIMS OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR LITIGATED JOINTLY OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER. If, however, this waiver of class or consolidated actions is deemed invalid or unenforceable, neither you nor we are entitled to arbitration; instead all claims and disputes will be resolved in a court as set forth in Section 18.

h. Right to Waive. Any rights and limitations set forth in this arbitration agreement may be waived by the party against whom the claim is asserted. Such waiver will not waive or affect any other portion of this arbitration agreement.

i. Opt-out. You may opt out of this arbitration agreement. If you do so, neither you nor Snap Inc. can force the other to arbitrate. To opt out, you must notify Snap Inc. in writing no later than 30 days after first becoming subject to this arbitration agreement. Your notice must include your name and address, your Snapchat username and the email address you used to set up your Snapchat account (if you have one), and an unequivocal statement that you want to opt out of this arbitration agreement. You must either mail your opt-out notice to this address: Snap Inc., ATTN: Arbitration Opt-out, 63 Market Street, Venice, CA 90291, or email the opt-out notice to arbitration-opt-out@snap.com.

j. Small Claims Court. Notwithstanding the foregoing, either you or Snap Inc. may bring an individual action in small claims court.

k. Arbitration Agreement Survival. This arbitration agreement will survive the termination of your relationship with Snap Inc.

# 18. Exclusive Venue

To the extent that these Terms allow you or Snap Inc. to initiate litigation in a court, both you and Snap Inc. agree that all claims and disputes (whether contract, tort, or otherwise), including statutory claims and disputes, arising out of or relating to the Terms or the use of the Services will be litigated exclusively in the United States District Court for the Central District of California. If, however, that court would lack original jurisdiction over the litigation, then all such claims and disputes will be litigated exclusively in the Superior Court of California, County of Los Angeles. You and Snap Inc. consent to the personal jurisdiction of both courts.

## 19. Choice of Law

Except to the extent they are preempted by U.S. federal law, the laws of California, other than its conflict-of-laws principles, govern these Terms and any claims and disputes (whether contract, tort, or otherwise) arising out of or relating to these Terms or their subject matter.

## 20. Severability

If any provision of these Terms is found unenforceable, then that provision will be severed from these Terms and not affect the validity and enforceability of any remaining provisions.

## 21. Additional Terms for Specific Services

Given the breadth of our Services, we sometimes need to craft additional terms and conditions for specific Services. Those additional terms and conditions, which will be available with the relevant Services, then become part of your agreement with us if you use those Services. If any part of those additional terms and conditions conflicts with these Terms, the additional terms and conditions will prevail.

## 22. Final Terms

- These Terms (together with any additional terms applicable to specific Services you use) make up the entire agreement between you and Snap Inc., and supersede any prior agreements.

- These Terms do not create or confer any third-party beneficiary rights.

- If we do not enforce a provision in these Terms, it will not be considered a waiver.

- We reserve all rights not expressly granted to you.

- You may not transfer any of your rights or obligations under these Terms without our consent.

## Contact Us

Snap Inc. welcomes comments, questions, concerns, or suggestions. Please send us feedback by visiting https://support.snapchat.com/.

Snap Inc. is located in the United States at 63 Market Street, Venice, California 90291.

---

# Snap Group Limited Terms of Service

(If you live outside the United States)
Effective: May 15, 2018

## Welcome!

We've drafted these Terms of Service (which we call the "Terms") so you'll know the rules that govern our relationship with you. Although

we have tried our best to strip the legalese from the Terms, there are places where these Terms may still read like a traditional contract. There's a good reason for that: these Terms do indeed form a legally binding contract between you and Snap Group Limited. So please read them carefully.

In order to use Snapchat or any of our other products or services that link to these Terms (we refer to these simply as the "Services"), you must have accepted our Terms and Privacy Policy, which are presented to you (i) when you first open the app and (ii) when we make any material changes to the Terms or the Privacy Policy. Of course, if you don't accept them, then don't use the Services.

These Terms apply to you if you live outside the United States or if you are using the Services on behalf of a business located outside the United States. If you live in the United States or are using the Services on behalf of a business located there, the Snap Inc. Terms of Service apply.

**ARBITRATION NOTICE: IF YOU'RE USING THE SERVICES ON BEHALF OF A BUSINESS, THEN YOUR BUSINESS WILL BE BOUND BY THE ARBITRATION CLAUSE THAT APPEARS LATER IN THESE TERMS.**

## 1. Who can use the Services

No one under 13 is allowed to create an account or use the Services. We may offer additional Services with additional terms that may require you to be even older to use them. So please read all terms carefully.

By using the Services, you state that:

- you can form a binding contract with Snap Group Limited.
- you are not a person who is barred from receiving the Services under the laws of the United States, the United Kingdom, or any

other applicable jurisdiction—meaning that you do not appear on the U.S. Treasury Department's list of Specially Designated Nationals or face any other similar prohibition.

- you will comply with these Terms and all applicable local, state, national, and international laws, rules, and regulations.

If you are using the Services on behalf of a business or some other entity, you state that you are authorised to grant all licences set out in these Terms and to agree to these Terms on behalf of the business or entity.

## 2. Rights we grant you

Snap Group Limited grants you a personal, worldwide, royalty-free, non-assignable, non-exclusive, revocable, and non-sublicensable licence to access and use the Services. This licence is for the sole purpose of letting you use and enjoy the Services' benefits in a way that these Terms and our usage policies, such as our Community Guidelines, allow.

Any software that we provide you may automatically download and install upgrades, updates, or other new features. You may be able to adjust these automatic downloads through your device's settings.

You may not copy, modify, distribute, sell, or lease any part of our Services. Nor may you reverse engineer or attempt to extract the source code of that software, unless laws prohibit these restrictions or you have our written permission to do so.

## 3. Rights you grant us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a licence to use

that content. How broad that licence is depends on which Services you use and the settings you have selected.

We call Story submissions that are set to be viewable by Everyone as well as content you submit to crowd-sourced Services, including Our Story, "Public Content." For all content you submit to the Services other than Public Content, you grant Snap Group Limited, Snap Inc. and their affiliates a worldwide, royalty-free, sublicensable, and transferable licence to host, store, use, display, reproduce, modify, adapt, edit, publish, and distribute that content for as long as you use the Services. This licence is for the limited purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones.

Because Public Content is public by nature and records matters of public interest, the licence you grant us for this content is broader. In addition to granting us the rights mentioned in the previous paragraph, you also grant us a licence to create derivative works from, promote, exhibit, broadcast, syndicate, sublicence, publicly perform and publicly display Public Content in any form and in any and all media or distribution methods (now known or later developed). To the extent it's necessary, when you appear in, create, upload, post or send Public Content, you also grant Snap Group Limited, Snap Inc. and our affiliates and business partners the unrestricted, worldwide right and licence to use your name, likeness, and voice. This means, among other things, that you will not be entitled to any compensation from Snap Group Limited, Snap Inc., or our affiliates and business partners if your name, likeness, or voice is conveyed through the Services, either on the Snapchat application or on one of our business partners' platforms.

For more information about how to tailor who can watch your content, please take a look at our Privacy Policy and Support Site.

We reserve the right to delete any content (i) which we think violates these Terms or our Community Guidelines, or (ii) if necessary to comply with our legal obligations. However, you alone, remain responsible for the content you create, upload, post, send, or store through the Services.

The Services may contain advertisements. In consideration for Snap Group Limited letting you access and use the Services, you agree that we, Snap Inc., our affiliates, and our third-party partners may place advertising on the Services, including personalised advertising based upon the information you provide us or we collect or obtain about you. Because the Services contain content that you and other users provide us, advertising may sometimes appear near, between, over, or in your content.

We always love to hear from our users. But if you volunteer feedback or suggestions, just know that we can use your ideas without compensating you.

## 4. The content of others

Much of the content on our Services is produced by users, publishers, and other third parties. Whether that content is posted publicly or sent privately, the content is the sole responsibility of the person or organisation that submitted it. Although Snap Group Limited reserves the right to review all content that appears on the Services and to remove any content that violates these Terms, our Community Guidelines or the law, we do not necessarily review all of it.

Through these Terms and our Community Guidelines, we make clear that we don't want the Services to be put to bad uses. But because we don't review all content, we cannot guarantee that content on the Services will always conform to our Terms or Guidelines.

## 5. Privacy

Your privacy matters to us. You can learn how your information is handled when you use our Services by reading the Privacy Policy.

## 6. Respecting other people's rights

Snap Group Limited respects the rights of others. And so should you. You therefore may not use the Services, or enable anyone else to use the Services, in a manner that:

- violates or infringes someone else's rights of publicity, privacy, copyright, trademark, or other intellectual-property right;

- bullies, harasses, or intimidates;

- defames;

- spams or solicits our users.

You must also respect the rights of Snap Group Limited and its affiliates, including Snap Inc. These Terms do not grant you any right to do any of the following (or enable anyone else do so):

- use branding, logos, designs, photographs, videos, or any other materials used in our Services;

- copy, archive, download, upload, distribute, syndicate, broadcast, perform, display, make available, or otherwise use any portion of the Services or the content on the Services except as authorised in these Terms;

- use the Services, any tools provided by the Services, or any content on the Services for any commercial purposes without our consent.

## 7. Respecting copyright

We respect copyright law. We therefore take reasonable steps to expeditiously remove from our Services any infringing material that we become aware of. And if Snap Group Limited becomes aware that one of its users has repeatedly infringed copyrights, we will take reasonable steps within our power to terminate the user's account.

We make it easy for you to report suspected copyright infringement. If you believe that anything on the Services infringes a copyright that you own or control, please fill out this form. Or you may file a notice with our designated agent:

Snap Inc.
Attn: Copyright Agent
63 Market Street
Venice, CA 90291
email: copyright@snap.com

If you file a notice with our Copyright Agent, it must:

- contain the physical or electronic signature of a person authorised to act on behalf of the copyright owner;

- identify the copyrighted work claimed to have been infringed;

- identify the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed, or access to which is to be disabled, and information reasonably sufficient to let us locate the material;

- provide your contact information, including your address, telephone number, and an email address;

- provide a personal statement that you have a good-faith belief that the use of the material in the manner complained of is not authorised by the copyright owner, its agent, or the law;

provide a statement that the information in the notification is accurate and, under penalty of perjury, that you are authorised to act on behalf of the copyright owner.

## 8. Safety

We try hard to keep our Services a safe place for all users. But we can't guarantee it. That's where you come in. By using the Services, you agree that:

- You will not use the Services for any purpose that is illegal or prohibited in these Terms.

- You will not use any robot, spider, crawler, scraper, or other automated means or interface to access the Services or extract other users' information.

- You will not use or develop any third-party applications that interact with the Services or other users' content or information without our written consent.

- You will not use the Services in a way that could interfere with, disrupt, affect negatively, or inhibit other users from fully enjoying the Services, or that could damage, disable, overburden, or impair the functioning of the Services.

- You will not use or attempt to use another user's account, username, or password without their permission.

- You will not solicit login credentials from another user.

- You will not post content that contains pornography, graphic violence, threats, hate speech, or incitements to violence.

- You will not upload viruses or other malicious code or otherwise compromise the security of the Services.

- You will not attempt to circumvent any content-filtering techniques we employ, or attempt to access areas or features of the Services that you are not authorised to access.

- You will not probe, scan, or test the vulnerability of our Services or any system or network.

- You will not encourage or promote any activity that violates these Terms.

We also care about your safety while using our Services. So do not use our Services in a way that would distract you from obeying traffic or safety laws. For example, never Snap and drive. And never put yourself or others in harm's way just to capture a Snap.

## 9. Your account

You are responsible for any activity that occurs in your Snapchat account. So it's important that you keep your account secure. One way to do that is to select a strong password that you don't use for any other account.

By using the Services, you agree that, in addition to exercising common sense:

- You will not create more than 1 account for yourself.

- You will not create another account if we have already disabled your account, unless you have our written permission to do so.

- You will not buy, sell, rent or lease access to your Snapchat account, Snaps, a Snapchat username or a friend link without our written permission.

- You will not share your password.

- You will not log in or attempt to access the Services through unauthorised third-party applications or clients.

If you think that someone has gained access to your account, please reach out immediately to Snapchat Support.

# 10. Memories

Memories is our data-storage service that makes it easier for you to reminisce anytime, anywhere. By agreeing to these Terms, you automatically enable Memories. Once Memories is enabled, it will remain enabled for as long as you maintain your Snapchat account. But you can always turn off certain Memories features through Settings.

One of the options we provide with Memories is the ability to create a restricted area by setting a passcode, which might be a PIN or a passphrase or some other mechanism. This is similar to the device-lock option you may be using on your mobile device; by setting a passcode, you make it less likely that another person who gets hold of your device will be able to see what you saved to the restricted area of Memories. But here's a big warning: **if you lose or forget your Memories passcode, or if you enter the wrong one too many times, you will lose access to any content you saved in the restricted area of Memories**. We don't offer any passcode recovery features for this restricted area. You are solely responsible for remembering your passcode. Please go to our Support Site for more details on passcodes.

Your content in Memories might become unavailable for any number of reasons, including things such as an operational glitch or a decision to terminate your account at our end. As we can't promise that your content will always be available, we recommend keeping a separate copy of the content you save to Memories.

We make no promise that Memories will be able to accommodate your precise storage needs. We reserve the right to set storage limits for Memories, and we may change these limits from time to time at our sole discretion. And just as with our other Services, your use of

Memories may take up space on your device and may incur mobile data charges.

You may not resell any Memories features. This means you can't do something like use Memories to operate your own file-storage or distribution service for other people.

## 11. Data charges and mobile phones

You are responsible for any mobile charges that you may incur for using our Services, including text-messaging and data charges. If you're unsure what those charges may be, you should ask your service provider before using the Services.

If you change or deactivate the mobile phone number that you used to create a Snapchat account, you must update your account information through Settings within 72 hours to prevent us from sending to someone else messages intended for you.

## 12. Third-party services

If you use a service, feature or functionality that is operated by a third party and made available through our Services (including Services we offer jointly with the third party), each party's terms will govern the respective party's relationship with you. Neither Snap Group Limited nor Snap Inc. is responsible or liable for a third party's terms or actions taken under the third party's terms.

## 13. Modifying the Services and termination

We're relentlessly improving our Services and creating new ones all the time. This means that we may add or remove features, products, or functionalities, and we may also suspend or stop the Services altogether. We may take any of these actions at any time, and when we

do, we will try to notify you beforehand - but this won't always be possible.

Though we hope you remain a lifelong Snapchatter, you can terminate these Terms at any time and for any reason by deleting your account.

Snap Group Limited may also terminate these Terms with you if you fail to comply with these Terms, our Community Guidelines or the law, or for any reason outside of our control. And while we'll try to give you advance notice, we can't guarantee it. Our right to terminate these Terms means that we may stop providing you with any Services, or impose new or additional limits on your ability to use the Services. For example, we may deactivate your account due to prolonged inactivity, and we may reclaim your username at any time for any reason.

Regardless of who terminates these Terms, both you and Snap Group Limited continue to be bound by Sections 3, 6, 9, 10 and 13-22 of the Terms.

## 14. Indemnity

You agree, to the extent permitted by law, to indemnify, defend and hold harmless Snap Group Limited, Snap Inc. and our affiliates, directors, officers, stockholders, employees, licensors, suppliers, and agents from and against any complaints, charges, claims, damages, losses, costs, liabilities and expenses (including attorneys' fees) due to, arising out of, or relating in any way to: (a) your access to or use of the Services; (b) your content; and (c) your breach of these Terms.

## 15. Disclaimers

We try to keep the Services up and running and free of annoyances. But we cannot promise that we will always succeed.

The Services are provided "as is" and "as available" and to the extent permitted by law without warranties of any kind, either express or implied, including, in particular implied warranties, conditions, or other terms relating to (i) merchantability, satisfactory quality, fitness for a particular purpose, title, quiet enjoyment, non-infringement, or (ii) arising from a course of dealing. In addition, while Snap Group Limited attempts to provide a good user experience, we do not represent or warrant that: (a) the Services will always be secure, error-free or timely; (b) the Services will always function without delays, disruption or imperfections; or (c) that any content or information you obtain through the Services will be timely or accurate.

IF THE LAW OF THE COUNTRY WHERE YOU LIVE DOES NOT ALLOW THE EXCLUSIONS OF LIABILITY PROVIDED FOR IN THIS CLAUSE, THOSE EXCLUSIONS SHALL NOT APPLY.

Snap Group Limited, Snap Inc., and their affiliates take no responsibility and assume no liability for any content that you, another user, or a third party creates, uploads, posts, sends, receives, or stores on or through our Services. You understand and agree that you may be exposed to content that might be offensive, illegal, misleading, or otherwise inappropriate, none of which Snap Group Limited, Snap Inc., nor their affiliates will be responsible for.

Nothing in these Terms will exclude or limit any responsibility we may have to remove content if so required by the law of the country where you live.

## 16. Limitation of liability

Snap Group Limited, Snap Inc. and our affiliates, directors, officers, stockholders, employees, licensors, suppliers, and agents will not be liable for any indirect, incidental, special, consequential, punitive, or multiple damages, or any loss of profits or revenues, whether incurred

directly or indirectly, or any loss of data, use, goodwill or other intangible losses, resulting from: (a) your use of the Services or inability to use the Services; (b) your access to or inability to access the Services; (c) the conduct or content of other users or third parties on or through the Services; or (d) unauthorised access, use or alteration of your content. In no event will Snap Group Limited, Snap Inc. or their affiliates' aggregate liability for all claims relating to the Services exceed the greater of €100 EUR or the amount you paid Snap Group Limited in the last 12 months for any paid Services.

IF THE LAW OF THE COUNTRY WHERE YOU LIVE DOES NOT ALLOW ANY LIMITATION OF LIABILITY PROVIDED FOR IN THIS CLAUSE, THAT LIMITATION WILL NOT APPLY.

## 17. Dispute resolution, arbitration

If you have a concern, let's talk. Go ahead and contact us first and we'll do our best to resolve the issue.

Some of our Services may have additional terms that contain dispute-resolution provisions unique to that Service or your residency.

If you are using the Services on behalf of a business (rather than for your personal use), you and Snap Group Limited agree that to the extent permitted by law, all claims and disputes between us arising out of or relating to these Terms or the use of the Services will be finally settled under the LCIA Arbitration Rules, which are incorporated by reference into this clause. There will be one arbitrator (to be appointed by the LCIA), the arbitration will take place in London, and the arbitration will be conducted in English. If you do not wish to agree to this clause, you must not use the Services.

## 18. Exclusive venue

To the extent the parties are permitted under these Terms to initiate litigation in a court, both you and Snap Group Limited agree that all claims and disputes (whether contractual or otherwise) arising out of or relating to the Terms or the use of the Services will be litigated exclusively in the courts of England in the United Kingdom, unless this is prohibited by the laws of the country where you reside. You and Snap Group Limited consent to the exclusive jurisdiction of those courts.

## 19. Choice of law

The laws of England and Wales govern these Terms and any claims and disputes (whether contractual or otherwise) arising out of or relating to these Terms or their subject matter. The courts in some countries may not apply the laws of England and Wales to some disputes related to these Terms. If you reside in one of those countries, the laws of your home country may apply to those disputes.

## 20. Severability

If any provision of these Terms is found unenforceable, then that provision will be severed from these Terms and not affect the validity and enforceability of any remaining provisions.

## 21. Additional terms for specific Services

Given the breadth of our Services, we sometimes need to craft additional terms and conditions for specific Services. Those additional terms and conditions, which will be presented to you before you access the relevant Services, then become part of your agreement with us when you accept them. If any part of those additional terms and conditions conflicts with these Terms, the additional terms and conditions will prevail.

## 22. Final terms

- These Terms make up the entire agreement between you and Snap Group Limited and supersede any prior agreements.

- These Terms do not create or confer any third-party beneficiary rights.

- If we do not enforce a provision in these Terms, it will not be considered a waiver.

- We reserve all rights not expressly granted to you.

- You may not transfer any of your rights or obligations under these Terms without our consent.

## Contact us

Snap Group Limited welcomes comments, questions, concerns, or suggestions. You can send us feedback or get support by using this online form.

The company responsible for the Services outside the United States is called Snap Group Limited and is located in the United Kingdom at 7-11 Lexington Street, London W1F 9AF, United Kingdom. Registered company number: 09763672. Authorised representative: David Lewis, Director. VAT ID: GB 237218316.

Privacy Policy

Terms of Service

Other Terms & Policies

English (US)

© 2019 Snap Inc.